**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PLAINTIFF JOSEPH LURENZ, individually and on behalf of all others similarly situated, | Docket No. 7:22-cv-10941-NSR |
| Plaintiff, | |
| v. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| THE COCA-COLA COMPANY and THE SIMPLY ORANGE JUICE COMPANY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Joseph Lurenz ("Plaintiff") brings this Class Action Complaint against Defendants The Coca-Cola Company and The Simply Orange Juice Company (collectively, "Defendants"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

<u>**NATURE OF THE ACTION**</u>

1.      Plaintiff brings this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Simply Tropical juice drink (the "Product"[1]), which is prominently labeled as an "All Natural" juice drink. In reality, Plaintiff's testing has revealed that the Product contains per- and polyfluoralkyl substances ("PFAS"), a category of synthetic chemicals that are, by definition, not natural.

---

[1] As alleged herein, Defendant conceals the presence of PFAS in the Product. Accordingly, discovery will reveal the exhaustive list of substantially similar Simply juice products that are included in this action.

2.      PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[2]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

4.      Defendants formulate, manufacture, market, and sell the Product, which they uniformly represent as an "All Natural" juice drink that is "made simply" with "all-natural ingredients."[4]

---

[2] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.

[3] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/ (last visited Aug. 15, 2022).

[4] https://www.drinksimplybeverages.com/products/juice-drinks/tropical-juice-drink



5.      Defendants have engaged in tireless marketing efforts to convince consumers that its Simply beverages, including the Product at issue, are made with simple ingredients that are "naturally delicious."[5]

6.      As one of the most widely recognized brands in the world, The Coca-Cola Company knows the importance of marketing and labeling, including the value of the label representations they carefully choose for placement on the Product.

7.      Defendants' uniform marketing, which extends to the incorporation of the word "Simply" into the Product's brand name, is intentionally designed to drive sales and increase profits by targeting health-conscious consumers who reasonably believe that the Product is all-natural and therefore free from synthetic or artificial ingredients which are known to be harmful to human health.

8.      However, despite Defendants' consistent and pervasive marketing representations to consumers that their Product is a healthy, all-natural juice drink, Plaintiff's independent testing has determined that the Product actually contains PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

9.      The presence of PFAS is entirely inconsistent with Defendants' uniform representations that the Product only contains only "all-natural ingredients" with "nothing to hide."[6]

10.     As a result of Defendants' misconduct, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

---

[5] https://www.drinksimplybeverages.com/our-story
[6] https://www.drinksimplybeverages.com/products/juice-drinks/tropical-juice-drink

11.     Accordingly, Plaintiff brings his claims against Defendants individually and on behalf of a Class of all others similarly situated for (1) violation of New York Gen. Bus. Law § 349, *et seq.*; (2) violation of New York Gen. Bus. Law § 350, *et seq.*; (3) breach of express warranty; (4) fraud; (5) constructive fraud; and (6) unjust enrichment.

## PARTIES

### A. Plaintiff

12.     Plaintiff Joseph Lurenz is a resident of Dutchess County, New York and was, at all times relevant hereto, a citizen of New York.

### B. Defendants

13.     Defendant The Coca-Cola Company is a beverage corporation that manufactures, sells, and markets, *inter alia*, ready to drink beverages across more than 200 different brands. The Coca-Cola Company's corporate headquarters is located in Atlanta, Georgia.

14.     Defendant The Simply Orange Juice Company is a wholly owned subsidiary of The Coca-Cola Company with its corporate headquarters located in Apopka, Florida. At all times relevant to this action, The Coca-Cola Company had authority and control over The Simply Orange Juice Company including its marketing and advertising campaigns.

## JURISDCTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (2) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (3) there is minimal diversity because a Plaintiff and Defendants are citizens of different states.

16.     This Court has personal jurisdiction over the Defendants because they transact business in this state and district, have substantial aggregate contacts with this state and district, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in this state and district, and because they purposefully availed themselves of the laws of the state of New York, and further because Plaintiff purchased the Product in this state and sistrict.

17.     In accordance with 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this district, including Plaintiff's purchase of the Product, because Defendants transact substantial business in this district, and because Defendants have intentionally availed themselves of the laws and markets within this district.

## FACTUAL ALLEGATIONS

### *Defendants' Business*

18.     Defendant The Simply Orange Juice Company ("Simply") was founded in 2001 as producer and seller of orange juice. Simply is a subsidiary of Defendant The Coca-Cola Company ("Coke").

19.     Over time, Simply has expanded its portfolio beyond just orange juice to include a wide variety of fruit juices, smoothies, and nut milks.

20.     Simply is currently the No. 1 chilled juice brand in the United States with more than $2 billion in annual retail sales.

21.     The North American fruit juice market  reached $35.7 billion in 2021 and is expected to grow by nearly 5% annually over the next five years.[7] As an undisputed leader in an

---

[7] https://www.imarcgroup.com/north-america-fruit-juice-market

extremely lucrative market, there is enormous incentive for Defendants to maintain their market share by meeting increasing consumer demand for safe and natural beverages that are free from artificial ingredients.

22.     In order to capitalize on this consumer demand, Simply beverages are aggressively marketed to health-focused consumers with the products' pervasive "all natural" representations prominently displayed across the products' packaging.

23.     Defendants sell the Simply beverages, which include the Product that is the subject of this litigation, at mass market retailers and grocery stores throughout the United States, including Target, Walmart, Kroger, and Publix.

