UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH LURENZ, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>THE COCA-COLA COMPANY and THE SIMPLY ORANGE JUICE COMPANY,<br><br>       Defendants. | Case No. 7:22-cv-10941 |

**DEFENDANTS THE COCA-COLA COMPANY AND SIMPLY ORANGE JUICE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

LEGAL STANDARD .................................................................................................... 7

ARGUMENT .................................................................................................................. 8

    I.     Plaintiff Lacks Article III Standing ............................................................... 8

         A.     Plaintiff Cannot Establish Concrete Economic Harm Sufficient to Confer Standing Under a Benefit-of-the-Bargain or Price Premium Theory ...................................................................................... 9

               1.     Plaintiff fails to show he received anything but the benefit of his bargain ................................................................. 9

               2.     Plaintiff's threadbare allegations concerning a price premium cannot confer standing .................................... 14

         B.     Plaintiff Has Not Pled a Particularized, Actual Injury in Fact ................. 16

    II.    Plaintiff's Testing Allegations Are Insufficiently Pled, Requiring Dismissal of the Complaint in Full ......................................................... 18

    III.    All of Plaintiff's Claims Fail Because the Challenged Statements and Omissions Cannot Mislead a Reasonable Consumer ............................................ 19

    IV.    Plaintiff's Claim Under New York's Agriculture & Markets Law Fails Because That Statute Does Not Contain a Private Right of Action and the Presence of Trace Amounts of PFAS Does Not Render a Product Adulterated or Misbranded ................................................................. 22

    V.    Plaintiff's Omission-Based Claims Are Preempted and Also Fail Because Plaintiff Has Not Plausibly Alleged That Coca-Cola Was Aware of the Presence of PFAS ................................................................. 25

    VI.    Plaintiff's Remaining Claims Fail for Additional, Independent Reasons As Well ............................................................................. 28

CONCLUSION ............................................................................................................ 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................................................7, 8, 18

*Axon v. Citrus World, Inc.,*
  354 F. Supp. 3d 170 (E.D.N.Y. 2018) ...........................................................20, 22

*Bayne v. Target Corp.,*
  630 F. Supp. 3d 544 (S.D.N.Y. 2022)..................................................................28

*Bildstein v. MasterCard Int'l, Inc.,*
  329 F. Supp. 2d 410 (S.D.N.Y. 2004)..................................................................29

*In re Bisphenol-A Polycarbonate Plastic Prods. Liab. Litig.,*
  No. 1967, 2009 U.S. Dist. LEXIS 104451 (W.D. Mo. Nov. 9, 2009)....................26

*Black Radio Network, Inc. v. NYNEX Corp.,*
  No. 96-cv-4138, 2000 U.S. Dist. LEXIS 594, (S.D.N.Y. Jan. 25, 2000) ...............30

*Boysen v. Walgreen Co.*
  No. 11-cv-06262, 2012 U.S. Dist. LEXIS 100528 (N.D. Cal. July 19, 2012) ......11, 12, 13, 28

*Brito-Munoz v. Walmart, Inc.,*
  No. 1:21-cv-00903, 2022 U.S. Dist. LEXIS 103876 (M.D. Pa. June 10, 2022).....................11

*Brown v. COTY, Inc.,*
  No. 22-cv-2696, 2023 U.S. Dist. LEXIS 54316 (S.D.N.Y. Mar. 29, 2023).......................1, 20

*DeMaria v. Nissan N. Am., Inc.,*
  No. 15-cv-3321, 2016 U.S. Dist. LEXIS 11295 (N.D. Ill. Feb. 1, 2016) ...............27

*Doss v. Gen. Mills, Inc.,*
  No. 18-cv-61924, 2019 U.S. Dist. LEXIS 100791 (S.D. Fla. June 14, 2019)........16

*Estrada v. Johnson & Johnson,*
  No. 16-7492, 2017 U.S. Dist. LEXIS 109455 (D.N.J. July 14, 2017)....................14

*In re Fruit Juice Prods. Mktg. & Sales Practices Litig.,*
  831 F. Supp. 2d 507 (D. Mass. 2011) ............................................................ *passim*

*Gaminde v. Lang Pharma Nutrition, Inc.,*
  No. 1:18-cv-300, 2019 U.S. Dist. LEXIS 48595 (N.D.N.Y. Mar. 25, 2019) .........16

*In re Gen. Mills Glyphosate Litig.*,
No. 16-cv-2869, 2017 U.S. Dist. LEXIS 108469 (D. Minn. July 12, 2017) .........................22

*In re Gerber Products Company Heavy Metals Baby Food Litigation*,
No. 1:21-cv-269, 2022 U.S. Dist. LEXIS 189822 (E.D. Va. Oct. 17, 2022)..........................15

*Gordon v. Target Corp.*,
No. 20-cv-9589, 2022 U.S. Dist. LEXIS 48769 (S.D.N.Y. Mar. 18, 2022)..........................29

*Haggerty v. Bluetriton Brands, Inc.*,
No. 21-cv-13904, 2022 U.S. Dist. LEXIS 226691 (D.N.J. Dec. 16, 2022)...........................12

*Harris v. Pfizer Inc.*,
586 F. Supp. 3d 231 (S.D.N.Y. 2022)......................................................................................27

*Hawyuan Yu v. Dr Pepper Snapple Grp., Inc.*,
No. 18-cv-06664, 2020 U.S. Dist. LEXIS 185322 (N.D. Cal. Oct. 6, 2020) .........................22

*Herrington v. Johnson & Johnson Consumer Cos.*,
No. 09-cv-1597, 2010 U.S. Dist. LEXIS 90505 (N.D. Cal. Sep. 1, 2010) ..............8, 10, 12, 29

*Horti v. Nestle Healthcare Nutrition, Inc.*,
No. 21-cv-09812, 2022 U.S. Dist. LEXIS 202479 (N.D. Cal. Nov. 7, 2022) .........................15

*Hubert v. Gen. Nutrition Corp.*,
No. 2:15-cv-01391, 2017 U.S. Dist. LEXIS 145506 (W.D. Pa. Sep. 8, 2017).................10, 14

*Huertas v. Bayer U.S., LLC*,
No. 21-cv-20021, 2022 U.S. Dist. LEXIS 148897 (D.N.J. Aug. 19, 2022) .....................10, 13

*Izquierdo v. Mondelez Int'l, Inc.*,
No. 16-cv-04697, 2016 U.S. Dist. LEXIS 149795 (S.D.N.Y. Oct. 26, 2016)........................15

*John v. Whole Foods Mkt. Grp., Inc.*,
858 F.3d 732 (2d Cir. 2017)....................................................................................................17

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*,
903 F.3d 278 (3d Cir. 2018)................................................................................................9, 10

*Kimca v. Sprout Foods, Inc.*,
No. 21-cv-12977, 2022 U.S. Dist. LEXIS 74642 (D.N.J. Apr. 25, 2022)..............9, 11, 13, 14

*Koronthaly v. L'Oreal USA, Inc.*,
No. 07-cv-5588, 2008 U.S. Dist. LEXIS 59024 (D.N.J. July 25, 2008) .................................10

*Lateef v. Pharmavite LLC*,
No. 12-cv-5611, 2012 U.S. Dist. LEXIS 152528 (N.D. Ill. Oct. 24, 2012) ...........................26

*Mazella v. Coca-Cola Co.*,
   548 F. Supp. 3d 349 (S.D.N.Y. 2021).................................................................28

*Myers v. Wakefern Food Corp.*,
   No. 20-cv-8470, 2022 U.S. Dist. LEXIS 35981 (S.D.N.Y. Mar. 1, 2022).............19

*Ohanian v. Apple Inc.*,
   No. 20-cv-5162, 2022 U.S. Dist. LEXIS 48740 (S.D.N.Y. Mar. 18, 2022).........27

*Onaka v. Shiseido Ams. Corp.*,
   No. 21-cv-10665, 2023 U.S. Dist. LEXIS 53220 (S.D.N.Y. Mar. 27, 2023).........17

*Parks v. Ainsworth Pet Nutrition, LLC*,
   377 F. Supp. 3d 241, 247 (S.D.N.Y. 2019)....................................................22, 29

*PDK Labs, Inc. v. Friedlander*,
   103 F.3d 1105 (2d Cir. 1997)..............................................................................23

*In re Plum Baby Food Litig.*,
   No. 1:21-cv-02417, 2022 U.S. Dist. LEXIS 197458 (D.N.J. Oct. 31, 2022) .........14

*Richburg v. ConAgra Brands, Inc.*,
   Nos. 22-cv-2420, 22-cv-2421, 2023 U.S. Dist. LEXIS 21137 (N.D. Ill. Feb. 8,
   2023) ................................................................................................... *passim*

*Rider v. Uphold HQ Inc.*,
   No. 22-cv-1602, 2023 U.S. Dist. LEXIS 29617 (S.D.N.Y. Feb. 22, 2023)............30

*Rudolph v. Hudson's Bay Co.*,
   No. 18-cv-8472, 2019 U.S. Dist. LEXIS 77665 (S.D.N.Y. May 7, 2019) ..............9

