UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH LURENZ, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. 7:22-cv-10941 |
| THE COCA-COLA COMPANY and THE SIMPLY ORANGE JUICE COMPANY, | |
| Defendants. | |

**DEFENDANTS THE COCA-COLA COMPANY AND SIMPLY ORANGE JUICE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

FACTUAL BACKGROUND ......................................................................................4

LEGAL STANDARD ..................................................................................................9

ARGUMENT ..............................................................................................................10

    I.      Plaintiff Lacks Article III Standing.................................................................10

          A.      Plaintiff Cannot Establish Concrete Economic Harm Sufficient to Confer Standing Under a Benefit-of-the-Bargain or Price Premium Theory......................................................................................................11

               1.      Plaintiff fails to show he received anything but the benefit of his bargain ..............................................................................11

               2.      Plaintiff's threadbare allegations concerning a price premium cannot confer standing ................................................14

          B.      Plaintiff Has Failed to Show He Was Personally Injured.........................16

    II.      All of Plaintiff's Claims Fail Because the Challenged Statements and Omissions Cannot Mislead a Reasonable Consumer............................................21

    III.      Plaintiff's Claim Under New York's Agriculture & Markets Law Fails Because That Statute Does Not Contain a Private Right of Action and the Presence of Trace Amounts of PFAS Does Not Render a Product Adulterated or Misbranded..................................................................................24

    IV.      Plaintiff's Omission-Based Claims Are Preempted and Also Fail Because Plaintiff Has Not Plausibly Alleged Coca-Cola Was Aware of the Presence of PFAS ............................................................................................27

    V.      Certain Remaining Claims Also Fail for Additional, Independent Reasons.........29

CONCLUSION............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................................9

*Axon v. Citrus World, Inc.*,
    354 F. Supp. 3d 170 (E.D.N.Y. 2018) ................................................................. 22, 23, 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................9

*Berni v. Barilla S.P.A.*,
    964 F.3d 141 (2d Cir. 2020) ...................................................................................30

*Bildstein v. MasterCard Int'l, Inc.*,
    329 F. Supp. 2d 410 (S.D.N.Y. 2004) ......................................................................29

*Black Radio Network, Inc. v. NYNEX Corp.*,
    No. 96-cv-4138, 2000 U.S. Dist. LEXIS 594 (S.D.N.Y. Jan. 25, 2000).................................30

*Boysen v. Walgreen Co.*
    No. 11-cv-06262, 2012 U.S. Dist. LEXIS 100528 (N.D. Cal. July 19, 2012) ................. 13, 14

*Brown v. COTY, Inc.*,
    No. 22-cv-2696, 2023 U.S. Dist. LEXIS 54316 (S.D.N.Y. Mar. 29, 2023)..........................22

*Brown v. Coty, Inc.*,
    No. 22-cv-2696, 2024 U.S. Dist. LEXIS 36146 (S.D.N.Y. Mar. 1, 2024)................. 16, 17, 18

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    433 F.3d 181 (2d Cir. 2005) ...................................................................................10

*Dalewitz v. P&G*,
    No. 7:22-cv-07323, 2023 U.S. Dist. LEXIS 172160 (S.D.N.Y. Sep. 22, 2023) ...................17

*DeMaria v. Nissan N. Am., Inc.*,
    No. 15-cv-3321, 2016 U.S. Dist. LEXIS 11295 (N.D. Ill. Feb. 1, 2016)...............................28

*Esquibel v. Colgate-Palmolive Co.*,
    No. 23-cv-00742, 2023 U.S. Dist. LEXIS 201609 (S.D.N.Y. Nov. 9, 2023) .......................17

*Estrada v. Johnson & Johnson*,
    No. 16-cv-7492, 2017 U.S. Dist. LEXIS 109455 (D.N.J. July 14, 2017) .............................14

*Harris v. Pfizer Inc.*,
    586 F. Supp. 3d 231 (S.D.N.Y. 2022) ................................................................28

*Hawyuan Yu v. Dr Pepper Snapple Grp., Inc.*,
    No. 18-cv-06664, 2020 U.S. Dist. LEXIS 185322 (N.D. Cal. Oct. 6, 2020) .........................24

*Hernandez v. Wonderful Co. LLC*,
    No. 23-cv-1242, 2023 U.S. Dist. LEXIS 231476 (S.D.N.Y. Dec. 29, 2023) ................... 10, 17

*Herrington v. Johnson & Johnson*,
    No. 09-cv-1597, 2010 U.S. Dist. LEXIS 90505 (N.D. Cal. Sep. 1, 2010) ......................12, 29

*Hicks v. L'Oréal U.S.A., Inc.*,
    No. 22-cv-1989, 2023 U.S. Dist. LEXIS 176565 (S.D.N.Y. Sep. 30, 2023) ................... 16, 18

*Hubert v. Gen. Nutrition Corp.*,
    No. 2:15-cv-01391, 2017 U.S. Dist. LEXIS 145506 (W.D. Pa. Sep. 8, 2017) ............... 12, 15

*Huertas v. Bayer U.S., LLC*,
    No. 21-cv-20021, 2022 U.S. Dist. LEXIS 148897 (D.N.J. Aug. 19, 2022) ..........................11

*In re Bisphenol-A Polycarbonate Plastic Prods. Liab. Litig.*,
    No. 1967, 2009 U.S. Dist. LEXIS 104451 (W.D. Mo. Nov. 9, 2009) ...................................27

*In re Fruit Juice Prods.*,
    831 F. Supp. 2d 507 (D. Mass. 2011) ...................................................................... 12, 14

*In re Gen. Mills Glyphosate Litig.*,
    No. 16-cv-2869, 2017 U.S. Dist. LEXIS 108469 (D. Minn. July 12, 2017) ..........................24

*In re Johnson & Johnson Talcum Powder*,
    903 F.3d 278 (3d Cir. 2018) ...................................................................................... 11, 12

*In re Plum Baby Food Litig.*,
    No. 1:21-cv-02417, 2022 U.S. Dist. LEXIS 197458 (D.N.J. Oct. 31, 2022) ..........................15

*In re Sling Media Slingbox Advert. Litig.*,
    202 F. Supp. 3d 352 (S.D.N.Y. 2016) ................................................................................28

*Izquierdo v. Mondelez Int'l, Inc.*,
    No. 16-cv-04697, 2016 U.S. Dist. LEXIS 149795 (S.D.N.Y. Oct. 26, 2016) .......................15

*John v. Whole Foods Mkt. Grp., Inc.*,
    858 F.3d 732 (2d Cir. 2017) ...............................................................................................19

*Kell v. Lily's Sweets, LLC*,
    2024 U.S. Dist. LEXIS 44297 (S.D.N.Y. Mar. 13, 2024) ...................................................19

*Kimca v. Sprout Foods, Inc.*,
    No. 21-cv-12977, 2022 U.S. Dist. LEXIS 74642 (D.N.J. Apr. 25, 2022) ...................... 11, 14

*Koronthaly v. L'Oreal USA, Inc.*,
    No. 07-cv-5588, 2008 U.S. Dist. LEXIS 59024 (D.N.J. July 25, 2008) ................................ 12

*Krakauer v. Rec. Equip., Inc.*,
    No. 22-cv-5830, 2024 U.S. Dist. LEXIS 65346 (W.D. Wash. Mar. 29, 2024) ..................... 14

*Lateef v. Pharmavite LLC*,
    No. 12-cv-5611, 2012 U.S. Dist. LEXIS 152528 (N.D. Ill. Oct. 24, 2012) .......................... 28

*Lewis v. Casey*,
    518 U.S. 343 (1996) .......................................................................................................... 10

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................................... 10

*Ohanian v. Apple Inc.*,
    No. 20-cv-5162, 2022 U.S. Dist. LEXIS 48740 (S.D.N.Y. Mar. 18, 2022) .......................... 28

*Onaka v. Shiseido Ams. Corp.*,
    No. 21-cv-10665, 2023 U.S. Dist. LEXIS 53220 (S.D.N.Y. Mar. 27, 2023) ........................ 16

*Onaka v. Shiseido Ams. Corp.*,
    No. 21-cv-10665, 2024 U.S. Dist. LEXIS 50613 (S.D.N.Y. Mar. 19, 2024) ........................ 17

*Parks v. Ainsworth Pet Nutrition, LLC*,
    377 F. Supp. 3d 241 (S.D.N.Y. 2019) ............................................................................ 24, 29

*Red v. Gen. Mills, Inc.*,
    No. 2:15-cv-02232, 2015 U.S. Dist. LEXIS 172671 (C.D. Cal. Dec. 29, 2015) ................... 21

*Rider v. Uphold HQ Inc.*,
    No. 22-cv-1602, 2023 U.S. Dist. LEXIS 29617 (S.D.N.Y. Feb. 22, 2023) .......................... 30

*Rudolph v. Hudson's Bay Co.*,
    No. 18-cv-8472, 2019 U.S. Dist. LEXIS 77665 (S.D.N.Y. May 7, 2019) ............................ 11

*Santiful v. Wegmans Food Mkts., Inc.*,
    No. 20-cv-2933-NSR, 2023 U.S. Dist. LEXIS 40920 (S.D.N.Y. Mar. 10, 2023) ........... 22, 23

