```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPH LURENZ, individually and on behalf of all others similarly situated,

                          Plaintiff,

-against-

THE COCA-COLA COMPANY and THE SIMPLY ORANGE JUICE COMPANY,

                         Defendants.

22 CV 10941 (NSR)

**OPINION & ORDER**

---

NELSON S. ROMÁN, United States District Judge:

    Plaintiff Joseph Lurenz ("Plaintiff") brings this action, on behalf of himself and all others similarly situated, against Defendants the Coca-Cola Company and the Simply Orange Juice Company (collectively, "Defendants"), for (1) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349, *et seq*; (2) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 350, *et seq*; (3) violation of the New York State Agriculture & Markets Law § 199-a; (4) negligence *per se*; and (5) unjust enrichment.[1] (*See* Second Amended Complaint ("SAC"), ECF No. 42.)

    Defendants move to dismiss Plaintiff's SAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ("Motion," ECF No. 50.) Because Plaintiff has failed to meet his "burden of demonstrating that [he has] standing," the Court grants Defendants' Motion and dismisses the SAC with prejudice. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31

---

[1] The Court notes that Plaintiff asserted claims for breach of warranty express, fraud, and constructive fraud in paragraph 12 of his SAC, but failed to include these claims in the enumerated counts in the SAC (¶¶ 163-198). The Court assumes the reference to these claims in paragraph 12 was in error and deems these claims abandoned.

1

(2021). Having determined that Plaintiff lacks standing, the Court does not reach the merits of the claims.

## BACKGROUND

### I. Factual Background

The following facts are taken from the SAC and assumed to be true for Defendants' motion.

Plaintiff alleges that Defendants formulate, manufacture, market, and sell Simply juice drinks (the "Products").[2] (SAC ¶¶ 1, 5.) Plaintiff contends that the Products are incorrectly advertised as "All Natural" juice drinks that are "made simply" with "all-natural ingredients" because Plaintiff's "independent testing" found that the Products, in fact, contain "PFAS," a category of man-made chemical compounds. (*Id.* ¶¶ 5, 10.) Plaintiff asserts that PFAS "are associated with numerous health concerns." (*Id.* ¶ 10.)

Plaintiff relied on an independent third-party, Enalytic Analytical Testing Laboratory ("Enalytic") in Syracuse, New York, for three separate tests of the Products: (1) testing in February 2023 on "samples collected in July 2022" (presumably from the Simply Tropical product line) (*Id.* ¶¶ 57-58); (2) testing in February 2023 of nine other of Defendants' product lines: Simply Limeade, Simply Apple, Simply Light, Simply Watermelon, Simply Grapefruit, Simply Cranberry Cocktail, Simply Peach, Simply Lemonade, and Simply Fruit Punch (*Id.* ¶ 65); and (3) testing in July 2024 on six other of Defendants' product lines: Simply Light Orange, Pulp Free; Simply Orange, Pulp Free; Simply Orange, Low Acid, Pulp

---

[2] Plaintiff defines "Products" to include the following 16 different Simply product lines: Simply Tropical; Simply Light Orange, Pulp Free; Simply Orange, Pulp Free; Simply Orange, Low Acid, Pulp Free; Simply Orange with Mango, Pulp Free; Simply Orange, Medium Pulp; Simply Orange, High Pulp; Simply Limeade; Simply Apple; Simply Light; Simply Watermelon; Simply Grapefruit; Simply Cranberry Cocktail; Simply Peach; Simply Lemonade; and Simply Fruit Punch.

Free; Simply Orange with Mango Pulp Free; Simply Orange, Medium Pulp; and Simply Orange, High Pulp. (*Id.* ¶ 68.) Plaintiff claims the February 2023 testing on the Simply Tropical samples "was performed in accordance with accepted industry standards for detecting the presence of PFAS." (*Id.* ¶ 57.) Plaintiff does not claim to have purchased any of the products in the second February 2023 testing, but claims that the July 2024 testing included two Products "actually purchased by Plaintiff." (*Id.* ¶ 69.)