***Defendants' False and Deceptive Advertising***

24.     The Product is a ready-to-drink juice which is uniformly represented as a healthy, all-natural beverage.

25.     The Product's packaging is replete with representations designed to convince consumers that it is a healthy choice, beginning with the "Simply" brand name, which intentionally utilizes the word "simply" in order to reinforce its claims that the Product is free from artificial or unnatural ingredients.

26.     The Product does not disclose the presence of PFAS—or any other synthetic chemical—in their ingredients. Rather, Defendants claim the only ingredients are filtered water, fruit juice and puree, cane sugar, and natural flavors.[8]

---

[8] https://www.drinksimplybeverages.com/products/juice-drinks/tropical-juice-drink

**INGREDIENTS**

CONTAINS PURE FILTERED WATER, PINEAPPLE JUICE, CANE SUGAR, MANGO PUREE, LEMON JUICE (FOR TARTNESS), NATURAL FLAVORS.

;NOT FROM CONCENTRATE ALL NATURAL JUICE DRINK PASTEURIZED

27.    The Product touts "Filtered Water" as its first ingredient, leading reasonable consumers to believe that additional care has been taken to remove any incidental chemicals or impurities that might otherwise contradict their natural claims.

28.    The health-focused representations are carried through to the Simply website, which reassures consumers that the Product is a healthy choice for families, including its philosophy that "the best things in life are made simply," with "simple ingredients and the great taste of Nature."[9]

29.    Defendants specifically differentiate the Product from competing products by reassuring consumers that it is made with all-natural ingredients with "nothing to hide."[10]

---

[9] https://www.drinksimplybeverages.com/our-story
[10] https://www.drinksimplybeverages.com/products/juice-drinks/tropical-juice-drink

# Simply® Juices and Drinks
# Tropical

Refreshing blends of fruity flavors. The sweet and delicious taste of tropical fruits. A fruit juice drink made simply, with natural flavors for a delicious taste. What more could you ask for? Simply Tropical delivers on the delicious and fresh taste you want from a fruit juice drink without overcomplicating it. What you see is what you get. In fact, Simply juices and juice drinks always have the "Fresh Taste Guarantee." Plus, it's all-natural without GMOs. With Simply Tropical, the difference is clear. Clear enough that you can see the all-natural ingredients inside. Because with Simply, there's nothing to hide.

30.     Beyond the Product's labeling and the Simply website, Defendants' other marketing efforts include television advertisements and a widespread digital marketing campaign which invites consumers to "Say Yes to Simple."[11] The marketing campaign is designed to appeal to younger consumers by "positioning Simply as a total beverage solution and inspiration for consumers to 'Say Yes to Simple' in their everyday lives by focusing on what matters most."[12]

31.     The Simply brand is uniformly marketed as being transparent, natural, simple in order to gain the trust of reasonable consumers who reasonably believe that the Product is free from synthetic, artificial, or otherwise unnatural ingredients which may be harmful to human health. These uniform representations continue through to Defendants' official social media channels: [13]



---

[11] https://www.coca-colacompany.com/news/Say-Yes-to-Simple-Simply-Brand-Refresh
[12] *Id*.
[13] https://www.instagram.com/p/CiSrlgGMDDl/?igshid=YTY2NzY3YTc=



32.     It is undeniable that the Product is uniformly represented across all marketing channels-- including the Product's packaging, where it cannot be missed by consumers -- as an all-natural juice drink.

***PFAS Chemicals and Associated Risks***

33.     PFAS are a category of highly persistent and potentially harmful <u>man-made chemicals</u>.[14]

---

[14] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited October 24, 2022).

34.     PFAS are <u>not naturally occurring</u>.[15] They were first developed by scientists in the 1940s.[16] Thus, they are indisputably "artificial" and not "natural."

35.     The man-made PFAS chemicals, which are in the Product, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

36.     Diet is considered a major route of PFAS exposure for humans, and reasonable consumers purchasing Product represented as natural would not expect them to contain harmful man-made chemicals, such as PFAS.[17]

37.     PFAS chemicals have been associated with a variety of negative health effects for humans and the environment.

38.     The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:"[18]

   a.   Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

   b.   Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

   c.   Increased risk of some cancers, including prostate, kidney, and testicular cancers.

   d.   Reduced ability of the body's immune system to fight infections, including
   e.   reduced vaccine response.

   f.   Interference with the body's natural hormones.

   g.   Increased cholesterol levels and/or risk of obesity.

---

[15] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (Last accessed October 24, 2022)
[16] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/ (Last accessed October 24, 2022).
[17] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (Last accessed October 24, 2022).
[18] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas

39.    A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[19]



40.    The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[20]

---

[19] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.
[20] *Id.*

41.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood development:[21]

42.     Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[22]

43.     PFAS in products which are frequently consumed by children, such as fruit juices, is particularly concerning, as children may be more sensitive to the harmful effects of chemicals such as PFAS.[23] Their immature organs and systems are more susceptible to damage, and children's ability to detoxify and eliminate toxics is variable.[24]

44.     Some of the reported health consequences of PFAS disproportionately affect children. Specifically, exposure to PFAS has been shown to affect growth, learning, and behavior in infants and older children.