*Santiful v. Wegmans Food Mkts., Inc.*,
   No. 20-cv-2933, 2022 U.S. Dist. LEXIS 15994 (S.D.N.Y. Jan. 28, 2022) ...........19, 20, 28, 29

*Schloegel v. Edgewell Pers. Care Co.*,
   No. 4:21-cv-00631, 2022 U.S. Dist. LEXIS 46393 (W.D. Mo. Mar. 16, 2022) ....16

*In re Sling Media Slingbox Advert. Litig.*,
   202 F. Supp. 3d 352 (S.D.N.Y. 2016)..................................................................27

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)........................................................................................8, 16

*Spurck v. Demet's Candy Co., LLC*,
   No. 21-cv-05506, 2022 U.S. Dist. LEXIS 133685 (S.D.N.Y. July 27, 2022)........29

*Steele v. Wegmans Food Mkts.*,
   472 F. Supp. 3d 47 (S.D.N.Y. 2020)....................................................................23

*Turek v. Gen. Mills, Inc.*,
    662 F.3d 423 (7th Cir. 2011) ................................................................26

*Turk v. Rubbermaid Inc.*,
    No. 21-cv-270, 2022 U.S. Dist. LEXIS 50230 (S.D.N.Y. Mar. 21, 2022) ...............................8

*Turnipseed v. Simply Orange Juice Co.*,
    No. 20-cv-8677, 2022 U.S. Dist. LEXIS 38823 (S.D.N.Y. Mar. 4, 2022) ...........................19

*Twohig v. Shop-Rite Supermarkets, Inc.*,
    519 F. Supp. 3d 154 (S.D.N.Y. 2021) ........................................................20

*United States v. Anderson Seafoods, Inc.*,
    622 F.2d 157 (5th Cir. 1980) ................................................................23

*Vitolo v. Dow Corning Corp.*,
    234 A.D.2d 361 (N.Y. App. Div. 2nd Dept. 1996) .............................................30

*Wallace v. ConAgra Foods, Inc.*,
    747 F.3d 1025 (8th Cir. 2014) ...............................................................16

*Warren v. Coca-Cola Co.*,
    No. 22-cv-6907, 2023 U.S. Dist. LEXIS 70494 (S.D.N.Y. Apr. 21, 2023) ........................30

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .........................................................................8

**Statutes**

15 U.S.C. § 2310 .............................................................................28

21 U.S.C. § 342 ..............................................................................23

21 U.S.C. § 343 ..............................................................................26

21 U.S.C. § 343-1 ............................................................................25

N.Y. Agric. & Mkts. Law § 199-a ......................................................7, 22, 23

N.Y. Agric. & Mkts. Law § 200 ...............................................................23

N.Y. Agric. & Mkts. Law § 201 ...............................................................23

**Regulations**

21 C.F.R. § 100.1 ...........................................................................26

21 C.F.R. § 101.100 .........................................................................26

21 C.F.R. § 165.110 ................................................................................................................21

**Other Authorities**

EPA, *Biden-Harris Administration Proposes First-Ever National Standard to
    Protect Communities from PFAS in Drinking Water*,
    https://www.epa.gov/newsreleases/biden-harris-administration-proposes-first-
    ever-national-standard-protect-communities ...............................................6, 13, 18

FDA, *Analytical Results for PFAS in 2022 Seafood Survey (Parts Per Trillion)*,
    https://www.fda.gov/media/159570/download............................................6, 25, 30

FDA, *Testing Food for PFAS and Assessing Dietary Exposure*,
    https://www.fda.gov/food/process-contaminants-food/testing-food-pfas-and-
    assessing-dietary-exposure ................................................................................6, 24

## INTRODUCTION

Plaintiff's lawsuit against Defendants The Coca-Cola Company and Simply Orange Juice Company (collectively, "Coca-Cola") is part of a growing trend of no-injury, no-deception class action suits aimed at consumer product companies over the alleged presence of trace amounts of per- and polyfluoralkyl substances ("PFAS") in their products. PFAS are ubiquitous manufactured chemicals that are present at low levels in the environment, including in water, soil, and even the air. Due to their ubiquity in the environment, incidental amounts of PFAS can ***potentially*** migrate to consumer products through contact with soil, water, or the manufacturing process—even where, as here, PFAS are not intentionally added to the product or its packaging.

In this recent rash of consumer-product-oriented class actions, plaintiffs do not adequately allege that PFAS are present in products at levels that are actually harmful to the consumer (if at all), or identify any actual representation that the products are free of trace amounts of PFAS. Thus, for example, a sister court in this District recently dismissed a PFAS case against a cosmetic company because the plaintiff did not allege that any product she herself purchased contained PFAS, she did not sufficiently plead that the presence of PFAS (assuming the products contained any) actually rendered the products unsafe, she could not point to any representation on the packaging that the product was PFAS-free, and she did not identify any basis on which a reasonable consumer would assume the product did not contain PFAS. *Brown v. COTY, Inc.*, No. 22-cv-2696, 2023 U.S. Dist. LEXIS 54316, at *12-14 (S.D.N.Y. Mar. 29, 2023). Another federal court recently dismissed cases concerning allegations of PFAS in popcorn, holding that it was unreasonable to interpret representations about the popcorn's "real," "simple," and "natural" ingredients to mean the popcorn was free of PFAS (a migratory substance, not an intended ingredient). *Richburg v. ConAgra Brands, Inc.*, Nos. 22-cv-2420, 22-

cv-2421, 2023 U.S. Dist. LEXIS 21137, at *12 (N.D. Ill. Feb. 8, 2023).

Plaintiff's Complaint fares no better and should likewise be dismissed. Plaintiff claims that the Simply® Tropical juice drink (the "Product") is mislabeled as an "All Natural" juice drink that is "made simply" with "all-natural ingredients," when it actually contains undisclosed PFAS which could potentially be associated with adverse health effects at (unspecified) high-levels of exposure. This theory fails on multiple grounds.

*First*, Plaintiff lacks Article III standing because he cannot show that he received anything other than the benefit of his bargain: he paid for juice, he received juice, and he consumed the juice without incident or ill-effects. Nor can he show that he paid a premium price because of the allegedly deceptive conduct because he has not demonstrated that the presence of trace chemicals—that, at most, pose a speculative, potential risk if consumed at high levels—rendered the Product inherently worth less than what he paid, let alone entirely worthless. Equally problematic for Plaintiff, he has not adequately alleged that the Products he personally purchased and consumed were tested and contained PFAS, instead vaguely relying on allegations about "third-party testing" of a single sample of the Product from an undisclosed source.

*Second*, those bare-bones testing allegations are alone reason to dismiss the Complaint. Plaintiff's entire suit rests on this testing to establish the presence of PFAS in the entire Product line, nationwide, but he does not provide any factual detail on the actual results, the methodology used, the name and qualifications of the testers, the quality assurance and quality control measures used, the lot code or production location of the tested sample, or (again) how the testing of a solitary different Product unit allows Plaintiff to extrapolate that the juice that Plaintiff purchased and consumed contained PFAS.

*Third*, Plaintiff has not shown that a reasonable consumer would be misled by any

misrepresentation or omission. The Product labeling states that it is "made simply" with "all-natural ingredients." That is true. The Product contains water, juices and puree, sugar, and natural flavors. PFAS are not "ingredients" intentionally added to the Product, and, if some amount of PFAS is present, FDA regulations exempt such incidental substances from disclosure on the FDA-mandated ingredient list. Further, there is no requirement that all trace amounts of chemicals with speculative health effects must be disclosed on a label.

*Fourth*, Plaintiff's attempt to assert a claim under the New York Agriculture and Markets Law ("AML") fails because there is no private right of action under that statute and the Product is not mislabeled or adulterated. There is no authority for Plaintiff's position that the presence of any amount of PFAS renders a product adulterated, and FDA has declined to take action against tested products with substantially higher amounts of PFAS than what Plaintiff alleges here.

*Fifth*, Plaintiff's omissions-based claims are expressly preempted because FDA exempts incidental substances like PFAS from any disclosure obligation. These claims also fail because Plaintiff has not plausibly alleged Coca-Cola knew of the presence of PFAS in the Product.

*Sixth*, each of Plaintiff's claims is technically deficient under Rule 12(b)(6) for numerous independent, additional reasons. As a result, Coca-Cola respectfully requests that the Court dismiss Plaintiff's Complaint, in its entirety, and with prejudice.

## FACTUAL BACKGROUND

Plaintiff alleges that the Product is falsely labeled as an "All Natural" juice drink that is "made simply" with "all-natural ingredients," when, in fact, the Product contains "multiple" substances among the thousands of chemical compounds commonly referred to collectively as "PFAS," including Perfluorooctanoic acid ("PFOA") and Perfluorooctanesulfonic acid ("PFOS"). Plaintiff's First Amended Complaint ("FAC"), Dkt. 25, ¶¶ 1, 4, 56.