*Steele v. Wegmans Food Mkts.*,
    472 F. Supp. 3d 47 (S.D.N.Y. 2020) ................................................................................... 24

*Taylor v. Bernanke*,
    No. 13-cv-1013, 2013 U.S. Dist. LEXIS 128533 (E.D.N.Y. Sep. 9, 2013) .......................... 21

*Turek v. Gen. Mills, Inc.*,
    662 F.3d 423 (7th Cir. 2011) ..................................................................27

*Turk v. Rubbermaid Inc.*,
    No. 21-cv-270, 2022 U.S. Dist. LEXIS 50230 (S.D.N.Y. Mar. 21, 2022)..............................9

*United States v. Anderson Seafoods, Inc.*,
    622 F.2d 157 (5th Cir. 1980) ..................................................................25

*Vitolo v. Dow Corning Corp.*,
    234 A.D.2d 361 (N.Y. App. Div. 2nd Dept. 1996) ............................................30

*Walker v. Keurig Dr. Pepper Inc.*,
    No. 22-cv-5557, 2024 U.S. Dist. LEXIS 125286 (E.D.N.Y. July 16, 2024) .................. 10, 20

*Warren v. Coca-Cola Co.*,
    No. 22-cv-6907, 2023 U.S. Dist. LEXIS 70494 (S.D.N.Y. Apr. 21, 2023) ..........................30

*Woulfe v. Universal City Studios LLC*,
    No. 2:22-cv-00459, 2023 U.S. Dist. LEXIS 170929 (C.D. Cal. Aug. 28, 2023) .................21

## STATUTES

21 U.S.C. § 342 ........................................................................................25

21 U.S.C. § 343 ........................................................................................27

21 U.S.C. § 343-1 .....................................................................................27

N.Y. Agric. & Mkts. Law § 199-a .......................................................... 24, 25

N.Y. Agric. & Mkts. Law § 200 ................................................................25

N.Y. Agric. & Mkts. Law § 201 ................................................................25

## REGULATIONS

21 C.F.R. § 100.1 .....................................................................................27

21 C.F.R. § 101.100 ............................................................................23, 27

21 C.F.R. § 165.110 .................................................................................23

## OTHER AUTHORITIES

EPA, *Past PFOA and PFOS Health Effects Science Documents*,
    https://www.epa.gov/sdwa/past-pfoa-and-pfos-health-effects-science-documents............8, 13

EPA, *Per- and Polyfluoroalkyl Substances (PFAS): Final PFAS National Primary Drinking Water Regulation*, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas................................................................................................. 8, 13

EPA, *PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies*, https://www.epa.gov/system/files/documents/2024-04/pfas_npwdr_faqsstates_4.8.24.pdf ................................................. 8, 14

FDA, *Analytical Results for PFAS in 2022 Seafood Survey (Parts Per Trillion)*, https://www.fda.gov/media/159570/download ................................................... 26

FDA, *Testing Food for PFAS and Assessing Dietary Exposure*, https://www.fda.gov/food/process-contaminants-food/testing-food-pfas-and-assessing-dietary-exposure ............................................................................. 26

# INTRODUCTION

Despite three chances to plead a plausible claim for relief against Defendants The Coca-Cola Company and Simply Orange Juice Company (collectively, "Coca-Cola"), and despite "the benefit of a court ruling with respect to the deficiencies of [his] pleading," (Dkt. 41 at 8), Plaintiff's allegations surrounding his testing and purchase of certain Simply juice products (the "Products")[1] remain insufficiently vague and conclusory and warrant dismissal with prejudice.

Plaintiff claims that the Products are mislabeled as "All Natural" juice products that are "made simply" with "all-natural ingredients," when they actually contain certain undisclosed PFAS—an umbrella term for thousands of ubiquitous chemicals that are omnipresent at low levels in the environment—which could potentially be associated with adverse health effects at (unspecified) high-levels of exposure. As the Court previously explained in dismissing Plaintiff's First Amended Complaint ("FAC"), Plaintiff's allegations regarding his purchases and testing of the Products are critical at this juncture because, in order to establish standing under his theory of the case, "Plaintiff must plausibly allege that he purchased a Product . . . that contained PFAS." (Dkt. 41 at 5). The Court dismissed Plaintiff's FAC, which was "based solely on a single independent test he had commissioned" for a single Product (Simply Tropical), because the findings of the test did not plausibly suggest "any injury with respect to the Products Plaintiff himself purchased." (*Id.* at 5). In particular: (1) Plaintiff failed to provide sufficient details regarding the testing, such as how many samples he tested, whether all of the tested samples revealed the presence of PFAS, and, if not, what percentage of the samples had PFAS, (*id.*); and

---

[1] Plaintiff's first two Complaints were limited to a single "Product," defined as the Simply Tropical juice product. Plaintiff has now significantly expanded the definition of "Products" to include 16 different Simply product lines. (Dkt. 42 at ¶ 1). Of those 16 Products, Plaintiff only specifically alleges that he personally purchased: (1) Simply Tropical; (2) Simply Orange, Pulp Free; and (3) Simply Orange with Mango, Pulp Free. (*See id.* at ¶ 126).

(2) Plaintiff did not test the Product he actually purchased and failed to "meaningfully link[]" the results of his testing of sample(s) within the same product line to his purchases, such as by averring facts from which the Court could extrapolate that his isolated testing applied broadly to the "tens of thousands" of Products sold during the Class Period and by alleging that Plaintiff "routinely shopped for those products," (*id.* at 5-8).

In his Second Amended Complaint ("SAC") (Dkt. 42), Plaintiff provides no additional details regarding his testing of the Simply Tropical Product, except to name the laboratory, Enalytic, that performed the testing and to disclose, for the first time, that there was a seven-month gap between when the samples were collected (July 2022) and when they were tested (February 2023)—giving rise to a plausible inference that the samples were contaminated given the widespread presence of PFAS in the environment. Moreover, because Plaintiff has now alleged that, while the samples were collected in July 2022, they were not tested until February 2023, his own allegations indicate that he never had any testing to support his claims when he first filed his initial Complaint in December 2022.

Plaintiff's SAC includes additional new allegations that Enalytic also conducted testing on nine other Simply product lines in February 2023, but, just as in his FAC, Plaintiff fails to provide sufficient details regarding that testing or to meaningfully link that testing to any of his actual purchases. For instance, Plaintiff does not explain how many samples of each of the nine product lines he tested, whether all tested samples revealed the presence of PFAS (and if not, the percentage of samples that had PFAS), the actual results (including the type of PFAS present and whether it was the same type of PFAS allegedly present in the Simply Tropical sample), the methodology used, the quality assurance and quality control measures used, or details about when the samples were collected and from where they were collected. Even more problematic

for Plaintiff, he fails to allege he made purchases of any Products from the nine tested product lines,[2] nor does he provide grounds for extrapolating from these limited results the conclusion that all of the "tens of thousands" of Products during the Class Period contained PFAS.

Finally, Plaintiff adds the allegation in his SAC that he conducted a second round of testing in July 2024 on six product lines, including "two products actually purchased by Plaintiff."[3] It is unclear from the SAC if Plaintiff is contending that he actually tested a sample obtained from a Product he physically purchased, or whether he simply means that he made purchases of Products within the tested Simply Orange, Pulp Free and Simply Orange with Mango, Pulp Free product lines. In either event, these allegations also cannot establish standing. If the former, courts have routinely rejected attempts to acquire standing by purchasing products solely for litigation and "self-inflicting" injury. If the latter, Plaintiff's July 2024 testing lacks temporal proximity to the pre-Complaint purchases he made (prior to filing in December 2022) giving rise to the lawsuit. In any event, Plaintiff still does not include basic facts about the July 2024 testing, such as the number of samples tested, the percentage of samples that had PFAS, and from where and when the samples were collected. As such, it is obvious Plaintiff cannot coherently string together plausible allegations demonstrating he suffered any actual injury, so "no standing exists" (*see* Dkt. 41 at 7), and the Court should dismiss the SAC with prejudice.

Even setting aside the infirmities of Plaintiff's allegations concerning standing, Plaintiff's

---

[2] Specifically, Plaintiff alleges the February 2023 testing involved: (1) Simply Limeade, (2) Simply Apple, (3) Simply Light, (4) Simply Watermelon, (5) Simply Grapefruit, (6) Simply Cranberry Cocktail, (7) Simply Peach, (8) Simply Lemonade, and (9) Simply Fruit Punch. (Dkt. 42 at ¶ 65). Meanwhile, he claims to have purchased: (1) Simply Tropical, (2) Simply Orange, Pulp Free, and (3) Simply Orange with Mango, Pulp Free. (*Id.* at ¶ 126).

[3] Plaintiff alleges the July 2024 testing involved: (1) Simply Light Orange, Pulp Free, (2) Simply Orange, Pulp Free, (3) Simply Orange, Low Acid, Pulp Free, (4) Simply Orange with Mango, Pulp Free, (5) Simply Orange, Medium Pulp, and (6) Simply Orange, High Pulp. (Dkt. 42 at ¶ 68). Of those Products, he claims to have purchased: (1) Simply Orange, Pulp Free, and (2) Simply Orange with Mango, Pulp Free. (*Id.* at ¶ 126).