Plaintiff claims that all three tests detected "material" and "significant" levels of PFAS in each of the tested products. (*Id.* ¶¶ 58, 66, 68.) Plaintiff contends "reasonable consumers purchasing Products represented as natural would not expect them to contain…PFAS" and alleges economic injury because he "paid a premium, or otherwise paid more for the Products" that were allegedly misbranded as all-natural. (*Id.* ¶¶ 38, 152.) Plaintiff does not claim that he or anyone else was physically harmed as a result of consuming the Products.

Based on the foregoing facts, Plaintiffs bring the following claims: (1) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349, *et seq*; (2) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 350, *et seq*; (3) violation of the New York State Agriculture & Markets Law § 199-a; (4) negligence *per se*; and (5) unjust enrichment.

## II.   Procedural History

Plaintiff filed the initial Complaint on December 28, 2022. ("Initial Complaint," ECF No. 1.) Defendants initially sought leave on May 22, 2023 to bring a motion to dismiss the Initial Complaint. (ECF No. 18.) Plaintiff responded on May 25, 2023 opposing leave and informing the Court that he would avail himself of his right to amend as a matter of course

3

pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). (ECF No. 20.) The Court, *inter alia*, directed Plaintiff to file an Amended Complaint. (ECF No. 23.) Plaintiff then filed the Amended Complaint on July 17, 2023. (ECF No. 25.) After full briefing by the parties, on June 10, 2024, the Court granted Defendants' motion to dismiss Plaintiff's Amended Complaint, without prejudice, and granted Plaintiff's request for leave to file a SAC. ("Order", ECF No. 41.)

On July 10, 2024, Plaintiff filed his SAC. (ECF No. 42.) On September 5, 2024, Defendants filed their motion to dismiss and memorandum of law in support thereof ("Defs.' Mem. of Law," ECF Nos. 50-51). On October 21, 2024, Plaintiff filed an opposition to Defendants' motion. ("Pl. Opp'n," ECF No. 53.) On November 18, 2024, Defendants filed a request for judicial notice (ECF No. 52) and a reply in support of their motion to dismiss. ("Defs.' Reply," ECF No. 54.) On November 25, 2024 and on August 12, 2025, Plaintiff and Defendants, respectively, submitted notices of supplemental authority to the Court. (ECF Nos. 55, 58.)

## LEGAL STANDARD

### I.   Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") provides, in relevant part, that a case is properly dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. When resolving a Rule 12(b)(1) motion for lack of subject matter jurisdiction, the court may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1010-11 (2d Cir. 1986). Plaintiff bears the burden of demonstrating by a preponderance of the evidence that subject matter jurisdiction exists. *See Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996).

4

## II.     Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ... and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

## I.     Defendants' Request for Judicial Notice

In support of their Motion, Defendants submitted the following five documents as

exhibits: (a) EPA webpage titled, "Per- and Polyfluoroalkyl Substances (PFAS): Final PFAS National Primary Drinking Water Regulation" (July 12, 2024); (b) EPA webpage titled, "Past PFOA and PFOS Health Effects Science Documents" (May 16, 2024); (c) EPA's PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies (Apr. 2024); (d) FDA webpage titled "Testing Food for PFAS and Assessing Dietary Exposure" (Apr. 18, 2024); and (e) results of FDA study titled "Analytical Results for PFAS in 2022 Seafood Survey (Parts Per Trillion)" (July 2022) (collectively, "Exhibits A-E," ECF No. 58).

"In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993) (alteration omitted)). "Courts may take judicial notice of public documents or documents of public record" in addition to "records of administrative bodies," such as government agencies like the U.S. Food and Drug Administration ("FDA") and the U.S. Environmental Protection Agency ("EPA"). *Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018). Exhibits A-E are publicly available documents on the websites of the FDA and the EPA. Accordingly, the Court grants Defendants' request for judicial notice of Exhibits A-E for the fact of their existence but not for the truth of the information contained therein.