45.     PFAS have also been shown to weaken children's immune systems during a critical period of development.[25]  Specifically, there is strong evidence that exposure to PFAS in infancy and early childhood diminishes childhood antibody vaccination response, as well as some indication of increased risk of childhood infectious diseases.[26]

---

[21] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021)  https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

[22] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html

[23] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (Last Accessed November 18, 2022)

[24] http://ncchild.org/wp-content/uploads/2020/02/1.22.20_PFAS-Impact-on-Children-Fact-sheet_Final-draft.pdf (Last Accessed November 18, 2022)

[25] https://www.mottchildren.org/posts/your-child/pfas-contamination; Stolber, T., "PFAS chemicals harm the immune system, decrease response to vaccines, new ewg review finds," Environmental Working Group, June 21, 2019. (Last Accessed November 18, 2022)

[26]  https://www.sciencedirect.com/science/article/pii/S2405844021022635; von Holst, H. et. al., Perfluoroalkyl

46.    In 2021, researchers found that early childhood exposure to PFAS in early life may disrupt neurodevelopment, with potential adverse impacts to children's behavior and executive function.[27]

47.    A study published in the International Journal of Environmental Research and Public Health found consistent evidence for PFAS' association with negative health outcomes in children, including dyslipidemia, renal dysfunction, and early onset of puberty.[28]

48.    It is increasingly understood that exposure to environmental chemicals during sensitive windows of development has the potential to permanently alter a child's risk of future adverse outcomes, even at doses that have little effect in adults.[29] According to children's environmental health experts, even "minuscule amounts of these exposures [to PFAS] can have serious and lifelong consequences [for children]."[30]

49.    According to the Environmental Protection Agency ("EPA"), limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[31]

---

substances exposure and immunity, allergic response, infection, and asthma in children: review of epidemiologic studies. (Last Accessed November 18, 2022)

[27] https://www.sciencedirect.com/science/article/pii/S0013935121009154; Harris, M. et. al., Prenatal and childhood exposure to per-and polyfluoroalkyl substances (PFAS) and child executive function and behavior problems. (Last Accessed November 18, 2022)

[28] *Id.*

[29] Rappazzo, Kristen M et al. "Exposure to Perfluorinated Alkyl Substances and Health Outcomes in Children: A Systematic Review of the Epidemiologic Literature." *International journal of environmental research and public health* vol. 14,7 691. 27 Jun. 2017, doi:10.3390/ijerph14070691 (Last Accessed November 18, 2022)

[30] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html (Last Accessed November 18, 2022)

[31] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (Last Accessed November 18, 2022)

50.     There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[32]

51.     Defendants are well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Product is free from artificial ingredients like PFAS.

52.     Defendants have engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Product is superior to other products that are not all natural and/or contain artificial ingredients.

53.     Reasonable consumers purchasing the Product would believe, based on Defendant's representations, that the Product does not contain artificial, synthetic or man-made chemicals that could adversely impact their health.

***Plaintiff's Independent Testing Confirms the Presence of PFAS Chemicals in the Product***

54.     Plaintiff sought independent third-party testing to determine whether the Product contained PFAS chemicals.

55.     Plaintiff's independent testing was conducted in accordance with accepted industry standards for detecting the presence of PFAS.  Plaintiff's testing was conducted on a sample collected in July of 2022.

56.     Plaintiff's testing detected material levels of multiple PFAS in the Product, including concerning levels of Perfluorooctanoic acid ("PFOA") and Perfluorooctanesulfonic acid ("PFOS").

---

[32]     https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure (Last Accessed November 18, 2022)

57.     PFOA and PFOS are two of the most well-studied types of PFAS, and they have been indisputably linked to negative health effects.[33]

58.     Human studies have found associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer. The most sensitive non-cancer effect and the basis for the updated health advisories for PFOA is suppression of vaccine response in children.[34]

59.     The EPA recently confirmed that the levels at which negative health effects could occur are much lower than previously understood– including near zero in some cases.[35]

60.     In other words, there is no "safe" level of exposure with regard to these chemicals, and even "trace" levels of PFAS can pose a risk to humans.

61.     The EPA recently tightened its lifetime health advisory levels for PFOA and PFOS exposure in drinking water.  For PFOA, the recommendation is 0.004 part per trillion (ppt) and for PFOS, 0.02 ppt.[36]

62.     However, Plaintiff's testing has revealed the Product contains PFOA and PFOS in amounts more than 100 times the EPA's recommended levels.

63.     Thus, Defendant's Product exposes hundreds of thousands of unsuspecting consumers, many of whom are children,[37] to toxic synthetic chemicals at levels far beyond what the EPA deems safe, in direct contradiction to their uniform representations.

---

[33] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html  (Last Accessed November 18, 2022)
[34]     https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q3 (Last Accessed November 18, 2022)
[35] Id.
[36] Id.
[37] In the United States, 94% of six- to eleven-year old children drink juice. See https://wellmune.com/2019/05/29/top-insights-for-childrens-beverage-market/

*Defendants' Unlawful Conduct*

64.     As the manufacturer of the Product, Defendants have exclusive control over the sourcing of the contents of the Product and of the manufacturing process.

65.     The inclusion of PFAS in the Product was detectable and was not unavoidable. Defendants should, and can, control for the PFAS chemicals which are contained in its Products.

66.     There are steps that Defendant can take to reduce or eliminate PFAS chemicals in the Products.  As the EPA notes,

> Certain technologies have been found to remove PFAS from drinking water, especially Perfluorooctanoic acid (PFOA) and Perfluorooctanesulfonic acid (PFOS), which are the most studied of these chemicals. Those technologies include activated carbon adsorption, ion exchange resins, and high-pressure membranes. These technologies can be used in drinking water treatment facilities, in water systems in hospitals or individual buildings, or even in homes at the point-of-entry, where water enters the home, or the point-of-use, such as in a kitchen sink or a shower.[38]

Additionally, studies show that UV lights can be used to degrade or eliminate PFAS chemicals. When combined with testing and processes to controls to prevent the introduction of PFAS chemicals, these methods can drastically limit the PFAS chemicals in the Products.  Yet, Defendant does not undertake these mitigation efforts and does not disclose the level of PFAS chemicals in the Products.