According to the FAC and the sources it incorporates by reference, PFAS are ubiquitous and unavoidable. For instance, EPA has explained that "[b]ecause of their widespread use and their persistence in the environment, many PFAS are found in the blood of people and animals all over the world."[1] PFAS "are present at low levels in a variety of food products"[2]—which they can unintentionally enter after migrating from packaging[3]—and in the environment, including in "water, air, fish, and soil."[4] The CDC has noted that "you probably cannot prevent PFAS exposure altogether,"[5] and the European Environment Agency has concurred that "[i]t is difficult for citizens to totally avoid exposure to PFAS."[6] Despite the ubiquitous and unavoidable nature of PFAS, Plaintiff takes the untenable position that their alleged presence in a consumer product (at apparently any level) constitutes consumer fraud.

While Plaintiff claims that PFAS, and PFOA and PFOS in particular, "have been indisputably linked to negative health effects," FAC ¶ 57, his cited source takes the more equivocal stance that "scientific studies have shown that exposure to *some* PFAS in the environment *may be* linked to harmful health effects" and that it is "difficult to show that substances directly cause health conditions in humans."[7] For that reason, Plaintiff cannot go any

---

[1] EPA, *PFAS Explained*, https://www.epa.gov/pfas/pfas-explained (incorporated into FAC ¶ 33 n.14).

[2] *Id.*

[3] Environmental Health Perspectives, *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (FAC ¶ 36 n.17).

[4] EPA, *PFAS Explained*, https://www.epa.gov/pfas/pfas-explained (FAC ¶ 33 n.14).

[5] CDC, *PFAS FAQs*, https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (FAC ¶ 34 n.15).

[6] EEA, *Emerging Chemical Risks in Europe—'PFAS,'* https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (FAC ¶ 39 n.19).

[7] CDC, *What are PFAS?*, https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (emphasis added) (FAC ¶ 57 n.33); *see also* EPA, *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (FAC ¶ 38 n.18 ("Current scientific research suggests that

further than alleging that some PFAS can pose a potential risk at (unspecified) high levels. *See, e.g.*, FAC ¶ 40 (exposure to "high levels of PFAS" puts people "most at risk of adverse health impacts"), ¶ 37 (PFAS have been "associated with" negative health impacts), ¶ 38 (exposure to "certain levels of PFAS may lead to" health consequences).

Plaintiff's sole basis for alleging the presence of PFAS in the Product here is "third-party testing," which purportedly detected material levels of multiple PFAS in the Product, including "concerning" levels of PFOA and PFOS. FAC ¶¶ 54, 56. Plaintiff alleges no details regarding the testing other than that it was conducted on "a sample" (i.e., a single sample) "collected in July 2022." *Id.* at ¶ 55. The Complaint does not contain any allegations regarding the methodology used, who performed the testing, the quality assurance and quality control measures used, whether the PFAS was discovered in the Product packaging or the juice itself, or any information about the Product unit tested, such as the lot code or the production location. Nor does Plaintiff allege the purported source of the PFAS—e.g., migration from Product packaging or manufacturing equipment, a water source that contains PFAS, or an isolated contamination incident. As a result, there is no way to infer from Plaintiff's Complaint that the purported presence of PFAS in the Product unit tested necessarily means all of the juice Products, produced at different facilities, contain PFAS, including the Product that Plaintiff purchased.

Meanwhile, Plaintiff's only factual allegations regarding the levels of PFAS allegedly detected are that the Product contains PFOA and PFOS in amounts "more than 100 times the EPA's recommended levels" (0.004 part per trillions (ppt) for PFOA and 0.02 ppt for PFOS). FAC ¶¶ 61-62. But—critically—what Plaintiff refers to as the EPA's "recommended levels" are actually 2022 interim lifetime health advisories for drinking water: the concentration of PFAS in

---

exposure to **high levels** of **certain** PFAS **may** lead to adverse health outcomes.") (emphasis added)).

*drinking water* at or below which adverse health effects are not anticipated to occur ***over a lifetime***.[8] Plaintiff's Complaint lacks any explanation of how lifetime health advisory levels for PFAS in drinking water are relevant to juice, consumed far less frequently than drinking water. But in any event, EPA has just recently issued proposed national standards for drinking water that would set PFOA and PFOS levels at 4 ppt, which is the level at which "they can be reliably measured." Request for Judicial Notice ("RJN"), Ex. A. Based on Plaintiff's allegations, the PFAS purportedly detected in the juice Product (0.004 ppt x 100, or **0.4 ppt for PFOA**, and 0.02 ppt x 100, or **2 ppt for PFOS**) would fall well below this new threshold for drinking water, and thus also fall below the level at which PFOA and PFOS can be reliably measured. Moreover, as discussed in more detail in **Section IV** below, when FDA (the agency that actually regulates juice beverages—not the EPA) detects PFAS in food, it considers "a number of factors" when determining whether there is a "possible human health concern." RJN, Ex. B. In 2022, FDA tested 81 samples of seafood, finding a detectable level of some type of PFAS in most of the samples. RJN, Ex. C. But FDA only determined that one set of samples—canned clams with over **20,000 ppt of PFOA**—were "likely to be a human health concern." RJN, Exs. B, C. FDA took no action with respect to the remaining samples, including samples that contained 100-500 ppt of PFOA, orders of magnitude more than the amount of PFOA Plaintiff insinuates is in one sample of the Product here. *See* RJN, Ex. C.

Plaintiff only claims economic injury as a result of the alleged misrepresentations or omissions, FAC ¶ 148, and does not claim that he or anyone else was physically harmed as a result of consuming the Product, or that he or anyone else is likely to suffer harm in the future.

---

[8] EPA, *Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS*, https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q3 (FAC ¶ 58 n.34).

Ultimately, what is most telling about Plaintiff's Complaint is what he does not allege: (1) the source of any PFAS allegedly in the Product; (2) whether the PFAS allegedly detected during testing was in the Product packaging or the juice itself; (3) that PFAS was intentionally added to the Product or that Coca-Cola knew PFAS was present in the Product; (4) the parameters of the laboratory testing; (5) the basis for inferring that the alleged PFAS in the tested Product unit means there was PFAS in the Product that Plaintiff purchased; (6) the level of PFAS (including PFOA or PFOS) that would have to be consumed to result in adverse health effects; (7) any scientific or government recommendation for PFAS levels in a juice product; (8) that he or anyone else suffered any physical harm or real and tangible threat of future harm; or (9) that he (or anyone else) even consumed PFAS by drinking the juice Product.

Plaintiff asserts seven claims.[9] He seeks to certify a nationwide class and/or a New York state subclass. FAC ¶ 149. He requests damages and restitution, but has now withdrawn any request for injunctive relief in his FAC. *See* FAC at Request for Relief.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, if accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* And although the court "must accept as true all of the allegations contained in a complaint' that are not legal conclusions," a complaint's "[t]hreadbare recitals of

---

[9] These claims are: (1) violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*; (2) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law ("GBL") § 349; (3) violation of New York's Deceptive Trade Practices Act, GBL § 350; (4) breach of express warranty; (5) violation of N.Y. Agric. & Mkts. Law § 199-a; (6) negligence per se; and (7) unjust enrichment.

the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Finally, the standard of review under Rule 12(b)(1) is substantively similar to the standard under 12(b)(6), except that the plaintiff bears the burden of proof. *Turk v. Rubbermaid Inc.*, No. 21-cv-270, 2022 U.S. Dist. LEXIS 50230, at *7 (S.D.N.Y. Mar. 21, 2022).

## ARGUMENT

Plaintiff's claims should be dismissed because: (1) Plaintiff lacks Article III standing; (2) he does not plausibly allege that the Product contains PFAS based on vague testing allegations; (3) the challenged labeling statements and omissions would not mislead a reasonable consumer; (4) there is no private right of action under the AML and the Product is not misbranded or adulterated; (5) his omissions-based claims are expressly preempted and fail because he has not adequately alleged knowledge; and (6) certain claims fail for additional reasons.

## I.     Plaintiff Lacks Article III Standing

The irreducible constitutional minimum of standing consists of three elements. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (citation omitted). A threatened future injury must be "certainly impending," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), and in increased risk-of-injury cases involving allegedly unsafe products, plaintiffs "must plead a credible or substantial threat to their health." *Herrington v. Johnson & Johnson Consumer Cos.*, No. 09-cv-1597, 2010 U.S. Dist. LEXIS 90505, at *13 (N.D. Cal. Sept. 1, 2010). Plaintiff fails to adequately allege an injury in fact and therefore fails to meet his burden.

### A. Plaintiff Cannot Establish Concrete Economic Harm Sufficient to Confer Standing Under a Benefit-of-the-Bargain or Price Premium Theory

Plaintiff's purported injury here is purely economic. He alleges he "did not obtain the full value of the advertised Product" (i.e., did not receive the benefit of his bargain) and "paid more for" the Product than he allegedly would have if he had known that the Product contains PFAS (i.e., he paid a price premium). FAC ¶ 95. Under either of these theories, Plaintiff's allegations are insufficient to establish "concrete" economic harm.