SAC still fails to state a claim on which relief can be granted, for multiple reasons. **First**, Plaintiff has not shown that a reasonable consumer would be misled by any misrepresentation or omission. Plaintiff challenges the representations that the Product is "made simply" with "all-natural ingredients." (Dkt. 42 at ¶ 5). Those representations are true. The Products contain, for example, juices and puree, water, sugar, and natural flavors. (Dkt. 42 at ¶ 28). PFAS is not an "ingredient" in the Product, as corroborated by FDA regulations exempting such incidental additives from disclosure on the FDA-mandated ingredient list. And there is no requirement that all trace amounts of chemicals with speculative health effects must be disclosed on a label. **Second**, Plaintiff's purported claim under the New York Agriculture and Markets Law ("AML") fails because there is no private right of action under the relevant provisions of that statute and the Products are not mislabeled or adulterated. There is no authority for Plaintiff's position that the presence of any amount of PFAS renders a product adulterated. **Third**, Plaintiff's omissions-based claims are expressly preempted because FDA exempts incidental additives like PFAS from any disclosure obligation. These claims also fail because Plaintiff has not plausibly alleged Coca-Cola knew of PFAS in the Products. **Fourth**, certain remaining claims are deficient under Rule 12(b)(6) or 12(b)(1) for other independent reasons. As a result, Coca-Cola respectfully requests that the Court dismiss Plaintiff's SAC, in its entirety, and with prejudice based on Plaintiff's "repeated failure to cure deficiencies by amendments previously allowed." Dkt. 41 at 8.

## FACTUAL BACKGROUND

Plaintiff alleges the Products are falsely labeled in a way that deceives consumers into believing they are "pure" and "All Natural" juice products "made simply" with "all-natural ingredients," when, in fact, the Products contain "multiple" substances among the thousands of chemical compounds known as "PFAS," including PFOA and PFOS. (Dkt. 42 at ¶¶ 2, 5, 58,

125). However, the only actual labeling representations Plaintiff identifies are: (1) "All Natural" on the Simply Tropical Product; and (2) "100% Pure Squeezed Pasteurized Orange Juice" on the Simply Orange, Pulp Free Product. (*Id.* at ¶¶ 5-6).[4] Plaintiff never identifies any supposedly misleading statement on the labels of the 14 other Products.

**PFAS Chemicals.** According to Plaintiff's SAC and the sources it incorporates by reference, PFAS are ubiquitous and unavoidable. For instance, EPA has explained that "[b]ecause of their widespread use and their persistence in the environment, many PFAS are found in the blood of people and animals all over the world."[5] PFAS "are present at low levels in a variety of food products"[6]—which they can unintentionally enter after migrating from packaging[7]—and in the environment, including in "water, air, fish, and soil."[8] The CDC has noted that "you probably cannot prevent PFAS exposure altogether,"[9] and the European Environment Agency has concurred that "[i]t is difficult for citizens to totally avoid exposure to PFAS."[10] Despite the ubiquitous and unavoidable nature of PFAS, Plaintiff takes the untenable position that their presence in a consumer product (at any level) constitutes consumer fraud.

While Plaintiff claims that PFAS, and PFOA and PFOS in particular, "have been

---

[4] Plaintiff makes passing references to other online marketing and advertising statements, but never specifically identifies the statements he purportedly viewed and relied upon before purchasing any Product. (Dkt. 42 at ¶ 127).

[5] EPA, *PFAS Explained*, https://www.epa.gov/pfas/pfas-explained (incorporated into SAC at Dkt. 42 at ¶ 35 n.13).

[6] *Id.*

[7] Environmental Health Perspectives, *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (Dkt. 42 at ¶ 38 n.16).

[8] EPA, *PFAS Explained*, https://www.epa.gov/pfas/pfas-explained (Dkt. 42 at ¶ 35 n.13).

[9] CDC, *PFAS FAQs*, https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (Dkt. 42 at ¶ 36 n.14).

[10] EEA, *Emerging Chemical Risks in Europe—'PFAS,'* https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (Dkt. 42 at ¶ 41 n. 18).

indisputably linked to negative health effects," (Dkt. 42 at ¶ 59), his cited source takes the more equivocal stance that "scientific studies have shown that exposure to **some** PFAS in the environment **may be** linked to harmful health effects" and that it is "difficult to show that substances directly cause health conditions in humans."[11] For that reason, Plaintiff cannot go any further than alleging that some PFAS can pose a potential risk at (unspecified) high levels. (*See, e.g.*, Dkt. 42 at ¶ 42 (exposure to "high levels of PFAS" puts people "most at risk of adverse health impacts"), ¶ 39 (PFAS have been "associated with" negative health impacts), ¶ 40 (exposure to "certain levels of PFAS may lead to" health consequences)).

 **Plaintiff's Testing.** Plaintiff's sole basis for alleging the presence of PFAS in the Products here is third-party testing, which purportedly detected "material" and "significant" levels of multiple PFAS in some of the Products, including "concerning" levels of PFOA and PFOS. (Dkt. 42 at ¶¶ 56, 58, 66, 68). Plaintiff claims that this testing was performed in February 2023 and July 2024 by Enalytic in New York, but provides little additional information:

- ***Simply Tropical Testing.*** In February 2023, two months ***after*** Plaintiff filed his initial Complaint, Enalytic "first conducted" testing on "samples collected in July 2022." (*Id.* at ¶ 57). Although the SAC does not explicitly say so, this testing presumably involved Simply Tropical. (*See id.* at ¶ 58). The testing allegedly "was performed in accordance with accepted industry standards for detecting the presence of PFAS" and revealed "material levels of PFAS." (*Id.* at ¶¶ 57). The SAC does not contain any allegations regarding the methodology used, the individual who performed the testing, the quality assurance and quality control measures used, whether the PFAS was discovered in the Product packaging or the juice itself, or any information about the Product unit tested, such as the lot code or the production location. Nor does Plaintiff allege the purported source of the PFAS—*e.g.*, migration from Product packaging or manufacturing equipment, a water source that contains PFAS, or an isolated contamination incident.

- ***February 2023 Testing of Unpurchased Products.*** Also in February 2023, Enalytic conducted testing on nine other product lines, none of which Plaintiff claims to have purchased. (*Id.* at ¶¶ 65, 126). Plaintiff's testing purportedly revealed that "each of the products contained significant levels of PFAS compounds." (*Id.* at ¶ 66). Plaintiff

[11] CDC, *What are PFAS?*, https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (emphasis added) (Dkt. 42 at ¶ 59 n.32).

provides no further information about the testing parameters, including the number of samples tested from each product line, whether the Products were tested more than once, whether other product lines were tested, or any of the other information outlined above.

- ***July 2024 Testing.*** In July 2024, Enalytic conducted further testing on six product lines. This testing purportedly revealed that each of the Products contained significant levels of PFAS compounds. (*Id.* at ¶ 68). The July 2024 testing included two Products "actually purchased by Plaintiff," although it is unclear if he means that he obtained samples from his own physical purchases or if he just purchased Products from the tested product lines.

**Test Results.** Plaintiff provides few allegations regarding testing results. With respect to the types of PFAS allegedly detected, Plaintiff: (1) claims his testing detected PFOA and PFOS in the Simply Tropical Product, (*id.* at ¶ 58); (2) fails to identify any specific PFAS compound with respect to the February 2023 testing of unpurchased Products, (*id.* at ¶ 66); and (3) only identifies specific PFAS with respect to two of the six product lines tested in July 2024—Simply Orange, Pulp Free purportedly tested positive for Perfluoro-1-butanesulfonic acid (not identified in Plaintiff's other testing) and Perfluoro-n-octanoic acid, and Simply Orange with Mango, Pulp Free allegedly tested positive for Perfluoro-1-butanesulfonic acid and PFOS.

Plaintiff's only factual allegations hinting at the levels of any PFAS allegedly detected are that the Simply Tropical Product contained PFOA and PFOS in amounts "more than 100 times the EPA's recommended levels" (0.004 part per trillions (ppt) for PFOA and 0.02 ppt for PFOS). (Dkt. 42 at ¶¶ 63-64). Plaintiff says nothing about the levels of PFAS allegedly detected in any other Product. Critically, what Plaintiff refers to as the EPA's "recommended levels" are actually 2022 interim lifetime health advisories for drinking water: the concentration of PFAS in ***drinking water*** at or below which adverse health effects are not anticipated to occur ***over a lifetime***.[12] Plaintiff's SAC lacks any explanation of how lifetime health advisory levels for PFAS

---

[12] EPA, *Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS*, https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q3 (Dkt. 42 at ¶ 60 n.33).

in drinking water are relevant to juice, consumed far less frequently than drinking water. But in any event, on April 10, 2024, EPA issued a new Maximum Contaminant Level ("MCL") that sets PFOA and PFOS levels for drinking water at 4 ppt. Request for Judicial Notice ("RJN"), Ex. A.[13] Critically, based on Plaintiff's allegations, the PFAS detected in the Simply Tropical Product (0.004 ppt x 100, or **0.4 ppt for PFOA**, and 0.02 ppt x 100, or **2 ppt for PFOS**) would fall ***below*** this new MCL for ***drinking water***.