## II.     Article III Standing

A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and is properly brought under Fed. R. Civ. P. 12(b)(1). *See Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016); *see*

*also Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 44 (2d Cir. 2015) (standing is "threshold matter" in determining a district court's jurisdiction to hear the case). In the class action context, plaintiff, as the party invoking federal jurisdiction, "bear the burden of demonstrating that [he has] standing." *Hicks v. L'Oreal U.S.A., Inc.* ("Hicks II"), No. 22 CIV. 1989 (JPC), 2024 WL 4252498, at *8 (S.D.N.Y. Sept. 19, 2024) (quoting *TransUnion*, 594 U.S. at 430). When determining a motion to dismiss an action for lack of subject matter jurisdiction, the Court must accept all factual allegations pled in the complaint as true. *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).

When faced with a motion asserting a combination of Rule 12(b) defenses, as Defendants do in the instant action, the Court must first resolve any jurisdictional challenges, such as whether Plaintiff has standing, before addressing whether the Complaint sufficiently states a claim. *Lurenz v. Coca-Cola Co.*, No. 22 CIV. 10941 (NSR), 2024 WL 2943834, at *2 (S.D.N.Y. June 10, 2024) (quoting *Hernandez v. Wonderful Co. LLC*, No. 23-CV-1242 (ER), 2023 WL 9022844, at *4 (S.D.N.Y. Dec. 29, 2023)).

To demonstrate Article III standing, a plaintiff must establish (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) redressability of the injury by a "favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id*. at 560 (internal quotations omitted). In a potential class action, the named class plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502

7

(1975). To establish an injury for Article III standing, parties might successfully allege an economic injury through a theory of price-premium injury or through the benefit-of-bargain theory. *See In re Beech-Nut Nutrition Co. Baby Food Litig.* ("In re Beech-Nut"), 771 F. Supp. 3d 96, 103 (N.D.N.Y. Mar. 19, 2025).

Here, Plaintiff alleges he "did not obtain the full value of the advertised Products" (i.e., did not receive the benefit of his bargain) and "paid more" (i.e., paid a price premium) for the Products than he would have had he known that the Products contained PFAS. (SAC ¶ 102.) Because Plaintiff invokes both theories of injury, the Court will address both in turn.

### III. Price-Premium Injury

To establish an economic injury under a price-premium theory, a plaintiff must allege that "[they] purchased products bearing allegedly misleading labels and sustained financial injury—paying a premium—as a result." *Axon v. Florida's Natural Growers, Inc.*, 813 F. App'x 701, 703-04 (2d Cir. 2020). More specifically, Plaintiff must plead that he "either purchased adulterated products or that PFAS was so widespread that it was plausible that either specific product lines or all of the defendant's products contained PFAS." *Lurenz*, 2024 WL 2943834, at *3. Plaintiff fails to do either.

#### A. Plaintiff Does Not Plausibly Allege That He Purchased Products Containing PFAS

Here, where Plaintiff relies on testing to support allegations of misbranding, "[t]he most direct route would be for Plaintiff[] to test [his] own purchases for PFAS." *Onaka v. Shiseido Ams. Corp.* ("Onaka II"), No. 21 Civ. 10665 (PAC), 2024 WL 1177976, at *2 (S.D.N.Y. Mar. 19, 2024). Yet, despite claims that independent testing revealed presence of

PFAS in the products tested, Plaintiff fails to establish that the products tested were the *actual physical* Products he had purchased.