67.     In view of the foregoing, it is plausible that at all times relevant to this action, Defendants knew that its Product contains PFAS.

68.     At all times relevant to this action, Defendants knew, or at minimum should have known, that its Product contains PFAS.

69.     To capitalize on increasing consumer demand for "better for you" products which are free from artificial ingredients, including harmful man-made chemicals like PFAS,

---

[38] https://www.epa.gov/sciencematters/reducing-pfas-drinking-water-treatment-technologies (last visited July 10, 2023).

Defendants have knowingly and willfully deployed a concerted strategy to distinguish its Product from competing options in the highly competitive beverage industry by representing its Product as an all-natural, "simple" juice drink free from artificial or synthetic ingredients.

70.     Throughout the class period, Defendants have targeted health-conscious consumers by falsely and misleadingly representing its Product is an "All Natural" juice drink. Consequently, reasonable consumers believe the Product is free of artificial, man-made chemicals known to harm human health.

71.     Defendants are well-aware that consumers are increasingly demanding beverage options that support their wellness goals.  As far back as 2017, Coke's President and CEO James Quincey acknowledged changing consumer preferences, noting: "They're changing around ingredients...whether it be more natural, whether it be organic, whether it be just really understanding the core provenance of where the product is coming from."[39]

72.     Defendants' wellness-focused business strategy is supported by current market research. According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[40]  Consumers ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[41]

73.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.   One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said

---

[39] https://www.coca-colacompany.com/news/beverages-for-life
[40] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-topfood-safety-concern-among-consumers/ (last visited Aug. 12, 2021).
[41] *Id.*

they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[42]

74.     These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[43]

75.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[44]

76.     Therefore, current research demonstrates, and Defendants' marketing strategy supports, that the presence of harmful chemicals in food, beverages, and their packaging is material to reasonable consumers.

77.     Defendants' strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell beverages which do only contain natural ingredients, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Product.

78.     Further, Defendants' claims touting its bona fides as a company for whom "[n]othing less than 100% quality and safety is acceptable,"[45] in conjunction with the Product's conspicuous all-natural representations, further contribute to the reasonable consumer perception and belief that the Product contains only natural ingredients and is free of man-made chemicals.

---

[42]     Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Aug. 12, 2022).
[43]     Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-thegame-for-food-beverage-processors/ (last visited Aug. 12, 2022).
[44] Made Safe, "What Shoppers Want," at 3.
[45] https://www.coca-colacompany.com/policies-and-practices/quality-and-food-safety-policy

79.     Since at least 2021, Defendants have been aware that the presence of PFAS in its beverages is material to consumers.  In response to similar allegations regarding the presence of PFAS in other beverages produced by Coke, a representative for the company reassured the public that it had made changes to its manufacturing process to avoid PFAS because the safety and quality of its products is "always our top priority."[46]

80.     Accordingly, based on its own public statements, Defendants indisputably knew that the presence of PFAS posed a concern with regard to the safety of the Product.  Despite this knowledge, Defendants failed to disclose the presence of PFAS in the Product.  Such omission was material to consumers.

81.      Consumers lack the expertise to ascertain the true ingredients in the Product prior to purchase.  Accordingly, reasonable consumers must, and do rely on Defendants to accurately and honestly advertise its Product's ingredients and not contradict those representations by using artificial man-made chemicals in its Product that are known to pose a risk to human health.  Such misrepresentations are material to reasonable consumers' purchasing decisions.

82.     Defendants' representations that the Product is an all-natural juice drink, including, *inter alia*, the representations described herein, are false because products containing toxic, man-made ingredients like PFAS are not "all natural" by definition.

83.     Defendants' representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiff and Class members, regarding the presence of PFAS chemicals in its Product. Accordingly, these acts and practices by Defendants are deceptive.

---

[46] https://www.consumerreports.org/bottled-water/topo-chico-cuts-pfas-levels-by-more-than-half-a4286812129/

84.     Consumers reasonably relied on Defendants' false statements and misleading representations, and reasonably expected that Defendants' Product would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

85.     Defendants' false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Product worthless or less valuable.

86.     If Defendants had disclosed to Plaintiff and putative Class Members that its Product contained PFAS chemicals, Plaintiff and putative Class Members would not have purchased Defendants' Product or they would have paid less for it.

87.     Plaintiff and Class Members were among the intended recipients of Defendants' deceptive representations and omissions described herein.

88.     Defendants' representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

89.     The materiality of the representations described herein also establishes causation between Defendants' conduct and the injuries Plaintiff and the Class Members sustained.

90.     Defendants are aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Product using "all natural" representations in order to profit off of unsuspecting consumers, including Plaintiff and Class Members.

91.     The presence of PFAS chemicals in Defendants' Product is entirely inconsistent with its uniform representations.

92.     Defendants' knowingly false and misleading representations have the intended result of convincing reasonable consumers that its Product is without artificial, unnatural, or

otherwise synthetic ingredients and therefore do not contain man-made, toxic chemicals. No reasonable consumer would consider Defendants' Product an "all natural" healthy juice drink if they knew that the Product contained harmful, artificial PFAS chemicals.