### 1. Plaintiff fails to show he received anything but the benefit of his bargain

In order to allege that he has suffered an economic injury for Article III purposes as a result of simply purchasing a product under a benefit-of-the-bargain theory, Plaintiff must adequately allege that the product was not worth what he paid for it. *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278, 287, 290 (3d Cir. 2018); *Rudolph v. Hudson's Bay Co.*, No. 18-cv-8472, 2019 U.S. Dist. LEXIS 77665, at *26 (S.D.N.Y. May 7, 2019) (finding no benefit-of-the-bargain injury in data breach case where there was no allegation that the purchased goods "were deficient or did not meet expectations" as a result of the breach).

In the context of cases involving the presence of purportedly unsafe chemicals in consumer products, courts around the country have consistently held that plaintiffs cannot meet this requirement where: (1) they received a functioning product that they used or consumed without incident; and (2) they assert the product is worth less (or worthless) because of the presence of potentially dangerous chemicals in the product, but fail to adequately allege that those chemicals pose a substantial and credible risk of future physical harm. *See, e.g.*, *In re Johnson & Johnson*, 903 F.3d at 287; *Kimca v. Sprout Foods, Inc.*, No. 21-cv-12977, 2022 U.S. Dist. LEXIS 74642 (D.N.J. Apr. 25, 2022) (explaining that plaintiffs had asserted the baby food

products containing heavy metals were worthless "precisely because they allegedly exposed their children to the risk of future harm—they do not otherwise allege that the Baby Food Products did not perform their intended purpose," so "without any plausible allegations of future risk, the allegation that the Baby Food Products were worthless also falls apart"); *Huertas v. Bayer U.S., LLC*, No. 21-cv-20021, 2022 U.S. Dist. LEXIS 148897, at *17 (D.N.J. Aug. 19, 2022); *Hubert v. Gen. Nutrition Corp.*, No. 2:15-cv-01391, 2017 U.S. Dist. LEXIS 145506, at *23 (W.D. Pa. Sept. 8, 2017; *In re Fruit Juice Prods. Mktg. & Sales Practices Litig.*, 831 F. Supp. 2d 507, 512 (D. Mass. 2011); *Herrington v. Johnson & Johnson*, No. 09-cv-1597, 2010 U.S. Dist. LEXIS 90505, at *18 (N.D. Cal. Sept. 1, 2010); *Koronthaly v. L'Oreal USA, Inc.*, No. 07-cv-5588, 2008 U.S. Dist. LEXIS 59024, at *14 (D.N.J. July 25, 2008), *aff'd*, 374 F. App'x 257 (3d Cir. 2010). If those two conditions are met, then the plaintiff has received what she bargained for—a consumable or otherwise functioning product—and has failed to show the product is worth any less than what she paid.

For instance, in *Johnson & Johnson*, the court found that the plaintiff could not establish an economic injury based on her purchase of "unsafe" talcum powder containing asbestos because she received "a functional product that she has already consumed" and did not claim she faced any credible increased risk of developing ovarian cancer in the future. 903 F.3d at 289, 293. As a result, she "failed to allege that the economic benefit she received from the powder was *anything* less than the price she paid"—the powder worked, and it did not give her cancer or even credibly increase her risk of getting cancer. *Id.* at 290.

In a recent PFAS case involving a food product (popcorn), the Northern District of Illinois reasoned that although "*Johnson & Johnson* is not binding upon this court, . . . its reasoning is instructive and persuasive." *Richburg*, 2023 U.S. Dist. LEXIS 21137, at *12. There:

> [P]laintiffs d[id] not allege that defendant's microwave [popcorn] products failed to work as intended—for example, the complaints do not contain any indication that the microwave popcorn products at issue did not pop correctly, or that plaintiffs were otherwise unable to consume the popcorn. Without such an allegation, the court is not persuaded that plaintiffs have established concrete injuries based on the benefit-of-the-bargain theory. As defendant argues, plaintiffs purchased popcorn and they received popcorn; they have offered only conclusory allegations to suggest that the products had diminished value.

*Id.* at *12-13. Other cases involving alleged chemical contaminants in juices are in accord. In *In re Fruit Juice Products*, the court held that the juice products "had no diminished value due to the presence of . . . lead" where: (1) plaintiffs received fruit juice "which they consumed without suffering harm" and (2) they did not plead any actual physical injury or any non-speculative allegations about future harm. 831 F. Supp. 2d at 512-13. The court in *Boysen v. Walgreen Co.* reached the same conclusion in dismissing claims based on the defendant's failure to disclose the presence of "material and significant" levels of arsenic and lead in its juices and its alleged affirmative misrepresentations that the products were healthy and safe. No. 11-cv-06262, 2012 U.S. Dist. LEXIS 100528, at *2, *22 (N.D. Cal. July 19, 2012). As in *In re Fruit Juice Products*, the *Boysen* court reasoned the plaintiff failed to allege he received a product that did not "work for its intended purpose" (i.e., consumption). *Id.* at *22. And although the complaint broadly referred to "significant health concerns associated with ingestion of lead or arsenic," the complaint stopped short of alleging that "the levels present in defendant's juice tend to cause physical harm" or that "any person ha[d] ever been injured by the products." *Id.* at *23-24.

As *Boysen* demonstrates, the same analysis applies to both claims based on omissions and affirmative representations. *Id.* at *2; *see also Kimca*, 2022 U.S. Dist. LEXIS 74642, at *2-3 (dismissing claims for lack of standing based on defendant's alleged false representations that the products were clean, healthy, and organic). In other words, casting an injury in terms of informational harm—supposedly being misled by the product label—does not create standing

where the plaintiff actually received the benefit of his bargain. *See also Brito-Munoz v. Walmart, Inc.*, No. 1:21-cv-00903, 2022 U.S. Dist. LEXIS 103876, at *3-4 (M.D. Pa. June 10, 2022) (no benefit-of-the-bargain injury for baby wipes misrepresented as hypoallergenic, where product lived up to expectations and plaintiffs' children did not develop any allergy from products); *Haggerty v. Bluetriton Brands, Inc.*, No. 21-cv-13904, 2022 U.S. Dist. LEXIS 226691, at *9, *10 n.5 (D.N.J. Dec. 16, 2022) (rejecting benefit-of-the-bargain theory where plaintiff failed to show product was worth less based on misrepresentation product was 100% recyclable).

The result here should be no different than in *Johnson & Johnson*, *Richburg*, *In re Fruit Juice Products*, *Boysen* or the host of other decisions finding plaintiffs lacked standing. Plaintiff never alleges that the juice Product failed its intended purpose of consumption. And Plaintiff does not credibly allege the Products are worth less (or worthless) because of any direct, tangible impact PFAS has on his health. Plaintiff generally alleges that PFAS chemicals have been "associated" with a variety of negative health effects, *see, e.g.*, FAC ¶ 37—based on EPA's website, which actually states that "**high levels** of **certain** PFAS **may** lead to adverse health outcomes."[10] *See also id.* at ¶ 58 (studies have found "associations" between PFOA/PFOS exposure and health effects), ¶ 59 ("health effects could occur"), ¶ 60 (trace levels "can pose a risk"). But Plaintiff does not come close to adequately alleging that he or anyone else: (1) suffered any actual physical harm from consuming the Product; or (2) faces a credible or substantial threat of physical harm at some point in the future based on consuming the Product. *See Boysen*, 2012 U.S. Dist. LEXIS 100528, at *23 (allegations of "significant health concerns associated with ingestion of lead or arsenic" insufficient and plaintiff must "expressly allege that

---

[10] EPA, *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (emphasis added) (FAC ¶ 38 n.18).

the levels present in defendant's juice ***tend to cause*** physical harm" (emphasis added)); *In re Fruit Juice Prods.*, 831 F. Supp. 2d at 511 (noting plaintiffs "have not claimed that any particular amount [of lead] in the products is dangerous, and have not alleged that any specific amount has caused actual injuries to any plaintiff"). At most, Plaintiff has speculatively alleged here that exposure to PFAS at unspecified levels can be associated with potential health risks.[11]

Plaintiff's attempt to compare the alleged levels of PFOA and PFOS in the Product with the EPA's 2022 interim health advisory levels for drinking water does not plausibly bridge this gap. FAC ¶ 61. As an initial matter, in March 2023, the EPA proposed a new national drinking water standard of 4 parts per trillion for PFOA and PFOS. *See* RJN, Ex. A. The results of Plaintiff's unspecified testing—which purportedly revealed that the Product contains 100 times more PFOA and PFOS than the EPA's interim advisory levels of 0.004 ppt for PFOA and 0.02 ppt for PFOS—would fall well below this new standard. More importantly, Plaintiff has not explained how the EPA's interim advisory level, based on an individual's anticipated ***lifetime*** exposure to ***drinking water***, has any relevance to a juice product. Courts have routinely rejected these types of inapposite comparisons in an attempt to show a product contains a dangerously high level of a trace chemical. *See, e.g.*, *Boysen*, 2012 U.S. Dist. LEXIS 100528, at *16-17 n.5 (rejecting attempt to rely on regulation governing bottled water to show fruit juice contained impermissibly high levels of toxins, and noting different standards govern those products

---

[11] Plaintiff does not save his allegations by claiming that the Product is adulterated or misbranded under federal or state law and thus has "no economic value and [is] legally worthless." FAC ¶ 112. In *Huertas*, 2022 U.S. Dist. LEXIS 148897, at *9, plaintiffs similarly alleged that the products (athlete's foot sprays allegedly contaminated with benzene) were worthless because they were adulterated. The court found plaintiffs failed to allege an injury in fact because their claims amounted to a wish to be reimbursed for a functional product they already used without incident and they otherwise relied on mere conjecture to claim that some future physical harm could potentially befall them for use of the product. *Id.* at *13. That "does not itself constitute an economic injury." *Id.* (quoting *Johnson & Johnson*, 903 F.3d at 293).

because juice consumption is lower than drinking water); *Kimca*, 2022 U.S. Dist. LEXIS 74642, at *16.