Notably, EPA has also identified 4 ppt as the lowest feasible level to reliably measure PFAS in drinking water and set 4 ppt as the Practical Quantification Level ("PQL"), meaning the level that "provide[s] the precision and accuracy that EPA estimates can be achieved during routine laboratory operating conditions." And, EPA instructs, "**if a laboratory provides a sample result less than the PQL [4 ppt], the system should use *zero* for that sample result**." RJN, Ex. C at pp. 6-7. In sum, the PFOA and PFOS levels allegedly detected by Plaintiff's testing are: (1) below the 4 ppt level set by the EPA for ***drinking water***; (2) below the level that EPA states PFAS can be precisely and accurately measured; and (3) so low, that if they were detected by a municipal water system, EPA would treat them as "zero." *Id.*

**Plaintiff's Purchases.** Plaintiff identifies just three Simply juice Products that he personally purchased: (1) Simply Tropical; (2) Simply Orange, Pulp Free; and (3) Simply Orange with Mango, Pulp Free. (Dkt. 42 at ¶ 126). He claims to have made purchases "during the class period," but does not provide any specific dates, making it impossible to determine the temporal proximity of his purchases and his testing. (*Id.*) He asserts he purchased the Products "numerous times," but does not give any indication as to the frequency or regularity with which he did so. (*Id.*). And he claims to have purchased from "various retailers in Dutchess County,

---

[13] In issuing the MCL, the EPA noted "[t]he 2022 PFOA and PFOS interim [levels]"—the levels relied on by Plaintiff—"no longer reflect the best available scientific information." RJN, Ex. B.

New York, including Price Chopper in Poughkeepsie, New York," but does not then link the location of his purchases to the location where the tested samples were obtained. (*Id.*).

**Plaintiff's Alleged Injury.** Plaintiff only claims to have suffered economic injury, (Dkt. 42 at ¶ 152), and does not claim that he or anyone else was physically harmed as a result of consuming the Products, or that he or anyone else is likely to suffer harm in the future. He asserts five claims[14] and seeks to certify a nationwide class and/or a New York state subclass and requests damages and restitution. (*See* Dkt. 42 at ¶ 153; Request for Relief).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, if accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* And although the court "must accept as true all of the allegations contained in a complaint' that are not legal conclusions," a complaint's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The standard of review under Rule 12(b)(1) is substantively similar to the standard under 12(b)(6), except that the plaintiff bears the burden of proof. *Turk v. Rubbermaid Inc.*, No. 21-cv-270, 2022 U.S. Dist. LEXIS 50230, at *7 (S.D.N.Y. Mar. 21, 2022). Further, a plaintiff seeking injunctive relief "cannot rely only on past injury to satisfy the injury requirement but must show

---

[14] In paragraph 12 of his SAC, Plaintiff asserts claims for (1) violation of N.Y. Gen. Bus. Law ("GBL") § 349, *et seq.*; (2) violation of GBL § 350, *et seq.*; *(3) breach of express warranty; (4) fraud; (5) constructive fraud*; and (6) unjust enrichment. However, the enumerated counts in the SAC (¶¶ 163-198) are for (1) violation of GBL § 349; (2) violation of GBL § 350; (3) violation of the AML; (4) negligence *per se*; and (5) unjust enrichment. The references to the breach of warranty, fraud, and constructive fraud claims appear to be in error, but in an abundance of caution, Coca-Cola moves to dismiss these claims as abandoned and reserves all rights.

a likelihood of future harm." *Hernandez v. Wonderful Co. LLC*, No. 23-cv-1242, 2023 U.S. Dist. LEXIS 231476, at *12 (S.D.N.Y. Dec. 29, 2023) (citation omitted).

**ARGUMENT**

Plaintiff's claims should be dismissed because: (1) Plaintiff lacks Article III standing; (2) the challenged statements and omissions would not mislead a reasonable consumer; (3) there is no private right of action under the sections of the AML Plaintiff invokes, and the Products are not misbranded or adulterated; (4) his omissions-based claims are expressly preempted and fail because he has not alleged knowledge; and (5) certain claims fail for additional reasons.

## I.    Plaintiff Lacks Article III Standing

To demonstrate Article III standing, a plaintiff must establish: (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of; and (3) redressability of the injury by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To satisfy the injury-in-fact requirement, a plaintiff must allege facts showing that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. In a potential class action, the named plaintiff must allege that he was personally injured by defendants' conduct. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005). A named plaintiff cannot rely on the standing of unnamed potential class members. *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

"To establish injury, a plaintiff may show a 'benefit-of-the-bargain' or a 'price-premium' theory . . . ." *Walker v. Keurig Dr. Pepper Inc.*, No. 22-cv-5557, 2024 U.S. Dist. LEXIS 125286, at *8 (E.D.N.Y. July 16, 2024). Here, Plaintiff invokes both theories, but fails to establish either. In addition, he has failed to allege that he was personally injured by the challenged conduct because his testing allegations do not plausibly demonstrate any injury with respect to the

Products Plaintiff himself purchased. (*See* Dkt. 41 at 5).

### A. Plaintiff Cannot Establish Concrete Economic Harm Sufficient to Confer Standing Under a Benefit-of-the-Bargain or Price Premium Theory

Plaintiff's purported injury is purely economic. He alleges he "did not obtain the full value of the advertised Product" (i.e., did not receive the benefit of his bargain) and "paid more for" the Product than he allegedly would have if he had known that the Product contained PFAS (i.e., he paid a price premium). (Dkt. 42 at ¶ 102). Under either of these theories, Plaintiff's allegations are insufficient to establish concrete economic harm.

### 1. Plaintiff fails to show he received anything but the benefit of his bargain

In order to allege that he has suffered an economic injury for Article III purposes as a result of simply purchasing a product under a benefit-of-the-bargain theory, Plaintiff must adequately allege that the Product was not worth what he paid for it. *In re Johnson & Johnson Talcum Powder*, 903 F.3d 278, 287, 290 (3d Cir. 2018); *Rudolph v. Hudson's Bay Co.*, No. 18-cv-8472, 2019 U.S. Dist. LEXIS 77665, at *25 (S.D.N.Y. May 7, 2019) (finding no benefit-of-the-bargain injury in data breach case where there was no allegation that the purchased goods "were deficient or did not meet expectations" as a result of the breach).

In the context of cases involving the presence of purportedly unsafe chemicals in consumer products, courts around the country have consistently held that plaintiffs cannot meet this requirement where: (1) they received a functioning product that they consumed without incident; and (2) they assert the product is worth less (or worthless) because of the presence of potentially dangerous chemicals in the product, but fail to adequately allege that those chemicals pose a substantial and credible risk of future physical harm. *See, e.g.*, *In re Johnson & Johnson*, 903 F.3d at 287; *Kimca v. Sprout Foods, Inc.*, No. 21-cv-12977, 2022 U.S. Dist. LEXIS 74642 (D.N.J. Apr. 25, 2022); *Huertas v. Bayer U.S., LLC*, No. 21-cv-20021, 2022 U.S. Dist. LEXIS

148897, at *17 (D.N.J. Aug. 19, 2022); *Hubert v. Gen. Nutrition Corp.*, No. 2:15-cv-01391, 2017 U.S. Dist. LEXIS 145506, at *23 (W.D. Pa. Sep. 8, 2017); *In re Fruit Juice Prods.*, 831 F. Supp. 2d 507, 512 (D. Mass. 2011); *Herrington v. Johnson & Johnson*, No. 09-cv-1597, 2010 U.S. Dist. LEXIS 90505, at *18 (N.D. Cal. Sep. 1, 2010); *Koronthaly v. L'Oreal USA, Inc.*, No. 07-cv-5588, 2008 U.S. Dist. LEXIS 59024, at *14 (D.N.J. July 25, 2008), *aff'd* 374 F. App'x 257 (3d Cir. 2010). Under those circumstances—where (1) the plaintiff receives a fully functioning product, and (2) the plaintiff is claiming the product is worth less because it contains potentially harmful chemicals but has not alleged the chemicals pose a substantial and credible risk of future harm—then the plaintiff has received what she bargained for.

For instance, in *Johnson & Johnson*, the court found that the plaintiff could not establish an economic injury based on her purchase of "unsafe" talcum powder containing asbestos because she received "a functional product that she has already consumed" and did not claim she faced any credible increased risk of developing ovarian cancer in the future. 903 F.3d at 289, 293. In a recent PFAS case involving a food product (popcorn), the Northern District of Illinois reasoned that although "*Johnson & Johnson* is not binding upon this court, . . . its reasoning is instructive and persuasive." *Richburg*, 2023 U.S. Dist. LEXIS 21137, at *12 (finding "[P]laintiffs [did] not allege that defendant's microwave [popcorn] products failed to work as intended" and that "[w]ithout such an allegation, the court is not persuaded that plaintiffs have established concrete injuries based on the benefit-of-the-bargain theory.").

Other cases involving alleged chemical contaminants in juices, like the present case, are in accord. *See, e.g.*, *In re Fruit Juice Products*, 831 F. Supp. 2d at 512-13 (holding juice products "had no diminished value due to the presence of . . . lead" where: (1) plaintiffs received fruit juice "which they consumed without suffering harm" and (2) they did not plead any actual

physical injury or any non-speculative allegations about future harm); *Boysen v. Walgreen Co.* No. 11-cv-06262, 2012 U.S. Dist. LEXIS 100528, at *2, *22 (N.D. Cal. July 19, 2012) (dismissing claims based on the defendant's failure to disclose the presence of "material and significant" levels of arsenic and lead in its juices because the plaintiff failed to allege he received a product that did not "work for its intended purpose" (i.e., consumption)).