Plaintiff claims Enalytic first conducted independent testing in February 2023 on "samples collected in July 2022." (SAC ¶ 57.) Not only does Plaintiff not clarify what Product line the samples came from (although the Court assumes from paragraph 58 of Plaintiff's SAC that the samples were of Simply Tropical), Plaintiff also does not clarify if the samples tested were from an actual physical Simply Tropical product Plaintiff had purchased or if they were samples from unpurchased products within Defendants' Simply Tropical product line. Plaintiff claims that, also in February 2023, Enalytic conducted additional testing on nine other products, but does not claim anywhere in the SAC to have purchased any of those tested products. (*Id.* ¶ 65.) Lastly, Plaintiff claims that, in July 2024, Enalytic conducted further testing on yet six other product lines "that included two products actually purchased by Plaintiff." (*Id.* ¶ 69.) Similarly, here, and as stated in Defs.' Mem. of Law, "it is unclear if [Plaintiff meant] that he obtained samples from his own physical purchases or if he just purchased Products from the tested product lines." (Defs.' Mem. of Law at 7.) Further, even if the Court assumed that the tested samples collected in July 2022 that tested positive for PFAS were from Plaintiff's physical purchases, Plaintiff's allegations still do not establish standing. Plaintiff does not explain the seven-month gap between when the samples were collected in July 2022 and when the testing occurred in February 2023. Thus, Plaintiff has failed to "plausibly allege that he purchased a Product that was misbranded, i.e., that contained PFAS," because the samples plausibly could have been PFAS-free when collected and contaminated with PFAS long after collection through no fault of Defendants. *Lurenz*, 2024 WL 2943834, at *3.

9

Moreover, beyond simply identifying the laboratory and the Product lines tested, Plaintiff does not aver any facts supporting Enalytic's testing. (*See generally* SAC.) Plaintiff does not clarify, *inter alia*, whether the samples tested were from Plaintiff's actual physical purchases or simply from Defendants' product lines, when the samples for the February 2023 testing of the nine products and for the July 2024 testing were collected, how many samples were collected and tested for each product line tested, and whether all tested samples tested positive for PFAS. *See Hicks v. L'Oreal U.S.A., Inc.* ("*Hicks I*"), No. 22 CIV. 1989 (JPC), 2023 WL 6386847, at *8 (S.D.N.Y. Sept. 30, 2023) (finding that plaintiffs had not adequately pleaded that the products they purchased contained PFAS because, among other things, "[t]he Amended Complaint [did] not allege, for instance, how many products were tested in Plaintiffs' Study, whether all those tested products revealed the presence of PFAS, and if not, what percentage of the products had PFAS.") Absent specific facts concerning the various tests, the Court cannot conclude that the presence of PFAS in the tested Products was anything more than a "sheer possibility." *Esquibel v. Colgate-Palmolive Co.*, No. 23-CV-00742-LTS, 2023 WL 7412169, at *2 (S.D.N.Y. Nov. 9, 2023) (citing *Iqbal*, 556 U.S. at 678.) "While the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Baur v. Veneman*, 352 F.3d 625, 636–37 (2d Cir. 2003).

Further, the Court notes that, by Plaintiff's own allegations, Enalytic conducted its February 2023 test two months *after* Plaintiff filed his Initial Complaint in December 2022. Similarly, while Plaintiff does not specify when the samples tested in July 2024 were collected, to the extent Plaintiff is claiming that these samples were from Products Plaintiff physically purchased around that time, those purchases would have also occurred

approximately nineteen months after Plaintiff filed his Initial Complaint, by then with the benefit of this Court's Order highlighting the deficiencies in his first Amended Complaint. (*See generally* Order, ECF No. 41.) "[A] plaintiff may not establish injury for standing purposes based on a self-inflicted injury." *Nat. Res. Def. Council Inc. v. U.S. Food and Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) (internal quotations omitted). If Plaintiff purchased the Products after the commencement of this litigation, then he was aware by then that the Products' labeling representations and advertising did not convey anything about PFAS, and so Plaintiff could not have been misled. A plaintiff that self-inflicts his alleged injury solely to manufacture standing for litigation does not have standing.