93.     Defendants' false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

94.     In making the false, misleading, and deceptive representations, Defendants knew and intended consumers would pay a premium for the Product over comparable products that are made from or contain synthetic or artificial ingredients.

95.     Plaintiff and Class Members all paid money for the Product, however, they did not obtain the full value of the advertised Product due to Defendants' misrepresentations as detailed herein. Plaintiff and Class Members purchased, purchased more of, or paid more for, the Product than they would have had they known the truth that the Product contains artificial, man-made, and harmful chemicals. Thus, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

96.     Defendants' widespread marketing campaign portraying the Product as "all natural" as detailed herein, is misleading and deceptive to consumers because the Product contains artificial, man-made, and toxic PFAS chemicals at levels dramatically higher than exposure limits recommended by the EPA.

97.     Accordingly, Plaintiff brings this action on behalf of the proposed Classes to stop Defendants' misleading practices.

***PFAS Renders the Products Adulterated, Misbranded and Illegal to Sell***

98.     The Product is used as a drink for humans and is therefore a "food" which is regulated by the U.S. Food and Drug Administration. *See* 21 U.S.C. § 321(f).

99.     The Federal Food, Drug & Cosmetic Act ("FDCA") establishes numerous regulations regarding the safety of food which is sold to consumers, including by creating various labeling requirements.

100.    Under the FDCA, a food is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to health." *See* 21 U.S.C. § 342(a)(1). Even in the event that a poisonous or deleterious substance is not an "added" substance (such as in the case of unintended contamination), food is still deemed adulterated if the quantity of the substance renders it injurious to health. *Id*.

101.    As detailed herein, PFAS, and specifically the PFOA found in Defendant's Product, is indisputably linked to negative health consequences and is therefore a "poisonous or deleterious substance."

102.    Furthermore, PFOA was discovered in Defendant's Product at levels that are more than 200 times the EPA's recommended limit for drinking water, which supports a finding that even if the PFOA is present due to contamination, it is still present in the Product at levels that are injurious to health.

103.    The FDA has not established any tolerances for PFAS in food. *See* 21 U.S.C. § 346.

104.    The FDCA does permit the limited use of PFAS in food contact applications, such as its use as a resin in forming gaskets, o-rings, and other parts of food processing equipment. This is due, in part, to the minimal risk of PFAS migrating from food processing equipment into

the food itself.[47] However, as a result of studies which questioned the safety of long-chain PFAS such as PFOA, the FDA worked with manufacturers beginning in the early 2000s to discontinue the use of long-chain PFAS chemicals in food contact applications.[48] In 2016, the FDA revoked regulations authorizing the remaining use of PFOA in food contact applications. As of November 2016, long-chain PFAS like PFOA are no longer used in food contact applications sold in the United States.[49]

105.    Accordingly, *there is no use of PFOA that is currently permitted by the FDA*.

106.    Thus, regardless of the source of PFAS in the Product, it is nevertheless "adulterated" by virtue of the significant levels of toxic PFOA present.

107.    Under the FDCA, a food is deemed "misbranded" if "its labeling is false or misleading in any particular." *See* 21 U.S.C. § 343(a).

108.    While the FDA has established regulations for bottled water, there are no established standards of identity for water when used as an ingredient in a food product. *See* 21 U.S.C. § 165.110 (exempting food ingredients that are declared as water in ingredient labeling).

109.    Accordingly, Defendant was not required to use the term "pure filtered water" in order to comply with FDA labeling requirements.

110.    The term "pure filtered water" on the Product's label is false and misleading because the Product contains multiple types of PFAS chemicals which may be removed by water filtration systems. Thus the Product is misbranded.

111.    The Product is further misbranded because its labeling is false and misleading insofar as it purports to be "All Natural" and does not disclose the presence of PFAS.

---

[47] https://www.fda.gov/food/process-contaminants-food/authorized-uses-pfas-food-contact-applications (Last visited March 14, 2023)
[48] *Id*.
[49] *Id*.

112.    Food that is deemed "adulterated" or "misbranded" may not be manufactured, distributed or sold in the United States. *See* 21 U.S.C. § 331. Adulterated and misbranded products thus have no economic value and are legally worthless.

113.    The New York Agriculture and Markets Law also adopts federal labeling requirements. It defines food as "adulterated" if it bears or contains any poisonous or deleterious substance which may render it injurious to health. *See* N.Y. Agri. & Mkts. § 200. It defines food as "misbranded" if its labeling is false or misleading in any particular. *See* N.Y. Agri. & Mkts. § 201.

114.    The mere presence of PFOA in the Product renders it adulterated and misbranded.

115.    As alleged herein, Defendant has violated the FDCA, New York Agriculture and Markets Law, and the New York General Business Law ("GBL"). Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding PFAS contamination affecting the Product.

116.    If Defendant had disclosed to Plaintiff and putative Class Members that the Product contained or risked containing PFAS and thus risked users to PFAS exposure, Plaintiff and putative Class Members would not have purchased the Product or they would have paid less for the Product.

117.    As a seller of a food product, Defendant had and has a duty to ensure that its Product did not and do not contain excessive (or any) level of toxic contaminants such as PFAS, including through regular testing, especially before the Product is injected into the stream of commerce for consumers to consume.