In the end, Judge Ponsor said it best in *In re Fruit Juice Products*: "[t]he fact is that Plaintiffs paid for fruit juice, and they received fruit juice, which they consumed without suffering harm. The products have not been recalled, have not caused any reported injuries, and do not fail to comply with any federal standards. The products had no diminished value due to the presence of the [PFAS]. Thus, Plaintiffs received the benefit of the bargain, as a matter of law, when they purchased these products." 831 F. Supp. 2d at 512.

## 2.  **Plaintiff's threadbare allegations concerning a price premium cannot confer standing**

Plaintiff's allegation that he and putative class members "paid a premium, or otherwise paid more for the Product when they otherwise would not have" fare no better. *See* FAC ¶ 148. In analogous cases where plaintiffs claimed a defendant was able to inflate the price of a product by failing to disclose or misrepresenting the presence of ingredients that posed a potential, but unrealized, health risk, courts have held that a "[p]laintiff's threadbare allegation that she purchased [the product] at a premium, without any factual allegations to support that claim, is insufficient to find an injury-in-fact." *Estrada v. Johnson & Johnson*, No. 16-7492, 2017 U.S. Dist. LEXIS 109455, at *44 (D.N.J. July 14, 2017), *aff'd*, 903 F.3d 278 (3d Cir. 2018); *see also Kimca*, 2022 U.S. Dist. LEXIS 74642, at *23 (finding plaintiffs did not adequately allege that misrepresentations and omissions about heavy metals in baby food caused them to pay premium price and instead relied on "threadbare" allegations without, e.g., identifying comparable, cheaper, or safer products); *Hubert*, 2017 U.S. Dist. LEXIS 145506, at *22; *In re Plum Baby Food Litig.*, No. 1:21-cv-02417, 2022 U.S. Dist. LEXIS 197458, at *25 (D.N.J. Oct. 31, 2022).

Here, the Complaint only contains the threadbare and conclusory allegations that Plaintiff

and putative class members "paid a premium" when they otherwise would not have (FAC ¶ 148), that they were induced to "pay a premium for Defendants' Product" (FAC ¶¶ 150, 177, 180, 181), that they "have been injured inasmuch as they . . . paid a premium for the Product" (FAC ¶¶ 179, 188), and that Coca-Cola "knew and intended consumers would pay a premium for the Product over [unidentified] comparable products that are made from or contain synthetic or artificial ingredients" (FAC ¶ 94). These formulaic allegations are not supported by any accompanying facts. "Simply because Plaintiffs here recite the word 'premium' multiple times in their Complaint does not make Plaintiffs' injury any more cognizable." *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697, 2016 U.S. Dist. LEXIS 149795, at *18 (S.D.N.Y. Oct. 26, 2016) (dismissing GBL § 349 claim); *see also Horti v. Nestle Healthcare Nutrition, Inc.*, No. 21-cv-09812, 2022 U.S. Dist. LEXIS 202479, at *17 (N.D. Cal. Nov. 7, 2022).

Further, while some courts have been more lenient in accepting superficial allegations of a price premium in consumer product cases, this is not a case where the court can readily infer that but-for the allegedly deceptive conduct, the Product would have sold for a lower price—such as where a defendant attempts to pass off an (objectively inferior) faux leather belt as an (objectively superior) genuine leather belt, or a product containing a mix of vegetable oils as containing 100% olive oil. For example, in *In re Gerber Products Company Heavy Metals Baby Food Litigation*, the court found plaintiffs fell short of establishing a price premium where they failed to allege facts showing the value of baby food products with trace amounts of heavy metals "was less than what Defendant falsely represented or what Plaintiffs believed it to be at the time of purchase." No. 1:21-cv-269, 2022 U.S. Dist. LEXIS 189822, at *39 (E.D. Va. Oct. 17, 2022). In other words, the court could not simply infer that the baby food products were worth objectively less (and thus that the allegedly deceptive conduct allowed the defendant to

charge a premium) because the products contained trace amounts of chemicals that were not unsafe as to plaintiffs' children and did not present an imminent risk of developing any specific ailment in the future.[12] The Court should likewise reject Plaintiff's conclusory and unsupported contentions that any alleged misrepresentation or omission resulted in a price premium.

### B.  Plaintiff Has Not Pled a Particularized, Actual Injury in Fact

Plaintiff not only fails to satisfy Article III's "concreteness" requirement, he also fails to allege any "particularized" injury. *See Spokeo*, 578 U.S. at 340 ("an injury in fact must be both concrete *and* particularized"). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 339 (citation omitted). Here, that means that Plaintiff must sufficiently allege that the Product he actually purchased contained PFAS. *See Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014) (plaintiffs failed to allege particularized injury where they claimed that some packages of Hebrew National hot dogs were misrepresented as non-kosher, but failed to show that the particular packages they personally purchased contained non-kosher beef); *Gaminde v. Lang Pharma Nutrition, Inc.*, No. 1:18-cv-300, 2019 U.S. Dist. LEXIS 48595, at *6 (N.D.N.Y. Mar. 25, 2019) (relying on *Wallace* to find no standing where plaintiff failed to show that the product he purchased contained less than the advertised amount of krill oil represented by label and instead relied on independent study testing two bottles of the product); *Schloegel v. Edgewell Pers. Care Co.*, No. 4:21-cv-00631, 2022 U.S. Dist. LEXIS 46393, at *6 (W.D. Mo. Mar. 16, 2022) ("Just as in *Wallace*, Plaintiff has failed to allege that she actually purchased Banana Boat Sunscreen products which were adulterated with benzene, and thus has failed to allege that she did not receive exactly what Edgewell

---

[12] Plaintiff does not save his allegations by referencing a generalized study suggesting consumers are willing to spend more for a product "they know is safer." FAC ¶ 75. Plaintiff has not shown that the juice Product was unsafe or posed any credible or substantial risk to his health.

promised . . . ."); *Doss v. Gen. Mills, Inc.*, No. 18-cv-61924, 2019 U.S. Dist. LEXIS 100791, at

*6 (S.D. Fla. June 14, 2019) ("Doss does not, however, even allege that the Cheerios she herself

bought actually contain any glyphosate—just that some Cheerios that have been tested do.").

Plaintiff has not alleged that he tested the Product that he actually purchased: the FAC

just refers to testing "a sample." FAC ¶ 55. Nor has Plaintiff alleged that the presence of PFAS

in the Products is so widespread as to render it plausible that Plaintiff would have necessarily

purchased a Product containing PFAS if he made multiple purchases. *Cf. John v. Whole Foods

Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) (finding allegations regarding study showing

that 89% of products were mislabeled and that plaintiff routinely shopped for those products

were sufficient to plausibly allege that the plaintiff purchased at least one mislabeled product).

Instead, Plaintiff relies on a single allegation of testing and, unlike in *John*, cites no studies or

articles indicating that the Product generally contains PFAS.

In fact, Plaintiff's only attempt to link the tested sample to the Product(s) he purchased is

his newly added allegations in the FAC that he made purchases in July of 2022 and the tested

sample was "collected" in July of 2022. FAC ¶¶ 55, 120, 122. Plaintiff will likely argue that

these allegations cross the plausibility threshold under the court's *dicta* in *Onaka v. Shiseido

Americas Corp.*, No. 21-cv-10665, 2023 U.S. Dist. LEXIS 53220, at *12-13 (S.D.N.Y. Mar. 27,

2023), where the court found that plaintiffs' single allegation of independent testing was

inadequate, but observed "[t]his need not be fatal, if the independent testing is 'reasonably near

in time' to Plaintiffs' own purchases." But *Onaka* involved cosmetic products, to which PFAS

are ***intentionally*** added for their functional properties. *Id.* at *3. Therefore, a positive test of a

unit from the same product line close in time to the plaintiffs' purchase could have given rise to

the plausible inference that other products within that line also contained PFAS—based on the

factual predicate that PFAS were intentionally added (and the reasonable assumption that products from the same timeframe used the same intentionally added ingredients).