The result here should be no different. Plaintiff never alleges that the juice Products failed their intended purpose of consumption, nor does Plaintiff credibly allege the Products are worth less (or worthless) because of any direct, tangible impact PFAS has on his health. Plaintiff generally alleges that PFAS chemicals have been "associated" with a variety of negative health effects, (*see, e.g.*, Dkt. 42 at ¶ 39, based on EPA's website, which actually states that "***high levels*** of ***certain*** PFAS ***may*** lead to adverse health outcomes").[15] But Plaintiff does not come close to adequately alleging that he or anyone else: (1) suffered any actual physical harm from consuming the Product; or (2) faces a credible or substantial threat of physical harm at some point in the future based on consuming the Product. *See Boysen*, 2012 U.S. Dist. LEXIS 100528, at *23 (allegations of "significant health concerns associated with ingestion of lead or arsenic" insufficient and plaintiff must "expressly allege that the levels present in defendant's juice ***tend to cause*** physical harm" (emphasis added)). At most, Plaintiff has speculatively alleged that exposure to PFAS at unspecified levels can be associated with potential health risks.[16]

---

[15] EPA, *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (emphasis added) (Dkt. 52 at ¶ 40 n.17).

[16] Plaintiff's attempt to compare the alleged levels of PFOA and PFOS in the Product with the EPA's 2022 interim health advisory levels for drinking water does not plausibly bridge this gap. (Dkt. 42 at ¶ 63). As an initial matter, in April 2024, the EPA issued new national drinking water MCLs of 4 ppt for PFOA and PFOS in drinking water and announced that the interim levels relied on by Plaintiff "no longer reflect the best available scientific information." *See supra*, p. 8; RJN, Exs. A, B. The results of Plaintiff's Simply Tropical testing—which purportedly revealed

In the end, Judge Ponsor said it best in *In re Fruit Juice Products*: "[t]he fact is that Plaintiffs paid for fruit juice, and they received fruit juice, which they consumed without suffering harm. The products have not been recalled, have not caused any reported injuries, and do not fail to comply with any federal standards. The products had no diminished value due to the presence of the [PFAS]. Thus, Plaintiffs received the benefit of the bargain, as a matter of law, when they purchased these products." 831 F. Supp. 2d at 512.

### 2. Plaintiff's threadbare allegations concerning a price premium cannot confer standing

Plaintiff's "price premium" allegations fare no better. (*See* Dkt. 42 at ¶ 152). In analogous cases where plaintiffs claimed a defendant inflated the price of a product by failing to disclose or misrepresenting the presence of ingredients that posed a potential, but unrealized, health risk, courts have held that a "[p]laintiff's threadbare allegation that she purchased [the product] at a premium, without any factual allegations to support that claim, is insufficient to find an injury-in-fact." *Estrada v. Johnson & Johnson*, No. 16-cv-7492, 2017 U.S. Dist. LEXIS 109455, at *44 (D.N.J. July 14, 2017), *aff'd* 903 F.3d 278 (3d Cir. 2018); *see also Krakauer v. Rec. Equip., Inc.*, No. 22-cv-5830, 2024 U.S. Dist. LEXIS 65346, at *20 (W.D. Wash. Mar. 29, 2024) (finding plaintiff's bald assertion that he would have paid less or not purchased a raincoat containing PFAS was insufficient to support overpayment theory); *Kimca*, 2022 U.S. Dist.

---

that the Product contains 100 times more PFOA and PFOS than the EPA's interim advisory levels of 0.004 ppt for PFOA and 0.02 ppt for PFOS—would fall below this new standard. Indeed, the levels supposedly revealed in Plaintiff's testing are so low that EPA treats them as "zero." RJN, Ex. C. Just as importantly, Plaintiff has not explained how this interim advisory level, based on an individual's anticipated lifetime exposure to drinking water, has any relevance to a juice product. Courts have routinely rejected these types of inapposite comparisons in an attempt to show a product contains a dangerously high level of a trace chemical. *See, e.g.*, *Boysen*, 2012 U.S. Dist. LEXIS 100528, at *16, *17 n.5 (rejecting attempt to rely on regulation governing bottled water to show fruit juice contained impermissibly high levels of toxins, and noting different standards govern those products because juice consumption is lower than drinking water); *Kimca*, 2022 U.S. Dist. LEXIS 74642, at *16.

LEXIS 74642, at \*23; *Hubert*, 2017 U.S. Dist. LEXIS 145506, at \*22; *In re Plum Baby Food Litig.*, No. 1:21-cv-02417, 2022 U.S. Dist. LEXIS 197458, at \*25 (D.N.J. Oct. 31, 2022).

Here, the SAC only contains the threadbare and conclusory allegations that Plaintiff and putative class members "paid a premium" when they otherwise would not have, (Dkt. 42 at ¶ 152); that they were induced to "pay a premium for Defendants' Products," (*id.* at ¶ 166); that they "have been injured inasmuch as they . . . paid a premium for the Products," (*id.* at ¶¶ 168, 177); and that Coca-Cola "knew and intended consumers would pay a premium for the Products over [unidentified] comparable products that are made from or contain synthetic or artificial ingredients," (*id.* at ¶ 101). These formulaic allegations are not supported by any accompanying facts. "Simply because Plaintiffs here recite the word 'premium' multiple times in their Complaint does not make Plaintiffs' injury any more cognizable." *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697, 2016 U.S. Dist. LEXIS 149795, at \*18 (S.D.N.Y. Oct. 26, 2016) (dismissing GBL § 349 claim).

Further, while some courts have been more lenient in accepting superficial allegations of a price premium in consumer product cases, this is not a case where the court can readily infer that but-for the allegedly deceptive conduct, the Products would have sold for a lower price— such as where a defendant attempts to pass off an (objectively inferior) faux leather belt as an (objectively superior) genuine leather belt, or a product containing a mix of vegetable oils as containing 100% olive oil. For example, in *In re Gerber Products Company Heavy Metals Baby Food Litigation*, the court found plaintiffs fell short of establishing a price premium where they failed to allege facts showing the value of baby food products with trace amounts of heavy metals "was less than what Defendant falsely represented or what Plaintiffs believed it to be at the time of purchase." No. 1:21-cv-269, 2022 U.S. Dist. LEXIS 189822, at \*38 (E.D. Va. Oct.

17, 2022). In other words, the court could not simply infer that the baby food products were worth objectively less (and thus that the allegedly deceptive conduct allowed the defendant to charge a premium) because the products contained trace amounts of chemicals that were not unsafe as to plaintiffs' children and did not present an imminent risk of developing any specific ailment in the future. The Court should likewise reject Plaintiff's conclusory and unsupported contentions that any alleged misrepresentation or omission resulted in a price premium.

### B. Plaintiff Has Failed to Show He Was Personally Injured

Even if Plaintiff were not foreclosed from proceeding under a benefit-of-the-bargain or price-premium theory, Plaintiff still must "plausibly allege that he purchased a Product that was misbranded, *i.e.*, that contained PFAS" for standing purposes. (Dkt. 41 at 5); *Onaka v. Shiseido Ams. Corp.*, No. 21-cv-10665, 2023 U.S. Dist. LEXIS 53220, at *11 (S.D.N.Y. Mar. 27, 2023).

At the threshold, courts have routinely dismissed claims in PFAS cases where the plaintiff did not provide adequate details about the testing, which precluded the court from plausibly inferring the plaintiff purchased a contaminated product. *E.g.*, *Hicks v. L'Oréal U.S.A., Inc.*, No. 22-cv-1989, 2023 U.S. Dist. LEXIS 176565, at *22-26 (S.D.N.Y. Sep. 30, 2023) (finding "critical details" that would indicate the prevalence of PFAS in the commissioned study were lacking, including how many products were tested overall; whether all of those products revealed the presence of PFAS, and if not, what percentage of the products had PFAS; or even whether all samples within the same product line tested positive); *Brown v. Coty, Inc.*, No. 22-cv-2696, 2024 U.S. Dist. LEXIS 36146, at *10-11 (S.D.N.Y. Mar. 1, 2024) (finding plaintiffs failed to include necessary details concerning how many samples of the products they tested, how pervasive PFAS was found to be, whether all products within the same product line tested positive for the presence of PFAS, or whether the tested samples tested positive for similar levels of the identified PFAS); *Esquibel v. Colgate-Palmolive Co.*, No. 23-cv-00742, 2023 U.S. Dist.

LEXIS 201609, at *7 (S.D.N.Y. Nov. 9, 2023) (where plaintiff failed to "plead facts indicating how many units of the Product were tested, where those units were acquired, where the test took place, or what entity performed the test," the court could not conclude that the presence of PFAS in bottles plaintiffs purchased was anything more than a "sheer possibility"); *Hernandez*, 2023 U.S. Dist. LEXIS 231476, at *1 (court could not plausibly infer substantially all products contained PFAS where plaintiff did not state "how many bottles of the Product she purchased or from where, nor how many were tested and in what manner"); *see also Dalewitz v. P&G*, No. 7:22-cv-07323-NSR, 2023 U.S. Dist. LEXIS 172160, at *9 (S.D.N.Y. Sep. 22, 2023). As the *Brown* court explained, "[t]hese details are necessary not to scrutinize the [t]est's scientific validity, but to understand what the [t]est found." 2024 U.S. Dist. LEXIS 36146, at *11.