### B. Plaintiff Does Not Plausibly Allege a Material Link Between His Purchase and the Independent Testing

Since Plaintiff did not plausibly allege that he purchased products containing PFAS — the most direct route to establish Article III standing under the price-premium theory — he may still attempt to allege the presence of PFAS by "sufficiently link[ing] the results of independent testing of the same product line to the product actually purchased." *Hicks II*, 2024 WL 4252498, at *9. To provide a sufficient link, Plaintiff must allege facts "from which the Court could extrapolate that [his] isolated testing should apply broadly to Defendant[s'] Products." *Onaka v. Shiseido Americas Corp.* ("Onaka I"), No. 21-CV-10665-PAC, 2023 WL 2663877, at *5 (S.D.N.Y. Mar. 28, 2023).

The Court considers a variety of factors to determine whether a meaningful link exists between the results of testing and a plaintiff's actual purchases to permit a plausible inference of injury. First, and perhaps most important, Plaintiffs must establish the test occurred "reasonably near in time" to their purchases. *Onaka II*, 2024 WL 1177976, at

11

\*3 (finding no injury absent information about "when exactly [Plaintiff] purchased each particular [product]" even though plaintiffs alleged purchase occurred "in September 2021" and the testing took place in "September or October of 2021"). Second, the Court will look to whether a plaintiff "regularly purchased" the product and whether they alleged facts that such product was "systematically and routinely mislabeled." *See John v. Whole Foods Mkt. Grp., Inc.,* 858 F.3d 732, 735-37 (2d Cir. 2017) (holding that the plaintiff plausibly alleged injury based on regular monthly purchases at two named locations during the same period a state investigation found systematic overcharging occurred nearly 90% of the time). Third, the Court will also consider "the number of samples tested, and the testing should involve more than a small number" and, to the extent relevant, "geographic proximity of the testing to the plaintiff's purchases." *Hicks II*, 2024 WL 4252498, at \*10 (collecting cases); *see also Dunning v. Supergoop, LLC*, No. 23 CIV.11242 (JPC), 2025 U.S. Dist. LEXIS 4427, 2025 WL 34822, at \*5 (S.D.N.Y. Jan. 6, 2025) (quoting *Hicks II*, 2024 WL 894965, at \*10).

      Plaintiff fails to sufficiently link the results of his third-party tests to his purchased Products. First, as already discussed above, the third-party testing in February 2023 is not reasonably near in time to when Plaintiff made his purchases because Plaintiff alleges the samples tested were collected in July 2022. (SAC ¶ 57.) The same is true for the February 2023 test of the nine other Products and the July 2024 test because Plaintiff did not clarify when the samples for each of those tests were collected and whether the samples were from physical Products Plaintiff had purchased around the time of the tests.

      Next, Plaintiff does not allege facts from which the Court could find that his third-party testing should apply generally to all of Defendants' Products. Plaintiff does not plead any facts concerning the frequency with which he bought the Products nor any facts

concerning where and when the Products were bought. Plaintiff simply alleges that he purchased Defendants' Products "numerous times from various retailers in Dutchess County, New York," including but not limited to, Simply Tropical, Simply Orange, Pulp Free, and Simply Orange with Mango, Pulp Free. (*Id.* ¶ 126.) Without additional information beyond having purchased the Products "numerous times" or about the frequency with which Plaintiff bought the several other Product lines that were tested, the Court cannot infer that Plaintiff "regularly purchased" the Products. Even assuming Plaintiff did regularly purchase the Products, as explained above, there was no temporal proximity between the dates of purchase and the testing. Plaintiff attempted to establish the "widespread contamination of Defendants' Products" by conducting testing on several of Defendants' product lines, but as explained, Plaintiff provided insufficient detail concerning the methodology and results of the tests. (*Id.* ¶ 68.) Consequently, Plaintiff does not adequately allege that "the presence of PFAS in the [P]roducts is so widespread as to render it plausible that…Plaintiff purchased a mislabeled [P]roduct at least once." (*Onaka I*, 2023 WL 2663877, at *5.)