118.    But based on Plaintiff's independent testing results set forth above, Defendant made no reasonable effort to test its Product for PFAS, despite representing to the public that it maintained comprehensive safety and quality control measures. Nor did it disclose to Plaintiff in

any advertising or marketing that its Product contained PFAS, let alone at levels that are many multiples of the lifetime advisory limit set by the EPA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Product was "all natural" and made primarily of "pure filtered water," that it was of merchantable quality, complied with federal and state law, and did not contain dangerous substances such as PFAS.

119.

## **PLAINTIFF'S FACTUAL ALLEGATIONS**

120.    Plaintiff Joseph Lurenz is a citizen and resident of the state of New York.  During the applicable statute of limitations period, Plaintiff purchased and consumed Defendants' Product that contained PFAS.  More specifically, in July of 2022, during the class period, Plaintiff purchased Defendants' Product numerous times from various retailers in Dutchess County, New York.

121.    Prior to his purchase, Plaintiff reviewed the labeling, packaging, and marketing materials of his Product, including those set out herein.  Thus, Plaintiff understood that based on Defendants' claims, including those on the Product's front label, the Product was an "all natural" juice beverage and thus was free of artificial, synthetic, and harmful chemicals like PFAS.  Plaintiff reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that he would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.

122.    Plaintiff purchased the Product at or around the same time the same Product was collected for independent testing conducted in this matter.  Since independent testing revealed the presence of harmful levels of PFAS, it is plausible that Plaintiff's Product contained PFAS.

123.    As a direct result of Defendants' material misrepresentations and omissions, Plaintiff suffered and continues to suffer, economic injuries.

124.    Plaintiff continues to desire to purchase the Product from Defendants if he can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff is unable to determine if Defendants' Product is actually all natural and free of harmful synthetic chemicals like PFAS in the future. Plaintiff understands that the composition of the Product may change over time, but as long as Defendants may freely advertise the Product as "all natural" when it contains material levels of PFAS, then when presented with false or misleading information when shopping, he will be unable to make informed decisions about whether to purchase Defendants' Product and will be unable to evaluate the different prices between Defendants' Product and competitor's products, which *are* in fact all natural and free of PFAS.

## INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM

125.    Defendants' wrongful conduct harms the public-at-large.

126.    PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

127.    PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

128.    Because Defendants' deceptive advertising is ongoing and directed to the public, and because Defendants continue to sell its Product containing PFAS chemicals, the deception poses an ongoing risk to the public.

129.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

130.    Defendants had actual knowledge that its Product contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

131.    Although Defendants were aware of the deception in their advertising, marketing, packaging, and sale of the Product given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiff or Class Members that its Product contained PFAS chemicals.

132.    Despite its knowledge, Defendants have fraudulently misrepresented the Product as having qualities and characteristics it does not, while concealing the fact that its Product contains PFAS chemicals.

133.    Defendants made, and continue to make, affirmative false statements and misrepresentations to consumers, and continue to omit the fact that the Product contains PFAS, to promote sales of its Product.

134.    Defendants misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Product. Defendants' misrepresentations and omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members. Accordingly, Plaintiff and Class Members reasonably relied upon Defendants' misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

135.    The PFAS chemicals in the design and/or manufacture of Defendants' Product was not reasonably detectible to Plaintiff and Class Members.

136.     At all times, Defendants actively and intentionally misrepresented the qualities and characteristics of the Product, while concealing the existence of the PFAS chemicals and failing to inform Plaintiff or Class Members of the existence of the PFAS chemicals in its Product. Accordingly, Plaintiff's and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

137.     Defendants' statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Product contained artificial, man-made PFAS chemicals.

138.     Defendants misrepresented the Product and concealed the PFAS chemicals for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

139.     As a result of Defendants' intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiff and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendants are estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Product.

140.     Further, the causes of action alleged herein did not occur until Plaintiff and Class Members discovered that the Product contained PFAS chemicals. Plaintiff and Class Members had no realistic ability to discern that the Product contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendants' active concealment of the existence and true nature of the Product.

## FEDERAL RULE OF CIVIL POROCEDURE 9(b) ALLEGATIONS

141.    Although Defendants are in the best position to know what content they placed on their packaging, website(s), and other marketing and advertising during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Product to Plaintiff and consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

142.    **WHO**: Defendants made "all natural" representations on the Product's packaging, online, and its marketing and advertising of the Product.

143.    **WHAT**: Defendants' conduct here was, and continues to be, deceptive and fraudulent because of its "all natural" representations. Thus, Defendants' conduct deceived Plaintiff and Class Members into believing that the Product was manufactured and sold with the represented qualities. Defendants knew or should have known this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Product as possessing qualities that it does not have.

144.    **WHEN**: Defendants made material misrepresentations, false statements and/or material omissions during the putative Class periods and at the time Plaintiff and Class Members purchased the Product, prior to and at the time Plaintiff and Class Members made claims after realizing the Product contained artificial, man-made chemicals, and continuously throughout the applicable Class periods.

145.    **WHERE**: Defendants' marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Product's packaging, as well as on website(s), social media channels, and digital media campaigns used to market and advertise the Product.

146.   **HOW**: Defendants made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Product.

147.   **WHY**: Defendants made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Product over other brands that did not make similar all natural and otherwise health-focused representations, the effect of which was that Defendant profited by selling the Product to many thousands of consumers.

148.   **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have, absent Defendants' misrepresentations, false and misleading statements.

<u>**CLASS ACTION ALLEGATIONS**</u>

149.   Plaintiff brings this action individually and as the representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

>    **National Class**: During the fullest period allowed by law, all persons who purchased the Product within the United States for personal use and not for resale.