Here, the fact that the tested sample allegedly containing PFAS was collected from the same timeframe Plaintiff was making purchases of the Product raises no more than a "sheer possibility," *Iqbal*, 556 U.S. at 678, that any Product Plaintiff purchased contained PFAS[13]—let alone that the "tens of thousands" of Products sold during the Class Period (FAC ¶ 153) all contained PFAS such that absent class members purchased a Product with PFAS. For instance, to the extent that the source of the alleged PFAS is the water used as an ingredient in the Product, Plaintiff has not alleged facts that would suggest that any Product he purchased used the same water source as the tested product (or that Coca-Cola uses the same water source nationwide, so that all Products might plausibly contain PFAS). Or, to the extent the PFAS purportedly migrated from manufacturing equipment or some aspect of the Product packaging, Plaintiff has given the Court no basis to infer that the Product he purchased was manufactured in the same facility as the tested product or used the same packaging materials. There is simply too far a gap between the single tested Product sample and the Product purchased by Plaintiff, and showing temporal proximity between the sample and purchased Product does not bridge that gap here. Given the dearth of allegations showing that the Product Plaintiff actually purchased contained PFAS, the Court should dismiss the Complaint for lack of standing.

## II. Plaintiff's Testing Allegations Are Insufficiently Pled, Requiring Dismissal of the Complaint in Full

Plaintiff's whole case rests on "independent testing" that Plaintiff purportedly performed

---

[13] It is equally plausible that the single test result was a false positive given EPA's pronouncement that 4 ppt is the threshold level at which PFOA and PFOS "can be reliably measured" (which is significantly higher than the purported levels in the Products), *see* RJN, Ex. A, or was the result of an isolated incident of contamination.

on the Product, allegedly confirming the presence of PFAS. But the entirety of Plaintiff's testing allegations are that the testing "was conducted in accordance with accepted industry standards" and that the test "detected material levels of multiple PFAS in the Product," including PFOA and PFOS, in amounts "more than 100 times the EPA's recommended levels." FAC ¶¶ 54-56, 62. Plaintiff has not alleged who performed the testing, when and where the testing was performed, any details about the sample of the Product tested, the testing methodology, the quality assurance and quality control measures used in the testing, whether the test detected PFAS in the Product packaging or the juice itself, or even the actual levels of PFAS found—all information necessary to plausibly allege that the Product contains PFAS.

This Court has repeatedly rejected similarly deficient allegations concerning testing. *Myers v. Wakefern Food Corp.*, No. 20-cv-8470-NSR, 2022 U.S. Dist. LEXIS 35981, at *13-14 (S.D.N.Y. Mar. 1, 2022) (Román, J.) (finding plaintiff failed to sufficiently allege that defendant misrepresented that its product contained no artificial flavors where plaintiff relied on laboratory testing, but did not "provide any details whatsoever about [what] this laboratory test entailed"— such as "the testing methodology followed, the specific date, time, or place of the testing, who conducted the testing, the qualifications of the testers, etc."); *Santiful v. Wegmans Food Mkts., Inc.*, No. 20-cv-2933-NSR, 2022 U.S. Dist. LEXIS 15994, at *15 (S.D.N.Y. Jan. 28, 2022) (Román, J.) (similar); *Turnipseed v. Simply Orange Juice Co.*, No. 20-cv-8677-NSR, 2022 U.S. Dist. LEXIS 38823, at *14 (S.D.N.Y. Mar. 4, 2022) (Román, J.) (similar). Plaintiff's bare-bones allegations here should meet the same fate.

### III.   All of Plaintiff's Claims Fail Because the Challenged Statements and Omissions Cannot Mislead a Reasonable Consumer

All of Plaintiff's claims are premised on the assertion that the Product labeling is misleading (FAC ¶¶ 167, 169, 177, 187, 199, 209, 217, 225), so all of Plaintiff's claims should

be dismissed if a reasonable consumer would not be misled by the Product label.[14] *See Santiful*, 2023 U.S. Dist. LEXIS 40920, at *12; *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 165 (S.D.N.Y. 2021). To satisfy the reasonable consumer standard, "Plaintiffs must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers. Plaintiffs must plausibly allege that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 182 (E.D.N.Y. 2018) (cleaned up). And while the question of whether a reasonable consumer would be deceived is not routinely resolved at the motion to dismiss stage, "dismissal is appropriate when the complaint fails to allege facts that state a plausible claim for relief." *Id.* at 183. That is the case here.

Plaintiff challenges the representations that the Product is an "All Natural" juice drink that is "made simply" with "all natural ingredients." FAC ¶ 4.[15] According to Plaintiff, these representations convey to consumers that "the Product is free from artificial ingredients like PFAS." FAC ¶ 51. But, even assuming the Product does contain PFAS, no reasonable consumer

---

[14] Plaintiff's AML and negligence *per se* claims are also alternatively based on the alleged adulteration of the Product. That formulation of those claims also fails, as discussed in **Section IV**.

[15] Plaintiff refers to other statements from advertisements and marketing materials intermittently throughout the Complaint, such as the statement "there's nothing to hide" on the Simply® brand website, a "Say Yes to Simple" digital marketing campaign, and the statement "Nothing less than 100% quality and safety is acceptable" from The Coca-Cola Company's website. FAC ¶¶ 29, 30, 74. None of these other statements from marketing materials add anything to Plaintiff's claims. First, he does not identify these particular statements as statements he viewed prior to his purchase and on which he then relied, *see Brown*, 2023 U.S. Dist. LEXIS 54316, at *10, and instead vaguely claims that he saw "marketing materials of his Product, including those set out herein" prior to his purchase. FAC ¶ 121. Second, these other statements are broad, vague, and commendatory, and are thus mere puffery. *Brown*, 2023 U.S. Dist. LEXIS 54316, at *10-11. Third, as to the quality statement in particular, it does not refer to a specific product and is a non-actionable "aspirational company mission statement" that cannot be objectively measured. *Id.* at *11. Fourth, Plaintiff does not claim that statements such as "there's nothing to hide"—which is referring to the Product's all-natural ingredients—convey a message different from the label.

would understand these statements to mean that the Product is free from trace amounts of PFAS—PFAS chemicals are not ingredients at all.[16]

This is precisely the conclusion the court reached in *Richburg*, where plaintiffs alleged that the presence of PFAS rendered defendant's statements that its popcorn products contained "only real ingredients" and "100% ingredients from natural sources" false or misleading. 2023 U.S. Dist. LEXIS 21137, at *20. The court found it was "implausible" that consumers would consider PFAS to be "ingredients" and interpret the statements to mean the popcorn products were PFAS-free. *Id.* at *22-23. In doing so, the court emphasized that the FDA itself does not treat "[s]ubstances migrating to food from equipment or packaging" as food ingredients, specifically exempting such migratory substances from federal regulations requiring ***ingredients*** to be listed on a product label. *Id.* (citing 21 C.F.R. § 101.100(a)(3)(iii)).[17] Reasonable consumers would not interpret "ingredients" to mean incidental, migratory substances that FDA does not require manufacturers to include on a product label, so "the representation on the packaging [was] correct as a matter of law." *Id.* at *23.[18]

The glyphosate line of cases are similarly on point. In those cases, as here, the plaintiffs attacked the defendants' "all natural" labeling statements as misleading because the challenged

---

[16] Plaintiff also claims that by listing "filtered water" in the ingredient list, Coca-Cola led consumers to believe that "any" incidental impurities had been removed. FAC ¶ 27; *see also id.* at ¶¶ 109-110. But accurately listing a product ingredient as filtered water does not equate to representing that the Product is PFAS free, and Plaintiff does not allege the Product does not contain filtered water.

[17] Similarly, to the extent Plaintiff alleges that PFAS were present in the water used as an ingredient in the Product, FDA does not consider trace chemicals present in water to be "ingredients." For example, the standard of identity for bottled water states that it may not contain any "added ingredients" but then also sets limits for the permissible amount of "chemical substances" that might be present. *See* 21 C.F.R. § 165.110.

[18] Coca-Cola's alleged omission of a disclosure statement identifying PFAS in the products also would not deceive a reasonable consumer. No reasonable consumer would expect a food product to disclose a substance that FDA expressly exempts from disclosure.

products contained trace amounts of a contaminant (pesticides or herbicides). The courts repeatedly rejected that theory of deception. In *Axon v. Citrus World, Inc.*, the court held it was not misleading to call the product "natural" because "[g]lyphosate . . . is not an 'ingredient' added to defendant's products; rather, it is a substance introduced through the growing process." 354 F. Supp. 3d at 183, *aff'd sub nom. Axon v. Florida's Nat. Growers, Inc.,* 813 F. App'x 701 (2d Cir. 2020). In *Parks v. Ainsworth Pet Nutrition, LLC*, the plaintiff asserted that the "natural"-labeled products "contain trace amounts of glyphosate, but not that the Products are composed of unnatural ***ingredients***"—moreover, "a reasonable consumer would not be so absolutist as to require that 'natural' means there is no glyphosate, even an accidental and innocuous amount, in the Products." 377 F. Supp. 3d 241, 247 (S.D.N.Y. 2019) (emphasis added); *see also In re Gen. Mills Glyphosate Litig.*, No. 16-cv-2869, 2017 U.S. Dist. LEXIS 108469, at *16 (D. Minn. July 12, 2017) (finding reasonable consumer would not believe even a product labeled as having one ingredient—100% Natural Oats—could not contain a trace amount of glyphosate); *Hawyuan Yu v. Dr Pepper Snapple Grp., Inc.*, No. 18-cv-06664, 2020 U.S. Dist. LEXIS 185322, at *9-10 (N.D. Cal. Oct. 6, 2020). As these cases demonstrate, as a matter of law, consumers would not interpret the term "ingredient" as referring to PFAS (an incidental chemical that could migrate into a food product or water source) and would not interpret "all natural" to mean utterly free of trace amounts of chemicals like PFAS.