Separate and apart from the requirement that plaintiffs provide the bare minimum factual allegations necessary to understand what the test found, courts in PFAS cases have required that plaintiffs either directly test their own purchases for PFAS, or, in the alternative, "meaningfully link[]" the results of their (indirect) testing of products within the same line as their purchases to their actual purchases. *Onaka v. Shiseido Ams. Corp.*, No. 21-cv-10665, 2024 U.S. Dist. LEXIS 50613, at *6 (S.D.N.Y. Mar. 19, 2024). Should plaintiffs pursue the indirect method:

(1) "they would have to, at a minimum, establish that the tests occurred 'reasonably near in time' to their purchases"; and

(2) "they would also have to allege 'that the presence of PFAS in the Products is so widespread as to render it plausible that any Plaintiff purchased a mislabeled Product at least once,'" which would require alleging facts (a) "from which the Court could extrapolate that their isolated testing should apply broadly to Defendant's Products," and that (b) "Plaintiffs purchased the Products with any regular frequency" such that the Court could "infer a plausible likelihood of a past injury." *Id.* at *6-7.

Here, Plaintiff has failed to allege adequate minimum facts to allow the Court to understand what his testing found, and he has additionally failed to "meaningfully link" his commissioned testing to his actual purchases.

*First*, the Court already found Plaintiff's allegations about testing the Simply Tropical Product were insufficient. (Dkt. 41 at 6-8). The only factual averments Plaintiff has added are that: (1) a lab named Enalytic in New York performed the testing; and (2) although the samples were collected in July 2022, the testing did not occur until February 2023. (Dkt. 42 at ¶¶ 57-58). As in *Hicks* and *Brown*, Plaintiff still fails to identify, for example, how many Products overall he tested; how many samples from each product line he tested; whether all Products tested, or all samples within the same product line tested, contained PFAS (and which specific PFAS they contained, if any); and whether all of the tested samples tested positive for similar levels of the same identified PFAS. Thus, he has done nothing to cure his pleading deficiencies with respect to the testing of the Simply Tropical Product.

In fact, Plaintiff's allegations concerning his Simply Tropical testing in his SAC are, if anything, murkier than they were in the FAC. Plaintiff now alleges there was an unexplained seven-month gap in between the collection of the samples and the testing, which introduces the equally plausible explanation that the samples were cross-contaminated prior to testing (given the prevalence of PFAS in the environment). (*See* Dkt. 42 at ¶ 57). In addition, taking his allegations at face value (Dkt. 42 at ¶ 57 ("Plaintiff's independent testing was first conducted in February 2023")), Plaintiff had not conducted any testing when he filed his initial Complaint, which means his December 2022 allegation that "testing has revealed the Product contains PFOA and PFOS" could not be true—and Plaintiff was not basing his initial Complaint on any actual testing. (*See* Dkt. 1 at ¶ 62). Plaintiff also refers to multiple "samples" in the SAC, while he referenced a single "sample" in the FAC, further calling into question what his testing actually entailed. (*Compare* Dkt. 25 at ¶ 55, *with* Dkt. 42 at ¶ 57).

In addition, Plaintiff has failed to meaningfully link the February 2023 Simply Tropical

testing (of samples collected in July 2022) to his own purchases of that Product. He has removed the allegation from paragraph 120 of his FAC that he purchased the Simply Tropical Product in July of 2022, now claiming only that he purchased Products "during the class period," including the Simply Tropical Product. (Dkt. 126). In any event, the Court already found that this temporal proximity alone could not support the inference that the presence of PFAS in a single sample meant PFAS was present in the Product Plaintiff actually purchased. (Dkt. 41 at 7). Further, Plaintiff has not alleged where he obtained the tested samples of the Simply Tropical Product, such that that the Court could plausibly infer the sample and his purchase came from the same lot or were produced in the same facility. (Dkt. 41 at 7 (noting that Plaintiff "does not allege that the sample was taken from a store he frequented")); *Kell v. Lily's Sweets, LLC*, 2024 U.S. Dist. LEXIS 44297, at *9 (S.D.N.Y. Mar. 13, 2024); *cf. John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 735 (2d Cir. 2017) (third-party investigation supported plaintiff's claims where investigation included two stores plaintiff patronized). Nor has he otherwise alleged facts from which the Court could extrapolate that this isolated testing should apply broadly to all Products (e.g., that the Products share a common water source).[17] Finally, his allegation that he purchased the "Products numerous times" falls short of showing that he purchased the Simply Tropical Product with such regularity that he plausibly purchased a contaminated bottle in the past.

**Second**, Plaintiff's allegations concerning Enalytic testing of nine other Simply product lines in February 2023 are similarly bereft of the requisite detail, and Plaintiff does not even allege that he purchased ***any*** Products from these nine tested product lines. Instead, he apparently relies on this testing of unpurchased Products to claim, "it is now more than plausible that the entirety of Defendants' Product Line is contaminated and that this issue is systemic." (Dkt. 42 at

---

[17] In fact, even that allegation would fail because water is not an ingredient in the Simply Orange products, which are 100% orange juice.

¶ 67). The court in *Walker v. Keurig Dr. Pepper Inc.* rejected this same argument. There, plaintiff argued "the allegations that the same defects existed in nine different samples of Defendant's Products raise a plausible inference that the products were systematically contaminated such that Plaintiff also likely purchased a misbranded Product." 2024 U.S. Dist. LEXIS 125286, at *6-7. The court disagreed, reasoning that the plaintiff still failed to provide basic information such as how many of each type of product was tested and which of the products allegedly contained PFOA and PFOS at levels more than 100 times the EPA's recommended levels for drinking water. *Id.* at *13. In addition, he only alleged, like here, that he "'purchased Defendant's Products numerous times,' but [did] not specify which types or flavors of the Products he purchased, other than to say that his purchases 'includ[ed] the Orchard Apple flavor.'" *Id.* Relying on this Court's prior order, the *Walker* court held that "[w]ithout additional information about the testing performed or the actual Products purchased by Plaintiff, the Court cannot conclude that it is plausible that Plaintiff purchased a contaminated Product." *Id.*

The Court should reach the same conclusion here. Plaintiff has not alleged a "systemic" issue because he has not provided detail on how many Products he tested, how many samples from each product line he tested, and how many samples did *not* contain PFAS. Nor has he shown that the nine product lines tested in February 2023 consistently or uniformly contained the same PFAS (at similar levels) as the three product lines from which Plaintiff actually purchased.

***Third***, Plaintiff's post-Complaint, July 2024 testing of six product lines gets him nowhere. As an initial matter, it is unclear if Plaintiff's allegation that "[t]he testing which occurred in July 2024 also included two Products actually purchased by Plaintiff, including Simply Orange, Pulp Free and Simply Orange with Mango, Pulp Free," (Dkt. 42 at ¶ 69), means that Plaintiff collected and analyzed a sample from bottles of Simply Orange, Pulp Free and

Simply Orange with Mango, Pulp Free that he purchased, or if he simply means he made purchases from those product lines and those product lines were tested. If Plaintiff is claiming that he tested actual bottles he purchased in July 2024, nineteen months after the start of this litigation, then that testing cannot give rise to standing. Courts routinely reject attempts to acquire standing by purchasing products solely for litigation. *See Taylor v. Bernanke*, No. 13-cv-1013, 2013 U.S. Dist. LEXIS 128533, at *32 n.5 (E.D.N.Y. Sep. 9, 2013) ("Self-inflicted injury that results from a plaintiff's personal choices rather than a defendant's conduct will not confer standing."); *Woulfe v. Universal City Studios LLC*, No. 2:22-cv-00459, 2023 U.S. Dist. LEXIS 170929, at *10 (C.D. Cal. Aug. 28, 2023); *Red v. Gen. Mills, Inc.*, No. 2:15-cv-02232, 2015 U.S. Dist. LEXIS 172671, at *12 (C.D. Cal. Dec. 29, 2015).

On the other hand, if Plaintiff is only alleging that he tested the same product lines that he purchased, he cannot show the necessary temporal connection between the testing and his purchases. Plaintiff never alleges ***when*** he purchased the Simply Orange, Pulp Free and Simply Orange with Mango, Pulp Free Products. (Dkt. 42 at ¶¶ 69, 126). If he made those purchases prior to filing the initial Complaint, there is a temporal disconnect of nineteen months. If he made those purchases after filing the Complaint, then any injury was self-inflicted, and he could not have been deceived by any labeling representations.

Finally, and in any event, his allegations about the July 2024 testing are just as vague and ill-pled as his allegations regarding the February 2023 testing.