      Finally, Plaintiff fails to plead sufficient facts concerning the geographic proximity between the Products and the number of samples tested. While Plaintiff alleges that he purchases the Products in Dutchess County, New York, which is geographically proximate to Enalytic's laboratory in East Syracuse, New York, as explained, it is unclear from Plaintiff's allegations whether he obtained the tested samples from his own physical purchases or if Plaintiff simply purchased Products from the tested product lines. Plaintiff does not provide identifying information — such as SKU numbers or lot codes — that would indicate where the tested products were purchased or obtained. In other words, while it may be true that Plaintiff purchases the Products in Dutchess County for himself, the samples tested may have

13

been obtained elsewhere, including somewhere geographically distant from Enalytic's laboratory.

Because Plaintiff fails to establish a meaningful link between the geographically limited test results and the specific Products he purchased, the Court cannot reasonably infer that Plaintiff purchased misbranded Products or that PFAS was so widespread as to plausibly affect specific product lines or all of Defendants' Products. In the absence of such allegations, "[t]he [Second] Amended Complaint's allegations boil down to describing general and unspecific results of testing" insufficient to sustain Article III standing. *See Hicks I*, 2023 WL 6386847, at *9. Therefore, Plaintiff is unable to demonstrate he suffered injury pursuant to a price-premium theory as needed to sustain Article III standing.

### IV.  Benefit of the Bargain Injury

Having concluded Plaintiff's price-premium theory of injury cannot satisfy the Article III standing threshold, the Court turns now to Plaintiff's argument that he suffered an economic injury under the benefit of the bargain theory. (SAC ¶¶ 168, 177.) Under the benefit of the bargain theory, "a plaintiff might successfully plead an economic injury by alleging that she bargained for a product worth a given value but received a product worth less than that value." *In re Beech-Nut*, 771 F. Supp at 103 (quoting *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liability Litigation*, 903 F.3d 278, 283 (3d Cir. 2018)). Plaintiffs must identify the specific misrepresentations that induced purchase. *Id.*

### A.  Plaintiff Does Not Plausibly Allege How The Presence of PFAS Render The Products Worth Less Than What He Bargained For

The Second Circuit has recently applied the more stringent Third Circuit standard for benefit of the bargain theory. In *In re Beech-Nut*, a case involving substantially similar facts

as here, the court rejected plaintiffs' benefit of the bargain theory as a basis for Article III standing because they did not allege an injury that was either concrete or particularized. *Id.* at 105. Therein, the plaintiffs alleged that defendants branded their products (baby food) as "organic," "natural," "USDA-Certified Organic," "real food for babies," "nothing artificial added," "non-GMO," and "free from artificial preservatives, colors, and flavors." *Id.* Crucially, the *In re Beech-Nut* court found that the plaintiffs did not show that defendant's products was worth something less than safe and usable baby food. *Id.* Plaintiffs paid for safe and healthy baby food. *Id.* They did not allege how the presence of heavy metals specifically rendered defendant's representations of the baby food false or misleading. *Id.* Nor did they specifically "plea[d] that the goods failed to serve their intended purpose," which ultimately undermined their claim. *Id.* The *In re Beech-Nut* court noted that the plaintiffs' allegations — that the baby foods they purchased contained "unsatisfactory levels of heavy metals" — impermissibly asked the court to infer that the mere presence of heavy metals "rendered the food unsafe, unusable, and therefore, worthless." *Id.* Accordingly, the Second Circuit found this to be insufficient, stating that such allegations, made in a "conclusory manner" did not constitute an injury that was "either concrete or particularized." *Id.*

In the instant action, Plaintiff offers the same conclusory arguments that were dismissed in *In re Beech-Nut*. Like in *In re Beech-Nut*, where plaintiffs alleged that the defendants branded their food as "organic," and "natural" "real food for babies," Plaintiff alleges that Defendants marketed and advertised the Products as "all natural," "made simply with all-natural ingredients," and "naturally delicious." (SAC ¶¶ 5, 7.) As in *In Re Beech-Nut*, Plaintiff fails to allege that the Products are worth something less than advertised. (*See generally* SAC.) Plaintiff paid for fruit juice and received fruit juice, which he consumed