>    **New York Subclass**: During the fullest period allowed by law, all persons who purchased the Product within the State of New York for personal use and not for resale.

150.   Members of the classes described are referred to herein as "Class Members" or members of the "Class."

151.    Plaintiff reserves the right to amend the Class definitions or add a Class or idepClasses if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

152.    The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

153.    **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiff does not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Product nationally, the members of the Class are so numerous that their individual joinder herein is impracticable.  Plaintiff is informed and believes that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

154.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

      a.    Whether Defendants misrepresented, omitted, and/or failed to disclose material facts concerning the Product;

b.    Whether Defendants' conduct was unlawful; unfair; fraudulent and/or deceptive;

c.    Whether Defendants breached express warranties to Plaintiff and Class Members;

d.    Whether Defendants were unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendants to retain the benefits conferred upon it by Plaintiff and the proposed Class;

e.    Whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

Defendants engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce on behalf of himself and the other Members of the proposed Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

155.   **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendants' uniform misconduct described herein. Further, there are no defenses available to Defendants that are unique to Plaintiff or to any particular Members of the Class.

156.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Members of the Class he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and he will prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and the undersigned counsel.

157.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy.  Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.  The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

158.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Members of the Class to individually seek redress for Defendants' wrongful conduct.  Even if Members of the Class could afford individual litigation, the court system could not.  Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violation Of Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq.***
**(On Behalf of Plaintiff and the National Class and Alternatively the New York Subclass)**

159.    Plaintiff repeats and re-allege all previous paragraphs, as if fully included herein.

160.    As previously alleged, this Court has original jurisdiction over this matter based upon the requirements of CAFA; therefore, the Court has alternate jurisdiction over Plaintiff's Magnuson-Moss claim.

161.    The Product is a consumer product as defined in 15 U.S.C. § 2301(1).

162.    Plaintiff and the National Class members are consumers as defined in 15 U.S.C. § 2301(3) and utilized the Product for personal and household use and not for resale or commercial purposes.

163.    Plaintiff purchased the Product costing more than $5 and their individual claim is greater than $25 as required by 15 U.S.C. §§ 2302(e) and 2310(d)(3)(A).

164.    Defendants are suppliers and warrantors as defined in 15 U.S.C. §§ 2301(4) and (5).

165.    The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

166.    The MMWA provides a cause of action for breach of warranty, including the violation of express and implied warranty of merchantability, or other violations of the Act. 15 U.S.C. § 2310(d)(1).

167.    The Defendants have breached the implied warranties of merchantability by failing to provide merchantable goods. The Product at issue is not merchantable or fit for its ordinary

purposes because the Product contains ingredients that render the Product as not "all natural" by definition.

168.    Therefore, Defendants' Product is not merchantable or fit for its ordinary purposes because it is not an "all natural" juice drink given it contains man-made and synthetic PFAS.

169.    Defendants violated the express warranty because despite claiming it is "all natural," it contains detectable levels of synthetic, artificial PFAS chemicals. Hence, it breached the express warranty by making said representation.

170.    In its capacity as warrantor, and by the conduct described herein, any attempt by Defendants to limit the warranties in a manner that it does is not permitted by law.

171.    By Defendants' conduct as described herein, Defendants have failed to comply with their obligations under their implied promises, warranties, and representations.

172.    Plaintiff and the National Class fulfilled their obligations under the implied warranties and express warranties for the Product.

173.    As a result of Defendants' breach of warranties, Plaintiff and the National Class are entitled to revoke their acceptance of the Product, obtain damages, punitive damages, equitable relief, and attorneys' fees and costs pursuant to 15 U.S.C. § 2301.

**COUNT II**
**Violation of the New York Deceptive Trade Practices Act,**
**New York Gen. Bus. Law § 349, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

174.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

175.    The New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

176.     Defendants misleadingly, inaccurately, and deceptively advertises and markets their Product to consumers.

177.     Defendants' improper consumer-oriented conduct—including labeling and advertising the Product as "all natural"—is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendants' Product and to use the Product when they otherwise would not have. Defendants made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

178.     Defendants also violate § 349 in that they omitted from their labeling the fact that the Product contains dangerous levels of PFAS.  Insofar as Defendants maintained exclusive control over the contents of the Product, this is not information that Plaintiff could have obtained prior to purchase.  Indeed, this information was possessed by Defendants alone.

179.     Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for a Product that was—contrary to Defendants' representations— not natural and did contain measurable levels of the man-made chemical PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

180.     Defendants' advertising and Product's packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Product and to pay a premium price.

181.     Defendants' omission of the fact that the Products contained or were at risk of containing dangerous levels of PFAS induced Plaintiff and the New York Subclass Members to buy Defendants' Product and to pay a premium price.

182.     Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

183.     As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**<ins>COUNT III</ins>**
**Violation of the New York Deceptive Trade Practice Act,**
**New York Gen. Bus. Law § 350, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

184.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

185.     The N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

186.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

187.     Defendants' labeling and advertisements contain untrue and materially misleading statements and omissions concerning Defendants' Product inasmuch as they misrepresent that the Product is "all natural" and therefore free of PFAS.

188.    Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Product which were—contrary to Defendants' representations—not natural and did contain dangerous levels of PFAS.  Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

189.    Defendants' advertising, packaging, and Product's labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Product.

190.    Defendants made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

191.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

192.    Defendants made the material misrepresentations described in this Complaint in Defendants' advertising and on the Product's packaging and labeling.