## IV.   Plaintiff's Claim Under New York's Agriculture & Markets Law Fails Because That Statute Does Not Contain a Private Right of Action and the Presence of Trace Amounts of PFAS Does Not Render a Product Adulterated or Misbranded

Plaintiff purports to assert a claim under § 199-a of New York's AML, which prohibits the sale of food that "is adulterated or misbranded within the meaning of this article." As an initial matter, Plaintiff's claim fails because there is no private right of action under § 199-a of the AML (or any of the other AML sections referenced in the Complaint). As explained by a

sister court in *Steele v. Wegmans Food Mkts.*, 472 F. Supp. 3d 47 (S.D.N.Y. 2020), the AML is generally "administered by a Commissioner who investigates and may sue for penalties." *Id.* at 49 (citing N.Y. Agric. & Mkts. Law § 35). Because only certain sections of the AML contain an express private right of action, "[n]o private civil actions can [otherwise] be inferred; the legislature created such a right of action only when it wished to." *Id.* (citing N.Y. Agric. & Mkts. Law § 378(3), which contains a private right of action); *cf. PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997) (explaining there is likewise no private right of action to enforce the AML's federal counterpart, the Federal Food, Drug & Cosmetic Act ("FDCA")). None of the AML sections Plaintiff invokes (§ 199-a, § 200, or § 201) include a private right of action.[19]

Setting aside the fact that Plaintiff cannot privately enforce § 199-a of the AML, Plaintiff fails to adequately allege that the Product is "adulterated" or "misbranded" within the meaning of that law.[20] According to Plaintiff, the Product is adulterated "because it contains PFAS which is undisputedly a deleterious substance." FAC ¶ 211. But, under the AML (and the like-worded FDCA), food shall be deemed adulterated if it bears or contains "any poisonous or deleterious substances *which may render it injurious to health*." N.Y. Agric. & Mkts. Law § 200 (emphasis added); *see also* 21 U.S.C. § 342(a)(1) (containing identical language). The "may render" standard has been interpreted to mean that there is a "reasonable possibility of injury to the consumer." *United States v. Anderson Seafoods, Inc.*, 622 F.2d 157, 159 (5th Cir. 1980).

Here, Plaintiff falls well short of establishing that there is a "reasonable possibility of

---

[19] Even Plaintiff appears to recognize that he "lacks a private right of action under Section 199-a." FAC ¶ 218.

[20] In claiming that the Product is misbranded, Plaintiff proceeds under subsection (1) of AML § 201, which provides that food is deemed misbranded it "its labeling is false or misleading in any particular." N.Y. Agric. & Mkts. Law § 201(1). Because Plaintiff's mislabeling allegations are addressed in **Section III**, this Section focuses on Plaintiff's misguided claim that the Product is adulterated.

injury" resulting from the PFAS (if any) in the Product. As discussed above, Plaintiff generally claims that PFAS chemicals have been "associated" with a variety of negative health effects that "could" occur. FAC ¶ 37, 59. But he never alleges sufficient facts to connect the actual PFAS allegedly in the Product to any disease, injury, or harmful health condition that is reasonably likely to occur. And he never alleges any baseline above which ingestion of PFAS (and particularly the specific types of PFAS in the Product) would lead to the reasonable possibility of injury, instead relying on inapposite and inapplicable lifetime drinking water advisory guidelines. Finally, he does not even plead that *he* was physically injured by consuming the product, further undermining any contention that the possibility of injury is reasonable here.

Plaintiff nevertheless suggests that because FDA has revoked regulations authorizing the use of PFOA in food contact applications, any amount of PFOA in the Product renders it adulterated.[21] That is incorrect. The presence of PFOA (or any other PFAS) in a food product does not automatically render the food adulterated, and FDA has not set any specific level at which PFAS/PFOA will be considered to have adulterated a food. Instead, when FDA finds a detectable level of PFAS during its testing, "the agency conducts an assessment to evaluate whether the level detected presents a possible human health concern and warrants further FDA action" (RJN, Ex. B)—an approach consistent with the statutory scheme and the "reasonable possibility of injury" requirement. For example, in 2022, FDA tested 81 samples of seafood and

---

[21] Plaintiff also claims that PFOA has been "indisputably linked to negative health effects." FAC ¶ 57. But, as discussed above, Plaintiff's cited source does not say that; it says PFOA is one of the most "commonly studied PFAS" and that "exposure to some PFAS in the environment may be linked to harmful health effects in humans and animals." *See* CDC, *What are PFAS?*, https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (emphasis added) (FAC ¶ 57 n.33). The other source Plaintiff cites regarding PFOA states only that studies "have found ***associations*** between PFOA and/or PFOS exposure and several types of health effects." EPA, *Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS*, https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q3 (emphasis added) (FAC ¶ 58 n.34).

found that 60 of the 81 of samples had detectable levels of at least one type of PFAS. *Id.* But the agency only found that one set of the tested samples—canned clams from China—posed a likely health concern, due to the estimated exposure to PFOA. *Id.* "Except for canned clams from China, [FDA] determined that none of the other PFAS exposures . . . [were] likely to be a human health concern." *Id.* Notably, the canned clams were found to have **over 20,000 ppt of PFOA**, as compared to the roughly **0.4 ppt of PFOA** allegedly in the Product at issue here. RJN, Ex. C. Meanwhile, other seafood products, which FDA concluded did not pose a likely health concern, contained amounts as high as 100 ppt, 300 ppt, and even 500 ppt of PFOA. *See id.* Plaintiff's position that a product containing even trace amounts of PFOA (a fraction of a part-per-trillion) is adulterated simply cannot be squared with FDA's decision that food products with 100 – 500 ppt of PFOA are unlikely to be human health concerns and do not require agency action.

Because Plaintiff has no private right of action under the AML, has not made out a claim for mislabeling, and has not plausibly alleged that the presence of trace amounts of PFAS (including PFOA) in the Product may render it injurious to health and thus adulterated, Plaintiff's claim under the AML fails.

## V.     Plaintiff's Omission-Based Claims Are Preempted and Also Fail Because Plaintiff Has Not Plausibly Alleged That Coca-Cola Was Aware of the Presence of PFAS

Plaintiff's GBL omissions claims fail for additional reasons. *First*, they are preempted by the Nutrition Labeling & Education Act ("NLEA")—a 1990 amendment to the FDCA—which includes a broad express preemption provision directing that "no State or political subdivision of a State may directly or indirectly establish . . . any requirement for . . . labeling of food . . . that is not identical to the requirement[s]" imposed by federal law. 21 U.S.C. § 343-1(a)(2). The phrase "'[n]ot identical to' does not refer to the specific words in the requirement but instead means that the State requirement directly or indirectly imposes obligations or contains provisions" that are

"not imposed by or contained in" or that "[d]iffer from those specifically imposed by or contained in" the statute or the FDA's implementing regulations. 21 C.F.R. § 100.1(c)(4). Accordingly, a plaintiff cannot use state law causes of action to attempt to hold a defendant liable for failing to provide disclaimers or disclosures that are not required by the FDCA—even if those disclaimers would be consistent with the requirements of the FDCA. *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 427 (7th Cir. 2011) ("[C]onsistency is not the test; identity is.").

While the FDCA generally mandates that food products with more than one component display an "ingredient" list on their packaging, *see* 21 U.S.C. § 343(i), under 21 C.F.R. § 101.100(a)(3)(iii) the FDA "exempts '[s]ubstances migrating to food from equipment or packaging' from compliance with this regulation, meaning that they do not need to be included in the ingredient list." *Richburg*, 2023 U.S. Dist. LEXIS 21137, at *22. Other courts have found preemption under 21 C.F.R. § 101.100 where plaintiffs sought to require disclosure of other incidental additives. *See In re Bisphenol-A Polycarbonate Plastic Prods. Liab. Litig.*, No. 1967, 2009 U.S. Dist. LEXIS 104451, at *39 (W.D. Mo. Nov. 9, 2009) ("Plaintiffs' claims are expressly preempted because they would impose disclosure requirements concerning BPA, the exact opposite of the exemption § 343(i)(2) permits."); *Lateef v. Pharmavite LLC*, No. 12-cv-5611, 2012 U.S. Dist. LEXIS 152528, at *9 (N.D. Ill. Oct. 24, 2012). Because Plaintiff's omission-based claims here would require a disclosure or disclaimer that is not identical to the labeling requirements under federal law, those claims are likewise preempted.