## II.    All of Plaintiff's Claims Fail Because the Challenged Statements and Omissions Cannot Mislead a Reasonable Consumer

All of Plaintiff's claims are premised on the assertion that the Product labeling is misleading (Dkt. 42 at ¶¶ 165, 166, 176, 179, 187, 195, 203), so all of Plaintiff's claims should

be dismissed if a reasonable consumer would not be misled by the Product labels.[18] *See Santiful v. Wegmans Food Mkts., Inc.*, No. 20-cv-2933-NSR, 2023 U.S. Dist. LEXIS 40920, at *12 (S.D.N.Y. Mar. 10, 2023). To satisfy the reasonable consumer standard, "Plaintiffs must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers. Plaintiffs must plausibly allege that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 182 (E.D.N.Y. 2018) (cleaned up). And while the question of whether a reasonable consumer would be deceived is not routinely resolved at the motion to dismiss stage, "dismissal is appropriate when the complaint fails to allege facts that state a plausible claim for relief." *Id.* at 183. That is the case here.

Plaintiff challenges the representations that the Product is an "All Natural" juice product that is "made simply" with "all natural ingredients." (Dkt. 42 at ¶ 5).[19] According to Plaintiff, these representations convey to consumers that "the Products are free from artificial ingredients like PFAS." (*Id.* at ¶ 53). But even assuming the Product does contain PFAS, no reasonable consumer would understand these statements to mean that the Product is free from trace amounts of PFAS—PFAS chemicals are not ingredients at all.

---

[18] Plaintiff's AML and negligence *per se* claims are alternatively based on the alleged adulteration of the Product. That formulation of the claims also fails, as discussed in **Section III**.

[19] Plaintiff refers to other statements from advertisements and marketing materials intermittently throughout the Complaint, such as the statement there's "nothing to hide" on the Simply brand website, a "Say Yes to Simple" digital marketing campaign, and the statement "Nothing less than 100% quality and safety is acceptable" from The Coca-Cola Company's website. (Dkt. 42 at ¶¶ 31, 32, 85). None of these other statements from marketing materials add anything to Plaintiff's claims. First, he does not identify these particular statements as statements he viewed prior to his purchase and on which he then relied, *see Brown v. COTY, Inc.*, No. 22-cv-2696, 2023 U.S. Dist. LEXIS 54316, at *10 (S.D.N.Y. Mar. 29, 2023), and instead vaguely claims that he saw "marketing materials of his Product, including those set out herein" prior to his purchase. (Dkt. 42 at ¶ 127). Second, these other statements are broad, vague, and commendatory, and are thus mere puffery. *Brown*, 2023 U.S. Dist. LEXIS 54316, at *10-11. Third, Plaintiff does not claim that these statements convey a message different from the label.

This is precisely the conclusion the court reached in *Richburg*, where plaintiffs alleged that the presence of PFAS rendered defendant's statements that its popcorn products contained "only real ingredients" and "100% ingredients from natural sources" false or misleading. 2023 U.S. Dist. LEXIS 21137, at *20. The court found it was "implausible" that consumers would consider PFAS to be "ingredients" and interpret the statements to mean the popcorn products were PFAS-free. *Id.* at *22-23. In doing so, the court emphasized that FDA itself does not treat "[s]ubstances migrating to food from equipment or packaging" as food ingredients, specifically exempting such migratory substances from federal regulations requiring ***ingredients*** to be listed on a product label. *Id.* (citing 21 C.F.R. § 101.100(a)(3)(iii)).[20] Reasonable consumers would not interpret "ingredients" to mean incidental, migratory substances that FDA does not require manufacturers to include on a product label, so "the representation on the packaging [was] correct as a matter of law." *Id.* at *23.[21]

The glyphosate line of cases is similarly on point. In those cases, as here, the plaintiffs attacked the defendants' "all natural" labeling statements as misleading because the challenged products contained trace amounts of a contaminant (pesticides or herbicides). The courts repeatedly rejected that theory of deception. In *Axon v. Citrus World, Inc.*, the court held it was not misleading to call the product "natural" because "[g]lyphosate . . . is not an 'ingredient' added to defendant's products; rather, it is a substance introduced through the growing process."

[20] Similarly, to the extent Plaintiff alleges that PFAS were present in the water used as an ingredient in the Product, FDA does not consider trace chemicals present in water to be "ingredients." For example, the standard of identity for bottled water states that it may not contain any "added ingredients" but then also sets limits for the permissible amount of "chemical substances" that might be present. *See* 21 C.F.R. § 165.110.

[21] Coca-Cola's alleged omission of a disclosure statement identifying PFAS in the Products also would not deceive a reasonable consumer. No reasonable consumer would expect a food product to disclose a substance that FDA expressly exempts from disclosure.

354 F. Supp. 3d 170, 173 (E.D.N.Y. 2018), *aff'd sub nom. Axon v. Florida's Nat. Growers, Inc.,* 813 F. App'x 701 (2d Cir. 2020). In *Parks v. Ainsworth Pet Nutrition, LLC*, the plaintiff asserted that the "natural"-labeled products "contain trace amounts of glyphosate, but not that the Products are composed of unnatural ***ingredients***"—moreover, "a reasonable consumer would not be so absolutist as to require that 'natural' means there is no glyphosate, even an accidental and innocuous amount, in the Products." 377 F. Supp. 3d 241, 247 (S.D.N.Y. 2019) (emphasis added); *see also In re Gen. Mills Glyphosate Litig.*, No. 16-cv-2869, 2017 U.S. Dist. LEXIS 108469, at *16 (D. Minn. July 12, 2017) (finding reasonable consumer would not believe even a product labeled as having one ingredient—100% Natural Oats—could not contain a trace amount of glyphosate); *Hawyuan Yu v. Dr Pepper Snapple Grp., Inc.*, No. 18-cv-06664, 2020 U.S. Dist. LEXIS 185322, at *9-10 (N.D. Cal. Oct. 6, 2020). As these cases demonstrate, as a matter of law, consumers would not interpret the term "ingredient" as referring to PFAS (an incidental chemical that could migrate into a food product or water source) and would not interpret "all natural" to mean utterly free of trace amounts of chemicals like PFAS.

### III. Plaintiff's Claim Under New York's Agriculture & Markets Law Fails Because That Statute Does Not Contain a Private Right of Action and the Presence of Trace Amounts of PFAS Does Not Render a Product Adulterated or Misbranded

Plaintiff purports to assert a claim under § 199-a of New York's AML, which prohibits the sale of food that "is adulterated or misbranded within the meaning of this article." As an initial matter, Plaintiff's claim fails because there is no private right of action under § 199-a of the AML (or any of the other AML sections referenced in the Complaint). As explained by a sister court in *Steele v. Wegmans Food Mkts.*, 472 F. Supp. 3d 47 (S.D.N.Y. 2020), the AML is generally "administered by a Commissioner who investigates and may sue for penalties." *Id.* at 49 (citing N.Y. Agric. & Mkts. Law § 35). Because only certain sections of the AML contain an express private right of action, "[n]o private civil actions can [otherwise] be inferred; the

legislature created such a right of action only when it wished to." *Id.* None of the AML sections

Plaintiff invokes (§ 199-a, § 200, or § 201) include a private right of action.[22]

Setting aside the fact that Plaintiff cannot privately enforce § 199-a of the AML, Plaintiff

fails to adequately allege that the Product is "adulterated" or "misbranded" within the meaning of

that law.[23] According to Plaintiff, the Product is adulterated "because it contains PFAS which is

undisputedly a deleterious substance." *Id.* at ¶ 1899 But, under the AML (and the like-worded

FDCA), food shall be deemed adulterated if it bears or contains "any poisonous or deleterious

substances ***which may render it injurious to health***." N.Y. Agric. & Mkts. Law § 200 (emphasis

added); *see also* 21 U.S.C. § 342(a)(1) (containing identical language). The "may render"

standard has been interpreted to mean that there is a "reasonable possibility of injury to the

consumer." *United States v. Anderson Seafoods, Inc.*, 622 F.2d 157, 159 (5th Cir. 1980).

Here, Plaintiff falls well short of establishing that there is a "reasonable possibility of

injury" resulting from the PFAS (if any) in the Product. As discussed above, Plaintiff generally

claims that PFAS chemicals have been "associated" with a variety of negative health effects that

"could" occur. (Dkt. 42 at ¶ 39, 61). But he never alleges sufficient facts to connect the actual

PFAS allegedly in the Products to any disease, injury, or harmful health condition that is

reasonably likely to occur. And he never alleges any baseline above which ingestion of PFAS

(and particularly the specific types of PFAS allegedly in the Products) would lead to a reasonable

possibility of injury, instead relying on inapposite and inapplicable lifetime drinking water

advisory guidelines. Finally, he does not even plead that ***he*** was physically injured by consuming

---

[22] Even Plaintiff appears to recognize that he "lacks a private right of action under Section 199-a." (Dkt. 42 at ¶ 196).

[23] In claiming that the Product is misbranded, Plaintiff proceeds under subsection (1) of AML § 201, which provides food is misbranded if "its labeling is false or misleading in any particular." N.Y. Agric. & Mkts. Law § 201(1). Because Plaintiff's mislabeling allegations are addressed above, this Section focuses on Plaintiff's claim that the Product is adulterated.

any Product, further undermining any contention that the possibility of injury is reasonable here.