15

without suffering harm, as inferred by the fact that he claims to have suffered only economic injury and does not claim that he or anyone else was harmed by the consumption of the Products. Like the claims in *In re Beech-Nut*, Plaintiff's assertion that "[n]o reasonable consumer would consider Defendants' Products an 'all-natural' healthy juice drink if they knew that the Product contained harmful, artificial PFAS chemicals" is purely conclusory and unsupported by any accompanying facts. (*Id.* ¶ 99.) Plaintiff must identify "cheaper, comparable products to support the notion of a premium," but he fails to do so. *In Re Beech-Nut*, 771 F. Supp at 106. Plaintiff does not identify comparable, PFAS-free fruit juices that are cheaper than what he paid for Defendants' Products. Similarly to plaintiffs' allegations in *In re Beech-Nut* that the presence of heavy metals warranted the court inferring injury, Plaintiff here relies on broad claims of "significant levels of PFAS" without any factual support. (SAC ¶¶ 66, 68, 113.) Plaintiff's only factual allegation concerning the levels of PFAS detected in the tested Products is that the Simply Tropical Product tested "contains PFOA and PFAS in amounts more than 100 times the EPA's recommended levels." (*Id.* ¶ 64). As noted in Defs.' Mem. of Law, however, the EPA's "recommended levels" to which Plaintiff refers are lifetime health advisories for the concentration of PFAS in drinking water. (Defs.' Mem. of Law at 7.) Plaintiff does not plead facts concerning the levels of PFAS allegedly detected in the other tested Products nor does he explain how EPA's recommended levels concerning drinking water are relevant to fruit juice. In any event, the FDA, and not the EPA, is the federal agency governing food and drink regulation.

     Plaintiff cites *Sitt v. Nature's Bounty, Inc.* as an example of a case in which the plaintiff was found to have sufficiently pled that the labeling of defendant's product, a supplement, contained false or misleading statements that may have misled reasonable

16

customers. No. 15-CV-4199 (MKB), 2016 WL 5372794 (E.D.N.Y. Sept. 26, 2016). In that case, defendant manufactured and sold a supplement advertised as "natural," "non-synthetic," and made with "only the finest quality herbs and spices" when, in fact, the supplement was allegedly "contaminated with unsafe levels of lead" *Id.* at 1. The packaging of the product further claimed that the product "helps alleviate hot flashes, night sweats and mild mood changes," when, according to the plaintiff, "reliable studies" had demonstrated the contrary. *Id.* However, *Sitt v. Nature's Bounty, Inc.* is distinguishable in one fundamental way: Unlike in *Sitt v. Nature's Bounty, Inc.*, where the plaintiff raised various forms of alleged misrepresentation beyond just the product's ingredients, the Plaintiff in this case limited his claims solely to misrepresentations about the Product's ingredients. Plaintiff did not allege that Defendants advertised the Products as having functions they could not perform, nor did he claim that the Products failed to serve their intended purpose. Plaintiff purchased fruit juice for consumption, and he did, in fact, receive fruit juice that he consumed without harm.

     In sum, Plaintiff does not plausibly allege that the Products were worth less than what he paid for and, therefore, fails to establish a concrete and particularized injury under the price-premium theory of injury. Accordingly, Plaintiff's claims alleging that he paid more than what he bargained for due to alleged misrepresentation in the Products' ingredients fail Article III standing.

## CONCLUSION

     For the foregoing reasons, the Court concludes that Plaintiff failed to plead sufficient facts to make it plausible that he suffered the sort of injury that would entitle him to relief and Plaintiff lacks Article III standing. Accordingly, Defendants' motion to dismiss the

17

Second Amended Complaint is GRANTED and Plaintiff's claims are dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 50 and to terminate this action.

Dated: September 29, 2025
      White Plains, New York

SO ORDERED:

HON. NELSON S. ROMAN
UNITED STATES DISTRICT JUDGE