193.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Product were and continue to be exposed to Defendants' material misrepresentations.

194.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT IV**
**Breach of Express Warranty**
**(Plaintiff on Behalf of the Class)**

195.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

196.    At Plaintiff and Class Members formed a contract with Defendants at the time Plaintiff and Class Members purchased the Product.

197.    The terms of the contract include the promises and affirmations of fact made by Defendants on the Product packaging and through marketing and advertising, as described above.

198.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class Members.

199.    As set forth above, Defendants purport through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and is all natural.

200.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

201.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiff's and Class Members' decision to purchase the Product.

202.    Plaintiff and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Product.

203.    Plaintiff and Class Members performed all conditions precedent to Defendants' liability under this contract when they purchased the Product.

204.    Defendants thereby breached the following state warranty laws:

    a.    Code of Ala. § 7-2-313;

    b.    Alaska Stat. § 45.02.313;

    c.    A.R.S. § 47-2313;

d.      A.C.A. § 4-2-313;

e.      Cal. Comm. Code § 2313;

f.      Colo. Rev. Stat. § 4-2-313;

g.      Conn. Gen. Stat. § 42a-2-313;

h.      6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.     Wash. Rev. Code Ann. § 6A.2-313;

vv.     W. Va. Code § 46-2-313;

ww.     Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

205.    Within a reasonable time after it knew or should have known, Defendant did not change the Products' label to stop the deceptive acts and practices.

## COUNT V
### Violation of the New York State Agriculture & Markets Law
### N.Y. Agric. & Mkts. Law §§ 199-a

206.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

207.    Section 199-a of the New York Agriculture and Markets Law ("N.Y. Agric. & Mkts. Law") prohibits persons and corporations from manufacturing or selling in this state "any article of food which is adulterated or misbranded within the meaning of this statute."

208.    Food is considered adulterated if it "contains any poisonous or deleterious substance which may render it injurious to health." N.Y. Agric. & Mkts. Law § 200(1).

209.    Food is considered misbranded if its "labeling is false or misleading in any particular." N.Y. Agric. & Mkts. Law § 201(1).

210.    Defendants violate Section 199-a insofar as they manufacture and sell the Product, which is both adulterated and misbranded.

211.    The Product is "adulterated" because it contains PFAS which is undisputedly a deleterious substance.

212.    The Product is "misbranded" because (a) its labeling contains the several affirmative misrepresentations detailed herein which represent that the product is "All Natural" when it actually contains dangerous synthetic PFAS; and (b) its labeling fails to identify the fact that it contains or is at risk of containing PFAS.

## COUNT VI
### Negligence Per Se

213.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

214.    Violation of a statute constitutes per se negligence where it can be shown that plaintiff belongs to the class of legislatively intended beneficiaries and that a right of action would be clearly in furtherance of the legislative purpose.

215.    Defendants are liable for negligence per se due to their violations of the Food Drug and Cosmetics Act (21 U.S.C. §§ 342, 343), described herein.  The Product is "adulterated" because it contains PFAS which is undisputedly a deleterious substance.

216.    Pursuant to 21 U.S.C. § 342, food is considered "adulterated" if it "contains any poisonous or deleterious substance which may render it injurious to health."

217.     Pursuant to 21 U.S.C. § 343, food is deemed "misbranded" if its "labeling is false or misleading in any particular."  The  Product is "misbranded" because (a) its labeling contains the several affirmative misrepresentations detailed herein which represent that the product is "All Natural" when it actually contains dangerous synthetic PFAS; and (b) its labeling fails to identify the fact that it contains or is at risk of containing PFAS.

218.    In addition, should this Court determine that Plaintiff lacks a private right of action under Section 199-a of the New York Agriculture and Markets Law (N.Y. Agric. & Mkts. Law), Defendants' violations of that statute (*see* Count V, above) amount to negligence per say under New York law.

219.    Both the N.Y. Agric. & Mkts. Law and the FDCA are designed to protect consumers like Plaintiff from products which are adulterated with dangerous substances and/or labeled in a deceptive manner.  Accordingly, Defendants violations of these statutes subject it to liability for negligence per se under New York law.

## COUNT VII
### Unjust Enrichment
### (In the Alternative and on Behalf of the Class)

220.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

221.     At all relevant times, Defendants were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product and its packaging. At all relevant times, it was reasonably foreseeable by Defendants that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

222.     At all relevant times, Defendants knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

223.     Defendants as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiff and the Class of all dangers associated with consumption of the Product.

224.     At minimum, the duty arose for Defendants to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

225.     Defendants have been unjustly enriched in retaining the revenues derived from the purchases of the Product by Plaintiff and the other members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendants' representations regarding the quality or value of the Product were misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased the Product had they known the truth or would only have purchased the Product for a lower price.

226. Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the other members of the Class for its unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class, prays for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendants bear the costs of any notice sent to the Class;

(c) Ordering Defendants to pay restitution to Plaintiff and the Class;

(d) A jury trial and damages according to proof;

(e) Awarding actual damages to Plaintiff and the Class;

(f) Awarding Plaintiff and members of the Class statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class;

(h) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i) Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of the claims asserted in this Class Action Complaint.

Dated: July 14, 2023

Respectfully submitted,


 /s/ Philip J. Furia
Jason P. Sultzer, Esq.
Philip J. Furia, Esq.
Daniel Markowitz, Esq.
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
furiap@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Gary Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
221 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Erin Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
hbryson@milberg.com


* *Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff and the Proposed Class*