*Second*, Plaintiff has failed to plausibly allege that Coca-Cola was aware of the presence of PFAS in the Product. To state an omissions-based GBL claim, Plaintiff must allege the defendant's exclusive knowledge at the time of purchase. *Harris v. Pfizer Inc.*, 586 F. Supp. 231, 241, 244 (S.D.N.Y. 2022) (dismissing GBL claims where plaintiffs failed to allege that

26

Pfizer had knowledge its drug was contaminated and allegations showed at most that Pfizer *may* have known that its medication was *at risk* of contamination); *Ohanian v. Apple Inc.*, No. 20-cv-5162, 2022 U.S. Dist. LEXIS 48740, at \*5 (S.D.N.Y. Mar. 18, 2022) (confirming that analysis applies to both GBL § 349 and § 350 claims). "The key, of course, is that the defendant 'possess' the information that the plaintiff claims it improperly withheld." *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016).

Here, Plaintiff's entire basis for claiming Coca-Cola had knowledge the Product contains PFAS is that "the inclusion of PFAS in the Product was detectable" and "[t]here are steps that Defendant can take to reduce or eliminate PFAS chemicals." FAC ¶¶ 65-66; *id.* at ¶ 67 ("In view of the foregoing, it is plausible that at all times relevant to this action, Defendants knew that its Product contains PFAS."). But the mere "*opportunity* to learn about [an] alleged defect" or alleged contamination of a product through testing does not necessarily mean that a manufacturer "*did* learn about the defect" or contamination. *DeMaria v. Nissan N. Am., Inc.*, No. 15-cv-3321, 2016 U.S. Dist. LEXIS 11295, at \*34 (N.D. Ill. Feb. 1, 2016). This is particularly true where Plaintiff has not alleged that testing for PFAS is standard in the food and beverage industry, that such testing is required by any state or federal agency, or that testing for PFAS can be feasibly implemented on a commercial scale.[22] As a result, Plaintiff has not plausibly alleged Coca-Cola was in possession of information about the alleged presence of PFAS in the Product. To hold otherwise would essentially foist an affirmative requirement on all manufacturers to disclose the presence of any substance that can be conceivably detected through testing, whether or not such testing was required, industry-standard, or actually performed. That result is clearly untenable and Plaintiff cannot proceed on his omissions-based GBL claims.

---

[22] To the extent Plaintiff relies on the alleged presence of PFAS in an entirely *different* beverage line, FAC ¶¶ 79-80, that cannot establish Coca-Cola's knowledge of PFAS in the Product.

**VI.    Plaintiff's Remaining Claims Fail for Additional, Independent Reasons As Well**

Although the previously discussed pleading defects require dismissal in full, there are additional reasons to dismiss certain of Plaintiff's claims.

**Violation of MMWA.** The Court lacks subject matter jurisdiction over Plaintiff's MMWA claim, which has its own independent jurisdictional requirement. Under 15 U.S.C. § 2310(d)(3), for any action brought as a class action, there must be at least one hundred named plaintiffs. A majority of courts have held that CAFA cannot be used to circumvent the MMWA's jurisdictional requirements. *Bayne v. Target Corp.*, 630 F. Supp. 3d 544, 551-52 (S.D.N.Y. 2022). The Court should reject Plaintiff's attempt to do exactly that here. *See* FAC ¶ 160.

In addition, the MMWA claim fails because Plaintiff has not adequately pled an underlying breach of warranty. *Santiful*, 2023 U.S. Dist. LEXIS 40920, at *14. To state an implied warranty claim, Plaintiff must sufficiently allege that the Product is unfit for human consumption. *Id.* at *13 (allegation that plaintiff did not want to consume artificial ingredients in food product insufficient). He cannot do so here, where he consumed the Product on numerous occasions (FAC ¶ 120), apparently without any adverse health effects. *Cf. Boysen*, 2012 U.S. Dist. LEXIS 100528, at *21 (complaint did not "claim that the juices at issue were unfit for their intended use, i.e. consumption" notwithstanding allegations regarding presence of arsenic and lead). The implied warranty claim also fails because "Plaintiff does not allege to have been in direct privity with Defendant[s]." *Mazella v. Coca-Cola Co.*, 548 F. Supp. 3d 349, 361 (S.D.N.Y. 2021) (Román, J.); *see* FAC ¶ 120 (Plaintiff purchased from "various retailers"). Finally, this claim fails for lack of pre-suit notice. *Spurck v. Demet's Candy Co., LLC*, No. 21-cv-05506-NSR, 2022 U.S. Dist. LEXIS 133685, at *13 (S.D.N.Y. July 27, 2022) (Román, J.).

**Express Warranty.** As discussed above, because "all natural" ingredients does not mean PFAS-free, the express warranty claim based on the "all natural" statements fails. Plaintiff also

contends that Coca-Cola expressly warranted that the Product is safe for consumption, but does not identify a specific affirmation of fact or promise regarding the Product's safety that he viewed and relied on prior to purchase,[23] let alone allege that the Product was not actually safe to consume (which Plaintiff did on multiple occasions with no apparent ill-effects). Thus, this basis for an express warranty claim fails as well. *See Gordon v. Target Corp.*, No. 20-cv-9589, 2022 U.S. Dist. LEXIS 48769, at *42 (S.D.N.Y. Mar. 18, 2022). Dismissal is also required because Plaintiff did not provide pre-suit notice. *Spurck*, 2022 U.S. Dist. LEXIS 133685, at *12-13.

**GBL §§ 349, 350.** Materiality is a required element for claims brought under GBL § 349 or §350. *Santifil*, 2022 U.S. Dist. LEXIS 15994, at *6. Information is material if it "is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Bildstein v. MasterCard Int'l, Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004). Here, Plaintiff's conclusory allegations of materiality (*e.g.*, FAC ¶¶ 88, 143) are implausible in light of his failure to allege that the Product actually causes or even creates a credible risk of tangible physical harm. *See Parks*, 377 F. Supp. 3d at 248 ("The presence of negligible amounts of glyphosate in a dog food product that do not have harmful, 'toxic,' or 'carcinogenic' effects is not likely to affect consumers' decisions in purchasing the product and is thus not material."); *Herrington*, 2010 U.S. Dist. LEXIS 90505, at *29 (failure to disclose presence of potential carcinogens was not actionable under the objective test for materiality because plaintiffs did not aver facts "that show that the levels of these substances caused them or their children harm").[24] It is likewise implausible the a consumer would find the presence of 0.4 ppt of PFOA to be material, where

---

[23] For instance, Plaintiff cites to Coca-Cola's online Quality & Food Safety Policy and a statement attributed to Coca-Cola in a *Consumer Reports* article without alleging he ever viewed or relied on these statements prior to purchase. FAC ¶¶ 78-79.

[24] The survey cited at paragraph 71 of the Complaint does not establish materiality because it only shows that consumers may be willing to pay more for a product "they ***know is safer***."

FDA has taken no action against products that contain 500 ppt of PFOA. *See* RJN, Ex. C (suggesting, in contrast, that presence of 20,000 ppt of PFOA would be material).

**Negligence *Per Se.*** Plaintiff's negligence *per se* claim is based on alleged violations of the FDCA and AML—*i.e.*, that the Products are "adulterated" or "misbranded" under those statutes. *See* FAC ¶¶ 215-218. As discussed above, the Products are neither adulterated nor misbranded, so this claim fails. In addition, the negligence *per se* claim fails because, as discussed above, there is no private right of action under either the FDCA or AML. "[A] decision to allow such a claim would effectively afford a private right of action that the statute does not recognize—contravening the legislative scheme." *Rider v. Uphold HQ Inc.*, No. 22-cv-1602, 2023 U.S. Dist. LEXIS 29617, at *19 (S.D.N.Y. Feb. 22, 2023). Finally, the negligence *per se* claim is barred by the economic loss doctrine. "[I]t is well settled that 'New York law holds that a negligence action seeking recovery for economic loss will not lie.'" *Black Radio Network, Inc. v. NYNEX Corp.*, No. 96-cv-4138, 2000 U.S. Dist. LEXIS 594, at *10 (S.D.N.Y. Jan. 25, 2000). This rule applies to negligence per se claims. *Vitolo v. Dow Corning Corp.*, 234 A.D.2d 361, 363 (N.Y. App. Div. 2nd Dep't. 1996).

**Unjust Enrichment.** Finally, Plaintiff's unjust enrichment claim fails as "merely duplicative" of all of his other claims. *Warren v. Coca-Cola Co.*, No. 22-cv-6907, 2023 U.S. Dist. LEXIS 70494, at *24 (S.D.N.Y. Apr. 21, 2023).

## CONCLUSION

For these reasons, Coca-Cola respectfully requests that the Court dismiss Plaintiff's Complaint in its entirety with prejudice.

DATED: August 14, 2023          */s/ Angela Spivey*
                                *Attorney for Defendants*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served on Plaintiff's counsel on August 14, 2023.


*/s/ Angela Spivey*