Plaintiff nevertheless suggests that any amount of PFOA in the Product renders it adulterated. That is incorrect. The presence of PFOA (or any other PFAS) in a food product does not automatically render the food adulterated, and FDA has not set any specific level at which PFAS/PFOA will be considered to have adulterated a food. Instead, when FDA finds a detectable level of PFAS during its testing, "the agency conducts an assessment to evaluate whether the level detected presents a possible human health concern and warrants further FDA action" (RJN, Ex. D)—an approach consistent with the statutory scheme and the "reasonable possibility of injury" requirement. For example, in 2022, FDA tested 81 samples of seafood and found that 60 of the 81 of samples had detectable levels of at least one type of PFAS. *Id.* But the agency only found that one set of the tested samples—canned clams from China—posed a likely health concern, due to PFOA exposure. *Id.* "Except for canned clams from China, [FDA] determined that none of the other PFAS exposures . . . [were] likely to be a human health concern." *Id.* Those canned clams were found to have **over 20,000 ppt of PFOA**, as compared to the roughly **0.4 ppt of PFOA** allegedly in the Simply Tropical Product here. RJN, Ex. E, at PDF p. 9. Meanwhile, other seafood products, which FDA concluded did not pose a likely health concern, contained amounts as high as 100 ppt, 300 ppt, and even 500 ppt of PFOA. *See id.* Plaintiff's position that a product that contains trace amounts of PFOA (a fraction of a part-per-trillion) is adulterated simply cannot be squared with FDA's decision that food products with 100-500 ppt of PFOA are unlikely to be human health concerns and do not require agency action.

Because Plaintiff has no private right of action under the AML, has not made out a claim for mislabeling, and has not plausibly alleged that the presence of trace amounts of PFAS may render the Products injurious to health and thus adulterated, Plaintiff's AML claim fails.

**IV.    Plaintiff's Omission-Based Claims Are Preempted and Also Fail Because Plaintiff Has Not Plausibly Alleged Coca-Cola Was Aware of the Presence of PFAS**

Plaintiff's GBL omissions claims fail for additional reasons. ***First***, they are preempted by the Nutrition Labeling & Education Act ("NLEA")—a 1990 amendment to the FDCA—which includes a broad express preemption provision directing that "no State or political subdivision of a State may directly or indirectly establish . . . any requirement for . . . labeling of food . . . that is not identical to the requirement[s]" imposed by federal law. 21 U.S.C. § 343-1(a)(2). The phrase "'[n]ot identical to' does not refer to the specific words in the requirement but instead means that the State requirement directly or indirectly imposes obligations or contains provisions" that are "not imposed by or contained in" or that "[d]iffer from those specifically imposed by or contained in" the statute or the FDA's implementing regulations. 21 C.F.R. § 100.1(c)(4). Accordingly, a plaintiff cannot use state law causes of action to attempt to hold a defendant liable for failing to provide disclaimers or disclosures that are not required by the FDCA—even if those disclaimers would be consistent with the requirements of the FDCA. *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 427 (7th Cir. 2011) ("[C]onsistency is not the test; identity is.").

While the FDCA generally mandates that food products with more than one component display an "ingredient" list on their packaging, *see* 21 U.S.C. § 343(i), under 21 C.F.R. § 101.100(a)(3)(iii) FDA "exempts '[s]ubstances migrating to food from equipment or packaging' from compliance with this regulation, meaning that they do not need to be included in the ingredient list." *Richburg*, 2023 U.S. Dist. LEXIS 21137, at *22. Other courts have found preemption under 21 C.F.R. § 101.100 where plaintiffs sought to require disclosure of other incidental additives. *See In re Bisphenol-A Polycarbonate Plastic Prods. Liab. Litig.*, No. 1967, 2009 U.S. Dist. LEXIS 104451, at *39 (W.D. Mo. Nov. 9, 2009) ("Plaintiffs' claims are expressly preempted because they would impose disclosure requirements concerning BPA, the

exact opposite of the exemption § 343(i)(2) permits."); *Lateef v. Pharmavite LLC*, No. 12-cv-5611, 2012 U.S. Dist. LEXIS 152528, at *9 (N.D. Ill. Oct. 24, 2012). Because Plaintiff's omission-based claims here would require a disclosure or disclaimer that is not identical to the labeling requirements under federal law, those claims are likewise preempted.

**Second**, Plaintiff has failed to plausibly allege that Coca-Cola was aware of the presence of PFAS in the Products. To state an omissions-based GBL claim, Plaintiff must allege the business alone possesses material information that is relevant to the consumer and fails to provide this information. *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 241, 244 (S.D.N.Y. 2022) (dismissing GBL claims where allegations showed at most that Pfizer **may** have known that its medication was **at risk** of contamination, not that Pfizer had affirmative knowledge); *Ohanian v. Apple Inc.*, No. 20-cv-5162, 2022 U.S. Dist. LEXIS 48740, at *5 (S.D.N.Y. Mar. 18, 2022) (analysis applies to GBL § 349 and § 350 claims). "The key, of course, is that the defendant 'possess' the information that the plaintiff claims it improperly withheld." *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016).

Here, Plaintiff's entire basis for claiming Coca-Cola had knowledge the Products contain PFAS is that "the inclusion of PFAS in the Products was detectable" and "[t]here are steps that Defendant can take to reduce or eliminate PFAS chemicals." (Dkt. 42 at ¶¶ 72-73). But the mere "*opportunity* to learn about [an] alleged defect," or alleged contamination of a product through testing, does not necessarily mean that a manufacturer "*did* learn about the defect" or contamination. *DeMaria v. Nissan N. Am., Inc.*, No. 15-cv-3321, 2016 U.S. Dist. LEXIS 11295, at *34 (N.D. Ill. Feb. 1, 2016). This is particularly true where Plaintiff has not alleged that testing for PFAS is standard in the food and beverage industry, that such testing is required by any state or federal agency, or that the testing or "mitigation efforts" Plaintiff vaguely references can be

feasibly implemented on a commercial scale. As a result, Plaintiff has not plausibly alleged Coca-Cola was in possession of information about the alleged presence of PFAS in the Products. To hold otherwise would essentially foist an affirmative requirement on all manufacturers to disclose the presence of any substance that can be conceivably detected through testing, whether or not such testing was required, industry-standard, or actually performed. That result is clearly untenable and Plaintiff cannot proceed on his omissions-based GBL claims.

## V.    Certain Remaining Claims Also Fail for Additional, Independent Reasons

Although the previously discussed pleading defects require dismissal in full, there are additional reasons to dismiss certain of Plaintiff's claims.

**GBL §§ 349, 350.** To state a GBL claim, Plaintiff must "allege facts establishing materiality." *Bildstein v. MasterCard Int'l, Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004). Information is material if it "is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Id.* Here, Plaintiff's conclusory allegations of materiality (*e.g.*, Dkt. 42 at ¶¶ 87, 95, 128, 166, 176) are implausible because he fails to allege the Product causes, or even creates a credible risk of, tangible physical harm. *See Parks*, 377 F. Supp. 3d at 248 ("The presence of negligible amounts of glyphosate in a dog food product that do not have harmful, 'toxic,' or 'carcinogenic' effects is not likely to affect consumers' decisions in purchasing the product and is thus not material."); *Herrington*, 2010 U.S. Dist. LEXIS 90505, at *29 (failure to disclose presence of potential carcinogens was not actionable under the objective test for materiality because plaintiffs did not aver facts "that show that the levels of these substances caused them or their children harm").

**Negligence *Per Se.*** Plaintiff's negligence *per se* claim is based on alleged violations of the FDCA and AML—i.e., that the Products are "adulterated" or "misbranded" under those statutes. (*See* Dkt. 42 at ¶¶ 193-196). As discussed above, the Products are neither adulterated

nor misbranded, so this claim fails. In addition, the negligence *per se* claim predicated on the AML fails because, as discussed above, there is no private right of action under the AML. "[A] decision to allow such a claim would effectively afford a private right of action that the statute does not recognize—contravening the legislative scheme." *Rider v. Uphold HQ Inc.*, No. 22-cv-1602, 2023 U.S. Dist. LEXIS 29617, at *19 (S.D.N.Y. Feb. 22, 2023). Finally, the negligence *per se* claim is barred by the economic loss doctrine. *Black Radio Network, Inc. v. NYNEX Corp.*, No. 96-cv-4138, 2000 U.S. Dist. LEXIS 594, at *9-11 (S.D.N.Y. Jan. 25, 2000) (citation omitted). This rule applies to negligence *per se* claims. *Vitolo v. Dow Corning Corp.*, 234 A.D.2d 361, 363 (N.Y. App. Div. 2nd Dept. 1996).

**Unjust Enrichment.** Plaintiff's unjust enrichment claim fails as "merely duplicative" of all of his other claims. *Warren v. Coca-Cola Co.*, No. 22-cv-6907, 2023 U.S. Dist. LEXIS 70494, at *24 (S.D.N.Y. Apr. 21, 2023).

**Injunctive Relief.** Finally, Plaintiff lacks standing to seek injunctive relief because, even if he was deceived in the past, he will make any future purchases "with exactly the level of information" he had from the beginning of this lawsuit. *Berni v. Barilla S.P.A.*, 964 F.3d 141, 148 (2d Cir. 2020). Thus he does not face any imminent threat of future deception.

## CONCLUSION

For these reasons, Coca-Cola respectfully requests that the Court dismiss Plaintiff's SAC in its entirety with prejudice.

DATED: September 5, 2024        */s/ Angela M. Spivey*
                                *Attorney for Defendants*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served

on Plaintiff's counsel on September 5, 2024.

*/s/ Angela M. Spivey*